**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. ___________________

CLIFFORD TAYLOR,

Plaintiff,

v.

ARMOR CORRECTIONAL HEALTH SERVICES, INC.,
SHERIFF JUSTIN SMITH, in his individual and official capacities,
THE BOARD OF COUNTY COMMISSIONERS FOR THE COUNTY OF LARIMER,
CAPTAIN TIMOTHY PALMER,
AMANDA JARMAN,
DR. KEITH MCLAUGHLIN,
DAYLA COOK,
KYRA HARMON,
LYNETTE HOISINGTON,
ALEX MAHLOCH,
JESSINA MORSE,
LYNN SCHULTZ,
LEAH OAKLEY,
CAROLYN PEISERT,
CHEYENNE PALMER,
KATIE WENZEL, and
MICHELLE WILSON,

Defendants.

---

**CIVIL RIGHTS COMPLAINT AND JURY DEMAND**

---

Plaintiff Clifford Taylor, through his attorneys, Gail K. Johnson, Aurora L. Randolph, and Haley M. DiRenzo of Johnson & Klein, PLLC, hereby submits this Complaint alleging violations of his civil rights.

## I. INTRODUCTION

1. In March 2018, officials at the Larimer County Jail (LCJ) locked Clifford Taylor, then 26, in the LCJ after he was arrested for a DUI. Mr. Taylor—a welder, weightlifter, and avid outdoorsman—was remorseful and prepared to get back on his feet and move on with his life after his jail sentence.

2. In late 2017, several months before Mr. Taylor was incarcerated at the LCJ in March 2018, he had undergone serious surgery on his left forearm to repair injuries sustained from an all-terrain vehicle accident. Mr. Taylor had plates, other hardware, and an antibiotic spacer implanted in his left forearm. When Mr. Taylor arrived at the LCJ in 2018, he was still closely consulting with and working with a medical care team at Denver Health that was providing medical care and follow-up medical consultation about his arm. Knowing that his wounded arm still needed close attention, Mr. Taylor informed staff working at LCJ of his recent surgery and the need for care and follow up to ensure full recovery without further complications. Staff working at LCJ were aware of Mr. Taylor's arm wound and repeatedly noted in his LCJ medical records his recent surgery and hospitalization at Denver Health.

3. Very unfortunately for Mr. Taylor, the Board of County Commissioners for the County of Larimer (BOCC) and Larimer County Sheriff Justin Smith (collectively, Larimer County) had contracted with Armor Correctional Health Services, Inc. (Armor), to serve as the medical provider to prisoners and detainees at the LCJ.

4. Armor has a long and consistent record of putting its profits before the health and safety of the people in its care. In the 16 years since Armor's inception, dozens of individuals

incarcerated in jails where Armor provides care have died or suffered serious, permanent injury as a result of Armor's inadequate medical care.

5. Predictably, Armor and Larimer County's contractual relationship followed the trend of placing profit and cost savings over the health and safety of the individuals in their care, including Mr. Taylor.

6. Around May 2018, after Mr. Taylor started to experience pain, swelling, and itching in his post-surgical wound, Mr. Taylor began complaining to Armor and jail staff regarding a potential infection in the wound. Mr. Taylor repeatedly told these individuals that he had recently undergone a serious surgery and that his surgeon and medical team at Denver Health needed to be consulted about the condition of his arm. Staff working at LCJ ignored Mr. Taylor or told him to keep watch on the wound for more signs of infection. Neither Armor nor LCJ officials ever consulted his medical team at Denver Health, nor did they allow Mr. Taylor to be seen by Denver Health medical professionals for any follow-up appointments.

7. As months went by, Mr. Taylor—still locked in the LCJ—began to suffer from worsening pain, radiating heat, and a visible, purulent discharge coming from his wound. Mr. Taylor escalated his pleas for medical attention for what was clearly a worsening infection in his open wound. Mr. Taylor continued to tell LCJ staff and Armor medical providers that his surgeon and medical team at Denver Health needed to be consulted about the deteriorating condition of his arm. He begged for any type of outside medical help for his arm—or any medical help at all. The Armor medical providers at the LCJ merely gave Mr. Taylor a 10-day prescription for basic antibiotics and again told him to keep watch on the wound. None of them consulted Mr. Taylor's surgeon or medical team at Denver Health, nor any other outside

specialist, regarding Mr. Taylor's worsening infection. The antibiotics failed to address the deepening infection in Mr. Taylor's arm.

8. Around September 2018, after nearly six months of complaining to LCJ staff and Armor medical providers about the open wound and worsening infection in his arm, Mr. Taylor began experiencing severe pain and tenderness in his arm, oozing discharge, radiating heat, swelling, nausea, vomiting, sleeplessness, weight loss, anxiety, fevers, and chills. The deteriorating condition of his arm also caused Mr. Taylor severe emotional distress. Mr. Taylor reported all of these symptoms on a daily basis to Armor medical providers at the LCJ. Despite knowing about the months-long infection in Mr. Taylor's arm, Armor medical staff refused to contact his surgeon or to consult any outside medical professional regarding the proper treatment for his chronic and worsening infection. They did, however, clear him to provide cheap labor in the LCJ kitchen, where he worked making food for other prisoners at no cost to Larimer County when he wasn't too sick—*i.e.*, vomiting—to work.

9. In October 2018, when jail officials finally released Mr. Taylor from the LCJ to a halfway house, he immediately scheduled an appointment to see his medical team and surgeon at Denver Health for his infection. Seeing the terrible condition of his arm, Denver Health providers ordered an x-ray the very same day, which revealed that the permanent implants in his arm were loose, and the arm showed signs of chronic infection. Denver Health scheduled Mr. Taylor for a biopsy and surgery, and the biopsy revealed chronic osteomyelitis in multiple sites in his forearm. Osteomyelitis is a deep and severe infection of bone that requires infected portions to be completely removed from the body.

10. Mr. Taylor's infection that developed and went untreated for months at the LCJ resulted in osteomyelitis that loosened the plates that had been surgically implanted in 2017 and were meant to be permanent. Since being released from the LCJ, Mr. Taylor has had to undergo four surgeries to address the osteomyelitis that grew and persisted in his arm while Larimer County and Armor officials refused him proper medical care. Mr. Taylor has required multiple medical procedures since being released from the LCJ, including excisional irrigation and debridements, removal of implants, repair of numerous structures, soft tissue flap for soft tissue coverage, and long-term antibiotic treatment with multiple antibiotic cement-spacer placements. The pieces of bone impacted by Mr. Taylor's osteomyelitis have had to be surgically removed, thereby permanently shortening his left forearm.

11. As a result of the infection and subsequent procedures required to address it, Mr. Taylor's left forearm and hand are permanently injured, and his forearm is severely deformed. He has permanent limited function in his left forearm and left hand, and he is relegated to using it as a "helper hand." To date, Mr. Taylor's surgeon at Denver Health cannot be sure that the osteomyelitis in Mr. Taylor's arm has been completely eradicated. Mr. Taylor is still working with his medical team at Denver Health to try to preserve the length of his arm and his limited mobility, but he has been told that



amputation may be inevitable due to the amount of time the severe infection persisted untreated. If amputation is ultimately required, the condition of Mr. Taylor's deformed forearm will likely make it very difficult for him to use a prosthetic limb.

12. Mr. Taylor will never again be able to return to work as a welder, a career that brought him purpose and financial stability. Nor will he be able to engage in all the activities that gave him joy as a young man living his life to the fullest in Colorado.

## II. JURISDICTION AND VENUE

13. This action arises under the Constitution and laws of the United States and is brought under 42 U.S.C. § 1983. Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1367. Jurisdiction supporting the claim for attorney's fees and costs is conferred by 42 U.S.C. § 1988.

14. Venue in the District of Colorado is proper under 28 U.S.C § 1391(b) because all of the events relevant to the claims contained herein occurred within the State of Colorado.

## III. PARTIES

15. At all times relevant to this Complaint, the plaintiff Clifford Taylor was a citizen of the United States and a resident of the State of Colorado.

16. Defendant Armor Correctional Health Services, Inc. (Armor), is a private corporation headquartered in Florida that conducts business in Colorado and many other states. At all times relevant to this Complaint, Defendant Armor was acting under the color of state law in its capacity as the contracted medical provider for the LCJ in Fort Collins, Colorado.

17. Defendant Sheriff Justin Smith is the Larimer County Sheriff. At all times relevant to this Complaint, Defendant Smith was a citizen of the United States, was a resident of

the State of Colorado, and was acting under the color of state law in his capacity as the Larimer County Sheriff.

18. The Board of County Commissioners for the County of Larimer (BOCC) is the public entity responsible for Larimer County and the LCJ, for approving the County's budget, and for providing funds for the LCJ and its contracts.

19. Defendant Smith in his official capacity and Defendant BOCC are collectively referred to throughout this Complaint as "Larimer County."

20. Defendant Captain Timothy Palmer is the commander of the Jail Division within the Larimer County Sheriff's Office. At all times relevant to this Complaint, Defendant Palmer was a citizen of the United States, was a resident of the State of Colorado, and was acting under the color of state law in his capacity as the commander of the Jail Division within the Larimer County Sheriff's Office.

21. At all times relevant to this Complaint, Defendant Amanda Jarman was a citizen of the United States, was a resident of the State of Colorado, and was acting under the color of state law in her capacity as the Health Services Administrator and a medical provider working in the LCJ for Armor. Defendant Jarman is responsible for the oversight of all medical care and medical training at the LCJ.

22. At all times relevant to this Complaint, Defendant Keith McLaughlin was a citizen of the United States, was a resident of the State of Colorado, and was acting under the color of state law in his capacity as a doctor working for Defendant Armor in the LCJ.

23. At all times relevant to this Complaint, Defendant Dayla Cook was a citizen of the United States, was a resident of the State of Colorado, and was acting under the color of state law in her capacity as a medical provider working for Defendant Armor in the LCJ.

24. At all times relevant to this Complaint, Defendant Kyra Harmon was a citizen of the United States, was a resident of the State of Colorado, and was acting under the color of state law in her capacity as a medical provider working for Defendant Armor in the LCJ.

25. At all times relevant to this Complaint, Defendant Lynette Hoisington was a citizen of the United States, was a resident of the State of Colorado, and was acting under the color of state law in her capacity as a medical provider working for Defendant Armor in the LCJ.

26. At all times relevant to this Complaint, Defendant Alex Mahloch was a citizen of the United States, was a resident of the State of Colorado, and was acting under the color of state law in her capacity as a medical provider working for Defendant Armor in the LCJ.

27. At all times relevant to this Complaint, Defendant Jessina Morse was a citizen of the United States, was a resident of the State of Colorado, and was acting under the color of state law in her capacity as a medical provider working for Defendant Armor in the LCJ.

28. At all times relevant to this Complaint, Defendant Lynn Schultz was a citizen of the United States, was a resident of the State of Colorado, and was acting under the color of state law in her capacity as a medical provider working for Defendant Armor in the LCJ.

29. At all times relevant to this Complaint, Defendant Leah Oakley was a citizen of the United States, was a resident of the State of Colorado, and was acting under the color of state law in her capacity as a medical provider working for Defendant Armor in the LCJ.

30. At all times relevant to this Complaint, Defendant Carolyn Peisert was a citizen of the United States, was a resident of the State of Colorado, and was acting under the color of state law in her capacity as a medical provider working for Defendant Armor in the LCJ.

31. At all times relevant to this Complaint, Defendant Cheyenne Palmer was a citizen of the United States, was a resident of the State of Colorado, and was acting under the color of state law in her capacity as a medical provider working for Defendant Armor in the LCJ.

32. At all times relevant to this Complaint, Defendant Katie Wenzel was a citizen of the United States, was a resident of the State of Colorado, and was acting under the color of state law in her capacity as a medical provider working for Defendant Armor in the LCJ.

33. At all times relevant to this Complaint, Defendant Michelle Wilson was a citizen of the United States, was a resident of the State of Colorado, and was acting under the color of state law in her capacity as a medical provider working for Defendant Armor in the LCJ.

34. Defendants Jarman, McLaughlin, Cook, Harmon, Hoisington, Mahloch, Morse, Schultz, Oakley, Peisert, Palmer, Wenzel, and Wilson are collectively referred to throughout this Complaint as the "medical-provider Defendants."

## IV. FACTUAL ALLEGATIONS

### A. Clifford Taylor's Initial Injuries and Medical Treatment.

35. Clifford Taylor, 28, was born in Oregon but moved to Colorado when he was 4 years old. Mr. Taylor attended Poudre High School, and he has lived in Fort Collins and Walden, Colorado.

36. Mr. Taylor has been a welder since he was 19. He worked for a local company in Wellington, Colorado, and eventually founded Taylor Welding. Through his business, Mr.

Taylor worked as a sub-contractor doing welding and equipment work for other companies. Mr. Taylor has worked on projects in automotive shops and on various types of equipment.

37. Like many young men, Mr. Taylor also enjoyed working on motor vehicles with his family and friends, lifting weights, and enjoying the beautiful Colorado outdoors. For his entire life, Mr. Taylor has loved camping and tinkering on mechanical projects.

38. Unfortunately, on July 17, 2017, Mr. Taylor crashed while driving an all-terrain vehicle, crushing his left forearm and suffering other injuries. Mr. Taylor had an open, comminuted distal left radial and ulnar fracture with radial artery rupture in his left forearm, among other injuries.



39. Due to these injuries, Mr. Taylor was hospitalized at Denver Health from July 17–August 3, 2017.

40. On July 26, 2017, Mr. Taylor had surgery at Denver Health for his arm injury. Mr. Taylor underwent a free-tissue-flap procedure and nerve repair along with skin grafting, and a permanent plate and antibiotic spacer were inserted over the distal radius and ulna in his left forearm.

41. The usual course of treatment after this surgery would involve regular checkups to ensure proper healing and to monitor for any signs of infection. If Mr. Taylor's treatment had gone according to plan, after the initial surgery, he would have simply needed a bone graft and rehabilitation to build back a significant amount of mobility in his left forearm and hand.

42. During the months following this surgery, Mr. Taylor was supposed to be seen every few months by his Denver Health team to monitor his healing and wound. To ensure early detection of any major problems with his healing, Mr. Taylor was supposed to be seen by his Denver Health team if he had any signs of infection at the wound.

**B. Mr. Taylor's Early Interactions with Medical Providers at LCJ.**

43. During his hospitalization, Mr. Taylor failed to appear at a court hearing. Consequently, Larimer County officials arrested him and sent him to the LCJ on August 8, 2017.

44. That day, Defendant Schultz conducted a medical-intake screening, which is designed to alert medical providers at the LCJ about the medical needs and current medical status of the prisoners and detainees under their care. Mr. Taylor told Defendant Schultz about his recent surgery and need for continued medical care at Denver Health. Defendant Schultz noted Mr. Taylor's injuries during this intake. He wrote: "left hand wrapped in brace and padding, cap refil[l] on slighlty [sic] sluggish, fingers warm to touch, slightly swollen." He also wrote: "[m]ultiple surgeries in the last 30 days." He also noted that Mr. Taylor had been at Denver Health within the previous three months.

45. Based upon this medical-intake screening, Defendant Schultz initiated a review of Mr. Taylor's screening by the Health Services Administrator (HSA), Defendant Jarman. Defendant Schultz also made an appointment for Mr. Taylor to see a provider on August 9, 2017.

46. On information and belief, this second-level review by an HSA is only triggered and required when an incoming detainee is found to have a health condition requiring additional medical care.

47. On information and belief, at this point, Defendant Jarman reviewed Mr. Taylor's medical records and spoke with Defendant Schultz about Mr. Taylor's forearm surgery.

48. At this time, Mr. Taylor was experiencing no signs of infection and did not alert Armor medical staff of any pain, swelling, or other signs of infection during his medical screening.

49. On information and belief, Defendant Jarman reviewed the information from Mr. Taylor's medical screening in August 2017.

50. Following the medical-intake screening but still that same day, August 8, 2017, a LCJ nurse spoke with Defendant McLaughlin regarding Mr. Taylor's injuries on his forearm and confirmed that Defendant McLaughlin would see Mr. Taylor the next day.

51. Also on August 8, 2017, LCJ and Armor medical staff received Mr. Taylor's records from Denver Health detailing his injuries, surgery, wounds, and post-operative care instructions.

52. On August 9, 2017, Defendant McLaughlin saw Mr. Taylor for an evaluation of his left arm wound and injury.

53. LCJ officials and Armor staff refused to take Mr. Taylor to an appointment at Denver Health scheduled in early August 2017 while he was incarcerated at the LCJ.

54. LCJ officials later released Mr. Taylor from custody. Mr. Taylor made an appointment with his medical team at Denver Health.

55. On August 15, 2017, Mr. Taylor received an x-ray at Denver Health. That x-ray showed no indications of infection or osteomyelitis. At that time, Mr. Taylor was healing well from his surgery.

56. From August 2017 to February 2018, Mr. Taylor's arm continued to heal from his surgery, and he was slowly regaining the ability to do some light work. During this time period, Mr. Taylor was in and out of the LCJ on a few occasions and discussed his recent surgery and wound with Defendants McLaughlin and Wenzel.

57. On September 25, 2017, Armor employee Defendant Wenzel saw Mr. Taylor regarding his left arm injury. Defendant Wenzel noted the injury and wound and noted the "importance of follow up with specialist." Defendant Wenzel also wrote in her notes about the medical appointment with Mr. Taylor: "If he is not bonded out, would like to try to have the patient seen while incarcerated for follow up with [his outside specialist]."

**C. Mr. Taylor's Medical Care at the LCJ in 2018.**

*a. March 2018*

58. On March 11, 2018, Mr. Taylor was arrested for driving under the influence. That day, LCJ officials incarcerated him at the LCJ. That evening, Defendant Schultz conducted Mr. Taylor's medical intake. Mr. Taylor reported his recent surgery and explained that he would soon need to be seen at Denver Health for continuing care. Defendant Schultz wrote in the medical record that Mr. Taylor was in a cast and had "[m]ultiple surgeries in the last 30 days." Defendant Schultz noted the surgical scars on Mr. Taylor's left arm and noted that he had been seen at Denver Health in the previous three months for his left arm. Defendant Schultz noted Mr. Taylor's arm injury as a chronic-care condition.

59. According to LCJ medical records, during this medical intake, Defendant Schultz obtained a signed Denver Health release of information from Mr. Taylor.

60. Defendant Schultz ordered that medical staff monitor Mr. Taylor several times a day for five days, from March 11-16, 2018.

61. On March 17, 2018, Defendant Peisert falsely wrote in Mr. Taylor's LCJ medical records that he had refused to sign a release of information for medical records.

62. Mr. Taylor never refused to sign a release of information. To the contrary, as his medical records indicate, he had provided a signed a release of information for his Denver Health records to Defendant Schultz a few days earlier, during his medical intake.

63. On March 19, 2018, Mr. Taylor reported a rash on his left arm to a nurse at LCJ, telling her it was itching. She noted in his LCJ medical records that he "has scattered small red areas on [below] elbows and around the edges of [his] large scarred area on left arm."

64. The nurse prescribed him hydrocortisone cream and told Mr. Taylor to increase his hydration and avoid irritants. Hydrocortisone cream is a basic, over-the-counter corticosteroid used to treat dermatitis or itchy skin. It does not treat infections.

65. On March 21, 2018, Mr. Taylor received a health assessment by an Armor medical assistant, who noted his recent left arm trauma hospitalization. This Armor medical assistance also noted a possible abscess on his left arm. She wrote in Mr. Taylor's LCJ medical records that his skin was normal "with exception to the left arm. Left arm erythema, with presence of edema."

66. Basic antibiotics were ordered for Mr. Taylor. The antibiotics were discontinued ten days later.

67. On March 21, 2018, Defendant Wenzel noted Mr. Taylor's left arm injury as a chronic condition, but cleared him to work in the LCJ's kitchen.

68. In March 2018, Defendants Peisert, Palmer, and Harmon were all among medical staff who personally delivered Mr. Taylor antibiotics for, as noted in his medical administration record, an "abscess to left arm."

*b. April 2018*

69. On April 2, 2018, Defendant McLaughlin saw Mr. Taylor. Mr. Taylor told him about his arm injuries and told him about pain and discomfort in his arm. Defendant McLaughlin noted that Mr. Taylor "had significant left arm trauma" and surgery, and had chronic neuropathic pain from the arm. Mr. Taylor told Defendant McLaughlin that he thought he should be seen by the specialists at Denver Health to check on his arm.

70. Defendant McLaughlin prescribed Mr. Taylor a pain medication. Defendant McLaughlin did not contact anyone at Denver Health or any specialist regarding Mr. Taylor's complex surgery and wound.

71. In April 2018, Armor staff issued "tasks" to the nurses at the LCJ to monitor Mr. Taylor's arm wound for signs of infection. From April 5-12, 2018, Armor nurses at the LCJ checked Mr. Taylor's wound daily.

72. On April 5, 2018, Defendant Schultz medically assessed Mr. Taylor's arm. She noted two areas that had scabbed over.

73. On April 11 and 20, 2018, Mr. Taylor had appointments with Defendant Wenzel and told her about his arm pain and the discomfort that was developing. Mr. Taylor told her that he thought he should be seen by the specialists at Denver Health to check on his arm.

*c. May 2018*

74. On May 15, 2018, Mr. Taylor was seen by Defendant Schultz for pain and other problems with his left arm. Defendant Schultz noted that there was a scab on the arm with a red area surrounding it.

75. Mr. Taylor told Defendant Schultz that he needed to go to Denver Health to see his doctor and receive medical treatment for his arm.

76. Defendant Schultz refused to take any actions to help Mr. Taylor. Defendant Schultz did not contact Denver Health nor any other medical provider. Defendant Schultz did not prescribe antibiotics. And even though Mr. Taylor was already showing signs of infection, Defendant Schultz turned Mr. Taylor away and told him to come back when signs of infection appear—as if such signs of infection were not already present.

77. On May 16, 2018, after Mr. Taylor had made numerous requests for medical treatment, Defendant Palmer assessed Mr. Taylor's wound. She measured his forearm and noted a reddened area with a scab on it.

78. Mr. Taylor told her about his injuries and told her about the pain, discomfort, discharge, and heat in his arm. Mr. Taylor asked that his medical providers at Denver Health be contacted and that he receive medical care from outside LCJ for his arm.

79. Nonetheless, Defendant Palmer provided no treatment to Mr. Taylor at that time despite clear signs of infection. Defendant Palmer did not contact Mr. Taylor's surgeon at Denver Health. Defendant Palmer did not prescribe antibiotics for Mr. Taylor. And Defendant Palmer did not seek any specialized medical care for Mr. Taylor.

80. On May 17, 2018, Defendant Mahloch assessed Mr. Taylor's wound. She measured his forearm and noted a reddened area with a scab on it.

81. On May 17, 2018, as indicated in his LCJ medical records, Mr. Taylor's left forearm measured 24.5 cm in circumference. Mr. Taylor's left forearm was noticeably swollen.

82. Mr. Taylor told Defendant Mahloch about his injuries and told her about the pain, discomfort, discharge, and heat in his arm. Mr. Taylor asked that his medical providers at Denver Health be contacted and that he receive medical care from outside LCJ for his infection.

83. Nonetheless, Defendant Mahloch provided no medical treatment to Mr. Taylor at that time despite clear signs of infection. Defendant Mahloch did not contact Mr. Taylor's surgeon at Denver Health. Defendant Mahloch did not prescribe antibiotics for Mr. Taylor. And Defendant Mahloch did not seek any specialized medical care for Mr. Taylor.

84. On May 18, 2018, after Mr. Taylor had made numerous requests for medical treatment, Defendant Peisert assessed Mr. Taylor's wound. Defendant Peisert measured Mr. Taylor's forearm and noted a reddened area with a scab on it.

85. Mr. Taylor told Defendant Peisert about his injuries and told her about the pain, discomfort, discharge, and heat in his arm. Mr. Taylor asked that his medical providers at Denver Health be contacted and that he receive medical care from outside LCJ for his infection.

86. Defendant Peisert falsely reported in Mr. Taylor's medical records that on May 18, 2018, there were no signs of infection, such as discharge, present on Mr. Taylor's left forearm. In fact, on that date, Mr. Taylor's left forearm showed clear signs of infection.

87. Despite clear signs of infection, Defendant Peisert provided no medical treatment to Mr. Taylor at that time. Defendant Peisert did not contact Mr. Taylor's surgeon at Denver

Health. Defendant Peisert did not prescribe antibiotics for Mr. Taylor. And Defendant Peisert did not seek any specialized medical care for Mr. Taylor.

88. On May 18, 2018, Mr. Taylor complained to Defendant Morse that his arm was in pain and that yellow discharge was coming out of his wound. She had an appointment with him and noted "[s]mall 1cm area that had previously had a scab on it, no longer has a scab and has a purulent discharge," and that the area was red.

89. Purulent drainage is a thick and milky discharge from a wound. It is often a sign of infection. It is basic medical knowledge that wounds with such a discharge should be treated as soon as possible in order to prevent the infection from spreading or minimize such spreading.

90. Mr. Taylor told Defendant Morse that he needed to go to Denver Health to see his doctor for his arm. Mr. Taylor also told Defendant Morse that he needed antibiotics.

91. Defendant Morse refused to take any actions to help Mr. Taylor. Defendant Morse did not contact Denver Health. Defendant Morse did not prescribe antibiotics for Mr. Taylor. Defendant Morse turned Mr. Taylor away and simply "advised [him] to keep area clean and dry and to refrain from picking at scab," as recorded in his LCJ medical records.

92. On May 19, 2018, Defendant Peisert assessed Mr. Taylor's wound.

93. Mr. Taylor told Defendant Peisert about his injuries and told her about the pain, discomfort, discharge, and heat in his arm. Mr. Taylor asked that his medical providers at Denver Health be contacted and that he receive medical care from outside LCJ for his infection.

94. Despite the documented presence of thick and milky discharge the previous day, and the continued concerning discharge present on May 19, 2018, Defendant Peisert falsely

reported in Mr. Taylor's medical records that there were no signs of infection, such as discharge, present on his left forearm.

95. Despite clear signs of infection, Defendant Peisert provided no medical treatment to Mr. Taylor on May 19, 2018. Defendant Peisert did not contact Mr. Taylor's surgeon at Denver Health. Defendant Peisert did not prescribe antibiotics for Mr. Taylor. And Defendant Peisert did not seek any specialized medical care for Mr. Taylor.

96. On May 20, 2018, Defendant Mahloch assessed Mr. Taylor's wound.

97. On May 20, 2018, according to LCJ medical records, Mr. Taylor's left forearm measured 27 cm in circumference—2.5 cm larger than the 24.5-cm circumference it had been measured at three days earlier. Mr. Taylor's left forearm was noticeably swollen.

98. Mr. Taylor told Defendant Mahloch about his injuries and told her about the pain, discomfort, discharge, and heat in his arm. Mr. Taylor asked that his medical providers at Denver Health be contacted and that he receive medical care outside of LCJ for his infection.

99. Nonetheless, and despite clear signs of infection, Defendant Mahloch provided no medical treatment to Mr. Taylor at that time. Defendant Mahloch did not contact Mr. Taylor's surgeon at Denver Health. Defendant Mahloch did not prescribe antibiotics for Mr. Taylor. And Defendant Mahloch did not seek any specialized medical care for Mr. Taylor.

100. On May 21, 2018, Defendant Palmer assessed Mr. Taylor's wound. She measured his forearm and noted a reddened area with a scab on it.

101. Defendant Palmer measured Mr. Taylor's left forearm at 27 cm in circumference. Mr. Taylor's left forearm was noticeably swollen.

102. Mr. Taylor told Defendant Palmer about his injuries and told her about the pain, discomfort, discharge, and heat in his arm. Mr. Taylor asked that his medical providers at Denver Health be contacted and that he receive medical care outside of the LCJ for his infection.

103. But Defendant Palmer provided no medical treatment to Mr. Taylor at that time. Defendant Palmer did not contact Mr. Taylor's surgeon at Denver Health. Defendant Palmer did not prescribe antibiotics for Mr. Taylor. And Defendant Palmer did not seek any specialized medical care for Mr. Taylor.

104. On May 22 and 23, 2018, Defendant Palmer assessed Mr. Taylor's wound. She measured his forearm, and noted a reddened area with a scab on it.

105. Mr. Taylor told Defendant Palmer about his injuries and told her about the pain, discomfort, discharge, and heat in his arm. Mr. Taylor asked that his medical providers at Denver Health be contacted and that he receive medical care outside of the LCJ for his infection.

106. Defendant Palmer provided no medical treatment to Mr. Taylor at that time. Defendant Palmer did not contact Mr. Taylor's surgeon at Denver Health. Defendant Palmer did not prescribe antibiotics for Mr. Taylor. And Defendant Palmer did not seek any specialized medical care for Mr. Taylor.

107. On May 24 and 26, 2018, Defendant Morse assessed Mr. Taylor's wound.

108. At this point, Mr. Taylor's left forearm had swelled to 27.5 cm in circumference.

109. Mr. Taylor told Defendant Morse about his injuries and told her about the pain, discomfort, discharge, and heat in his arm. Mr. Taylor asked that his medical providers at Denver Health be contacted and that he receive medical care outside of the LCJ for his infection.

110. Defendant Morse provided no medical treatment to Mr. Taylor at that time. Defendant Morse did not contact Mr. Taylor's surgeon at Denver Health. Defendant Morse did not prescribe antibiotics for Mr. Taylor. And Defendant Morse did not seek any specialized medical care for Mr. Taylor.

111. On May 27, 2018, Defendant Palmer assessed Mr. Taylor's wound.

112. Mr. Taylor told Defendant Palmer about his injuries and told her about the pain, discomfort, discharge, and heat in his arm. Mr. Taylor asked that his medical providers at Denver Health be contacted and that he receive medical care outside of the LCJ for his infection.

113. Defendant Palmer provided no treatment at that time. Defendant Palmer did not contact Mr. Taylor's surgeon at Denver Health. Defendant Palmer did not prescribe antibiotics. Defendant Palmer did not seek specialized care for Mr. Taylor.

114. For several months after the May 27, 2018 wound assessment, Armor nursing staff stopped regular assessments of Mr. Taylor's wound, even though his arm was continuing to swell, and he was reporting significant signs of infection such as heat, pain, and discharge.

115. On May 31, 2018, Mr. Taylor entered a guilty plea in his criminal case. Mr. Taylor remained at the LCJ.

116. In May 2018, Defendant Morse delivered medications to Mr. Taylor on May 2-3, 12, 16-18, 24-27, and 30.

117. In May 2018, Defendant Palmer delivered medications to Mr. Taylor on May 2, 14, 21-22, and 28-29.

118. In May 2018, Defendant Peisert delivered medications to Mr. Taylor on May 9-12, 16, 18, 19, 23, 25, and 30.

119. In May 2018, Defendant Mahloch delivered medications to Mr. Taylor on May 17, 20, 24, and 29.

120. In May 2018, Defendant Schultz delivered medications to Mr. Taylor on May 15 and 21.

121. At each medication administration during May 2018, Mr. Taylor complained to the Armor nurse administering the medication about the condition of his arm, about the worsening pain he was experiencing from his wound, and about the fact that his wound had begun to discharge. At each medication administration during May 2018, Mr. Taylor asserted to the Armor nurse administering the medication that he needed to go to Denver Health to see his doctor for his arm or to see someone who could figure out what was wrong with his arm, and that he needed medical treatment for he believed was an infection.

122. Given their medical backgrounds, the medical-provider Defendants knew that a wound that is red with a scab can be a sign of infection, that a wound with discharge is a sign of infection, and that it is a particularly concerning sign of infection when a patient reports pain, discomfort, discharge, swelling, and heat from a wound.

123. Given their medical backgrounds, the medical-provider Defendants also knew that nausea, fever, chills, weight loss, and sleeplessness—when coupled with indications of pain, redness, swelling, discharge, and heat at the site of a wound—are signs of a severe infection.

124. Given their medical backgrounds, the medical-provider Defendants knew that patients who have recently undergone significant surgery need to have their surgical wounds and implants closely monitored and cared for to ensure proper healing and to avoid infection.

125. Given their medical backgrounds, the medical-provider Defendants knew that outside medical specialists who conducted a serious surgery need to follow up with their patients regularly to ensure the health of those patients and the long-term success of their surgical treatment.

126. Despite clear signs of serious infection, no Defendant contacted Denver Health nor any outside specialist regarding the worsening condition of Mr. Taylor's arm in May 2018.

127. No Defendant even requested Mr. Taylor's medical record from Denver Health in May 2018.

*d. June 2018*

128. From June to October 2018, Mr. Taylor asked Armor medical staff for medical treatment for his arm on at least a daily basis by speaking to them in person, including asking for treatment from the medical-provider Defendants themselves.

129. On June 13, 2018, as reflected in Mr. Taylor's LCJ medical records, LCJ mental-health staff met with Mr. Taylor, who complained about the anxiety, depression, and sleeplessness he was experiencing because of the worsening condition of his arm and his inability to get the medical care he needed for it. Mr. Taylor again asked to be seen by his medical team at Denver Health or to be seen by a medical specialist for his infected surgical wound.

130. In June 2018, Defendant Mahloch delivered medications to Mr. Taylor on June 1, 2, and 18.

131. In June 2018, Defendant Morse delivered medications to Mr. Taylor on June 1, 13-16, 18-19, 21-23, 25, 27, and 29.

132. In June 2018, Defendant Schultz delivered medications to Mr. Taylor on June 2-3, 12, 21, and 26.

133. In June 2018, Defendant Cook delivered medications to Mr. Taylor on June 4 and 27.

134. In June 2018, Defendant Hoisington delivered medications to Mr. Taylor on June 10, 17, 19, 24, and 26.

135. On June 5, 2018, Defendant Palmer delivered medications to Mr. Taylor.

136. At each medication administration during June 2018, Mr. Taylor complained to the Armor nurse administering the medication about the condition of his arm, about the worsening pain he was experiencing from his wound, and about the fact that his wound was still excreting discharge. At each medication administration during June 2018, Mr. Taylor complained to the Armor nurse administering the medication that he needed to go to Denver Health to see his doctor for his arm or to see some medical professional who could figure out what was wrong with his arm, and that he needed something to medically treat what he believed was a worsening infection.

137. Despite clear signs of infection, no Defendant contacted Denver Health or any outside medical specialist regarding the worsening condition of Mr. Taylor's arm in June 2018.

138. No Defendant even requested Mr. Taylor's medical record from Denver Health in June 2018.

*e. July 2018*

139. On July 12, 2018, Defendant Jarman reviewed Mr. Taylor's medical records in the process of disclosing them to another county for a continuity-of-care request. At that time,

Defendant Jarman noted in Mr. Taylor's medical records, in response to a prompt about physical disabilities/limitations: "chronic left arm issues with surgeries."

140. In July 2018, Defendant Mahloch delivered medications to Mr. Taylor on July 2 and 9-10.

141. In July 2018, Defendant Morse delivered medications to Mr. Taylor on July 2, 7, 8, 11, 12, and 26.

142. In July 2018, Defendant Hoisington delivered medications to Mr. Taylor on July 1, 3, 8, 10, 16, 21, and 28.

143. In July 2018, Defendant Schultz delivered medications to Mr. Taylor on July 6, 16, and 30.

144. In July 2018, Defendant Harmon delivered medications to Mr. Taylor on July 11 and 12.

145. In July 2018, Defendant Palmer delivered medications to Mr. Taylor on July 18, 22, 24-25, and 29.

146. In July 2018, Defendant Cook delivered medications to Mr. Taylor on July 23 and 30-31.

147. At each medication administration in July 2018, Mr. Taylor complained about the worsening condition of his arm. He complained to the Armor nurse administering the medication that he was still experiencing worsening pain from his wound and that his wound had discharge coming out of it. At each medication administration, Mr. Taylor stated that he needed to go to Denver Health to see his doctor for his arm or to see some medical professional who could address the problems he was experiencing. Mr. Taylor would plead to each Armor nurse

that he needed help with his infection, and would tell the nurse that he was losing weight, experiencing nausea, and having regular bouts of fever, which he thought was associated with his infected wound.

148. Despite clear signs of serious infection, no Defendant contacted Denver Health nor any outside medical specialist regarding the worsening condition of Mr. Taylor's arm in July 2018.

149. No Defendant even requested Mr. Taylor's medical record from Denver Health in July 2018.

*f. August 2018*

150. During the month of August, Mr. Taylor's arm took another sharp turn for the worse. He began to experience even more severe nausea, fever, chills, weight loss, and sleeplessness. His infected arm was even more tender and swollen than it was previously.

151. In addition to his pleas to Armor medical staff, Mr. Taylor repeatedly asked Larimer County Sheriff deputies at the jail for help for his worsening medical condition.

152. Larimer County Sheriff deputies told Mr. Taylor that they could not do anything to address his medical needs and that he would have to speak to Armor medical staff for any medical problems he was having.

153. Mr. Taylor put in several requests to Armor medical staff to be seen for his worsening wound.

154. On August 26, 2018, Defendant Harmon saw Mr. Taylor for his arm pain and infection. Mr. Taylor repeated to her that his seeping wound had been there for months and was not getting any better. Mr. Taylor told Defendant Harmon that he was experiencing nausea,

fever, chills, weight loss, and sleeplessness as a result of his worsening condition. Defendant Harmon noted the open wound, purulent drainage, sign of infection, and the redness of the arm. Defendant Harmon also noted the "[record of] problem with wound."

155. On August 26, 2018, Defendant Harmon called Defendant McLaughlin and spoke with him about Mr. Taylor's wound and his purulent drainage.

156. On August 26, 2018, Defendant McLaughlin ordered a ten-day dose of general antibiotics for Mr. Taylor—even though Defendant McLaughlin knew that the antibiotics Mr. Taylor had been prescribed several months earlier for the same infected wound had not resolved the infection.

157. Defendant McLaughlin also approved an order for a week of Bacitracin for Mr. Taylor, an over-the-counter antibiotic ointment intended for the treatment of minor cuts and scrapes.

158. Neither Defendant McLaughlin nor Defendant Harmon contacted Mr. Taylor's medical team at Denver Health to report his condition nor to receive guidance on the proper treatment for the long-term infection of a wound from a complicated surgery.

159. Later that evening, on August 26, 2018, Defendant Oakley saw Mr. Taylor for his infection. Mr. Taylor repeated to her that his seeping wound had been there for months and was not getting any better. Mr. Taylor told her about his injuries and told her about the pain, tenderness, discharge, and heat in his arm. Mr. Taylor asked that his medical providers at Denver Health be contacted and that he receive medical care outside of the LCJ for his infection.

160. Defendant Oakley falsely documented that there was no drainage from Mr. Taylor's arm and falsely reported that Mr. Taylor had refused wound care.

161. Defendant Oakley did not contact Mr. Taylor's surgeon at Denver Health. Defendant Oakley did not seek specialized medical care for Mr. Taylor.

162. On August 27, 2018, Defendant Cook saw Mr. Taylor for his arm pain and infection. Mr. Taylor repeated to her that his seeping wound had been there for months and was not getting any better. Mr. Taylor told her about his injuries and told her about the pain, discomfort, discharge, and heat in his arm. Mr. Taylor asked that his medical providers at Denver Health be contacted and that he receive medical care outside of the LCJ for his infection.

163. Defendant Cook falsely wrote that Mr. Taylor thought a Band-Aid was sufficient for his seeping wound and did not want a dressing change. But Mr. Taylor was gravely concerned about his wound.

164. Defendant Cook did not contact Mr. Taylor's surgeon at Denver Health. Defendant Cook did not seek specialized medical care for Mr. Taylor.

165. By late August 2018, an Armor medical provider had ordered that because Mr. Taylor's wound was open and draining, he must have a dressing over it in order to continue his work in the LCJ kitchen, where he made food for other LCJ detainees.

166. On August 28, 2018, Defendant Cook met with Mr. Taylor regarding his wound.

167. Mr. Taylor repeated to Defendant Cook that his seeping wound had been there for months and was not getting any better. Mr. Taylor told Defendant Cook about his injuries and told her about the pain, discomfort, discharge, and heat in his arm. Mr. Taylor asked that his medical providers at Denver Health be contacted and that he receive medical care outside of the LCJ for his infection.

168. Defendant Cook noted the following regarding the drainage of Mr. Taylor's wound at that time: "Purulent=Thick white blood cells and living or dead organisms; yellow, green or brown color can suggest the type of infecting organism. A pungent, strong, foul, fecal or musty odor suggests infection." Defendant Cook noted twice how Mr. Taylor's symptoms suggested infection.

169. Nonetheless, Defendant Cook did not contact Mr. Taylor's surgeon at Denver Health nor seek specialized medical care for Mr. Taylor, nor did Defendant Cook do anything else to alleviate Mr. Taylor's infection.

170. On August 28, 2018, Defendant Wenzel reviewed Mr. Taylor's LCJ medical records and made a note that he had an open wound with drainage, acknowledging that Mr. Taylor works in the LCJ kitchen and that there was a draining wound around food, so the wound should be covered if he was to continue to work in the kitchen.

171. Defendant Wenzel did not contact Denver Health nor put in a request for Mr. Taylor to see a medical specialist for his worsening condition.

172. Also on August 28, 2018, mental-health staff at the LCJ met with Mr. Taylor, who again complained about the anxiety, depression, and sleeplessness he was experiencing because of the worsening condition of his arm and his inability to obtain the medical care he needed for it. He reported that his anxiety was very high, that he was losing sleep and weight, and that he was having a hard time calming down due to this situation. Mr. Taylor again asked to be seen by his medical team at Denver Health.

173. Instead, the mental-health staff at the LCJ placed Mr. Taylor on an additional medication for anxiety.

174. No Armor medical staff contacted any specialist regarding the escalating symptoms of infection that Mr. Taylor was experiencing.

175. On August 29, 2018, an LCJ medical provider met with Mr. Taylor about his wound. Mr. Taylor again told her of the pain and infection in his left arm, and asked to see his medical team at Denver Health or to obtain any kind of medical treatment for his arm. Recognizing the festering nature of the wound, the provider made a note in his LCJ records that for sanitary reasons, Mr. Taylor should keep a dressing on the wound while he was working in the LCJ kitchen. The provider did not contact Denver Health nor take any action to address Mr. Taylor's worsening, seeping wound.

176. On August 31, 2018, Defendant Wenzel spoke with Mr. Taylor about his worsening wound. Mr. Taylor again told her about the pain and infection in his left arm and asked to see his medical team at Denver Health or to obtain any kind of medical treatment for his arm.

177. Defendant Wenzel provided no treatment for Mr. Taylor and did not contact his medical team at Denver Health nor any outside medical specialist.

178. Later on August 31, 2018, Defendant Morse spoke with Mr. Taylor about his wound. Mr. Taylor again told her of the pain and infection in his left arm and asked to see his medical team at Denver Health or to obtain any kind of medical treatment for his arm.

179. Defendant Morse provided no treatment for Mr. Taylor and did not contact his medical team at Denver Health nor any outside medical specialist.

180. In August 2018, Defendant Hoisington delivered medications to Mr. Taylor on August 2, 4, 6, 13, and 24.

181. In August 2018, Defendant Jarman delivered medications to Mr. Taylor on August 4.

182. In August 2018, Defendant Palmer delivered medications to Mr. Taylor on August 5, 7-8, 12, and 14.

183. In August 2018, Defendant Mahloch delivered medications to Mr. Taylor on August 7, 19, 27, and 29.

184. In August 2018, Defendant Harmon delivered medications to Mr. Taylor on August 9-10, 17, 22, 26, 29, and 31.

185. In August 2018, Defendant Oakley delivered medications to Mr. Taylor on August 18 and 25-27.

186. In August 2018, Defendant Schultz delivered medications to Mr. Taylor on August 19.

187. In August 2018, Defendant Cook delivered medications to Mr. Taylor on August 21, 27, and 28.

188. At each medication administration in August 2018, Mr. Taylor complained about the worsening condition of his arm, including: the worsening pain from his wound, the arm's swelling and tenderness, the discharge oozing from the wound, and the heat radiating throughout his arm. At each medication administration, Mr. Taylor told the administrating Armor nurse or Defendant Jarmon that he needed medical attention to address the infection in his arm, and he complained about the anxiety, depression, and sleeplessness that he was experiencing because of the worsening condition of his arm and his inability to obtain the medical care he needed for it. Mr. Taylor told the medical providers that he was losing weight, experiencing nausea, and

having regular bouts of fever, which he told them he believed was associated with his untreated wound.

189. No Defendant contacted Denver Health nor any outside specialist regarding the worsening condition of Mr. Taylor's arm in August 2018.

190. No Defendant even requested Mr. Taylor's medical record from Denver Health in August 2018.

*g. September 2018*

191. On September 1, 2018, Defendant Hoisington spoke with Mr. Taylor about his wound. Mr. Taylor again told Defendant Hoisington of the pain and infection in his left arm and asked to see his medical team at Denver Health or to obtain any kind of medical treatment for his arm. Defendant Hoisington did not contact Mr. Taylor's surgeon at Denver Health, nor did she seek any emergency medical intervention. Defendant Hoisington merely measured the wound.

192. On September 2-4, 2018, Defendant Cook did wound assessments of Mr. Taylor. Mr. Taylor again told Defendant Cook of the pain and infection in his left arm and asked to see his medical team at Denver Health.

193. Defendant Cook noted the presence of slough or fibrotic tissue on the wound and serosanguineous drainage coming from the wound.

194. But Defendant Cook did not contact Denver Health nor seek outside medical care for the worsening wound. Instead, Defendant Cook simply put Bacitracin on the wound, covered it, and sent Mr. Taylor away.

195. On September 2, 2018, Defendant Cook noted that Mr. Taylor's wound was twice as large as it had been the previous day.

196. On September 5, 2018, an Armor nurse did a wound assessment of Mr. Taylor, noting the presence of slough or fibrotic tissue on the wound and serosanguineous drainage on his bandage.

197. On September 5, 2018, Defendant Wenzel ordered Mr. Taylor to stop receiving dressing changes.

198. Defendant Wenzel told Mr. Taylor he could just cover his wound with a Band-Aid.

199. But Mr. Taylor's wound was worsening, his forearm was hot to the touch, swollen, tender, and the wound was still draining discharge and causing him immense pain. Mr. Taylor told Defendant Wenzel about his worsening condition, but she did not contact Denver Health nor seek any other urgent medical care for Mr. Taylor's infection.

200. In September 2018, Defendant Morse delivered medications to Mr. Taylor on September 1, 3-4, 11-12, 16, 19-21, and 26.

201. In September 2018, Defendant Cook delivered medications to Mr. Taylor on September 2-4 and 16.

202. In September 2018, Defendant Oakley delivered medications to Mr. Taylor on September 2, 9, 13, and 23.

203. In September 2018, Defendant Hoisington delivered medications to Mr. Taylor on September 3, 7, 9, 25, and 30.

204. Defendant Schultz delivered medications to Mr. Taylor on September 10, 2018.

205. Defendant Harmon delivered medications to Mr. Taylor on September 12, 2018.

206. Defendant Mahloch delivered medications to Mr. Taylor on September 27 and 29, 2018.

207. At each medication administration in September 2018, Mr. Taylor complained about the worsening condition of his arm, explaining to the nurse that he was still experiencing severe pain and heat radiating from his wound and that there was discharge oozing from it. Mr. Taylor asked for medical attention to address the infection in his arm and complained about the anxiety, depression, fevers, nausea, and sleeplessness he was experiencing because of the worsening condition of his arm.

208. No Defendant contacted Denver Health nor any outside medical specialist regarding the worsening condition of Mr. Taylor's arm in September 2018.

209. No Defendant even requested Mr. Taylor's medical record from Denver Health in September 2018.

*h. October 2018*

210. On October 2, 2018, Mr. Taylor approached an Armor nurse during medical line and complained about the pain in his arm, the swelling and discharge, and the heat emanating from his arm. The nurse did not contact Denver Health or any other provider for Mr. Taylor's emergency medical condition. Rather, as noted in his LCJ medical records, the nurse merely "[e]ncouraged patient to use [over the counter medication] for discomfort and to notify medical if symptoms worsen or persist."

211. On October 3, 2018, after Mr. Taylor had been awake throughout the night vomiting and unable to sleep, he declared a medical emergency.

212. After he declared a medical emergency, Mr. Taylor was seen by Defendant Wilson. Mr. Taylor reported to her that he had been vomiting for several days, had not been able to eat for several days, was experiencing fever/chills, and was having episodes of diarrhea. Defendant Wilson noted in Mr. Taylor's LCJ records that he had visible shakes and chills and was pale. Mr. Taylor pleaded with Defendant Wilson to seek outside medical care for his symptoms, again telling her about his infected wound, the continuing discharge, and the throbbing pain and heat emanating from his wound.

213. Defendant Wilson did not seek any outside care for Mr. Taylor nor provide any other care for Mr. Taylor's serious and worsening infection. Defendant Wilson did not contact Denver Health. Instead, Defendant Wilson put Mr. Taylor on bedrest and excused him from work in the LCJ kitchen—for a day. Defendant Wilson added Gatorade to Mr. Taylor's medication list, told him to rest, and sent him away.

214. A few days later, on October 7, 2018, Mr. Taylor approached Defendant Oakley complaining of the pain in his arm, the swelling, discharge, and heat emanating from his arm. Mr. Taylor reported to Defendant Oakley that his infection was making him vomit, was making him unable to eat, was causing him to lose weight, and was interfering with his sleep. Mr. Taylor asked for medical treatment for the worsening infection in his arm. Mr. Taylor asked for Defendant Oakley to contact the specialists at Denver Health who had worked on his arm.

215. Defendant Oakley made no contact with any other health provider. Defendant Oakley did not contact Mr. Taylor's medical team at Denver Health. Defendant Oakley simply measured Mr. Taylor's arm but provided him no treatment to address his worsening infection.

216. Defendant Hoisington delivered medications to Mr. Taylor on October 6, 2018.

217. In October 2018, Defendant Harmon delivered medications to Mr. Taylor on October 7 and 10.

218. In October 2018, Defendant Oakley delivered medications to Mr. Taylor on October 7 and 9.

219. Defendant Cook delivered medications to Mr. Taylor on October 8, 2018.

220. At each medication administration in October 2018, Mr. Taylor complained about the rapidly worsening condition of his arm, explaining to the Armor nurse administering medications that he was experiencing severe pain and had been for months. Mr. Taylor reported the heat radiating from his wound and the discharge seeping from it. Mr. Taylor asked for medical attention to address the infection in his arm and complained about the anxiety, depression, fevers, nausea, and sleeplessness that he was experiencing because of his worsening infection.

221. No Defendant contacted Denver Health nor any outside specialist regarding the worsening condition of Mr. Taylor's arm in October 2018.

222. No Defendant even requested Mr. Taylor's medical record from Denver Health in October 2018.

223. From May-October 2018, Defendant McLaughlin reviewed Mr. Taylor's medical records and merely recommended one prescription for antibiotics. Defendant McLaughlin knew that Mr. Taylor had a serious surgery before entering the LCJ. Defendant McLaughlin knew that Mr. Taylor's arm was becoming increasingly infected yet did nothing to adequately treat the infection.

224. From May-October 2018, Defendant Jarman saw Mr. Taylor twice in person to deliver his medication. Defendant Jarman observed that Mr. Taylor's arm was becoming increasingly infected yet did nothing to adequately treat the infection. Defendant Jarman knew that Mr. Taylor had a serious surgery before entering the LCJ. Defendant Jarman oversaw all medical staff at LCJ and failed to ensure that she and her staff were meeting and addressing Mr. Taylor's serious medical needs.

225. From May-October 2018, Defendant Cook saw Mr. Taylor five times to change his wound dressing or otherwise address his complaints. Defendant Cook saw Mr. Taylor an additional thirteen times to deliver his medications. On each of these occasions, Defendant Cook observed that Mr. Taylor's arm was becoming increasingly infected yet did nothing to adequately treat the infection.

226. From May-October 2018, Defendant Harmon saw Mr. Taylor once to change his wound dressing or otherwise address his complaints. Defendant Harmon saw Mr. Taylor an additional twelve times to deliver his medications. On each of these occasions, Defendant Harmon observed that Mr. Taylor's arm was becoming increasingly infected yet did nothing to adequately treat the infection.

227. From May-October 2018, Defendant Hoisington saw Mr. Taylor once to change his wound dressing or otherwise address his complaints. Defendant Hoisington saw Mr. Taylor an additional 23 times to deliver his medications. On each of these occasions, Defendant Hoisington observed that Mr. Taylor's arm was becoming increasingly infected yet did nothing to adequately treat the infection.

228. From May-October 2018, Defendant Mahloch saw Mr. Taylor two times to change his wound dressing or otherwise address his complaints. Defendant Mahloch saw Mr. Taylor an additional nineteen times to deliver his medications. On each of these occasions, Defendant Mahloch observed that Mr. Taylor's arm was becoming increasingly infected yet did nothing to adequately treat the infection.

229. From May-October 2018, Defendant Morse saw Mr. Taylor four times to change his wound dressing or otherwise address his complaints. Defendant Morse saw Mr. Taylor an additional 40 times to deliver his medication. On each of these occasions, Defendant Morse observed that Mr. Taylor's arm was becoming increasingly infected yet did nothing to adequately treat the infection.

230. From May-October 2018, Defendant Schultz saw Mr. Taylor once to change his wound dressing or otherwise address his complaints. Defendant Schultz saw Mr. Taylor an additional twelve times to deliver his medications. On each of these occasions, Defendant Mahloch observed that Mr. Taylor's arm was becoming increasingly infected yet did nothing to adequately treat the infection.

231. From May-October 2018, Defendant Oakley saw Mr. Taylor two times to change his wound dressing or otherwise address his complaints. Defendant Oakley saw Mr. Taylor an additional ten times to deliver his medications. On each of these occasions, Defendant Oakley observed that Mr. Taylor's arm was becoming increasingly infected yet did nothing to adequately treat the infection.

232. From May-October 2018, Defendant Peisert saw Mr. Taylor two times to change his wound dressing or otherwise address his complaints. Defendant Pesisert saw Mr. Taylor an

additional ten times to deliver his medications. On each of these occasions, Defendant Peisert observed that Mr. Taylor's arm was becoming increasingly infected yet did nothing to adequately treat the infection.

233. From May-October 2018, Defendant Palmer saw Mr. Taylor five times to change his wound dressing or otherwise address his complaints. Defendant Palmer saw Mr. Taylor an additional seventeen times to deliver his medications. On each of these occasions, Defendant Palmer observed that Mr. Taylor's arm was becoming increasingly infected yet did nothing to adequately treat the infection.

234. From May-October 2018, Defendant Wenzel saw Mr. Taylor twice to change his wound dressing, review his file, or otherwise address his complaints. Defendant Wenzel additionally reviewed his medical records and ordered LCJ medical staff to stop changing the dressing on Mr. Taylor's wound. Defendant Wenzel knew and observed that Mr. Taylor's arm was becoming increasingly infected yet did nothing to adequately treat the infection.

235. From May-October 2018, Defendant Wilson saw Mr. Taylor to address his complaints of vomiting, nausea, fever, chills, weight loss, and sleeplessness associated with his severe infection. Defendant Wilson observed that Mr. Taylor's arm was becoming increasingly infected yet did nothing to adequately treat the infection.

236. On information and belief, all LCJ medical staff review medical records when meeting with or treating an incarcerated person under their care.

237. On October 11, 2018, Mr. Taylor was released from the LCJ to a halfway house, where he would be able to pursue his own medical care.

**D. Mr. Taylor is Diagnosed with Osteomyelitis and Forced to Undergo a Series of Surgeries to Attempt to Fight the Infection and Preserve His Remaining Mobility in His Arm and Hand.**

238. Following his release from the LCJ, Mr. Taylor immediately made an appointment with his medical team at Denver Health to examine his forearm.

239. On October 16, 2018, Mr. Taylor was seen at Denver Health for an appointment and x-ray. Mr. Taylor's left forearm was red, swollen, painful, seeping discharge, and hot. The x-ray revealed that the implants in Mr. Taylor's left arm were loosening, and they showed signs of chronic infection. Medical records from this appointment show that Mr. Taylor had significant erosion in the forearm plates that had been implanted (which were meant to be in place permanently) and showed signs of a deep infection. Determining that the problem needed to be addressed rapidly, Mr. Taylor's medical team at Denver Health decided he needed a bone biopsy very soon.

240. On October 29, 2018, Mr. Taylor underwent an open excision biopsy of his left forearm to ascertain the nature and scope of the infection. The team at Denver Health removed the plate and antibiotic spacer from Mr. Taylor's left forearm and conducted an irrigation and debridement of the area.

241. Cultures taken as a part of this biopsy showed growth of gram-negative bacteria. Gram-negative bacteria are resistant to many drugs and are largely resistant to most available antibiotics.

242. On October 29, 2018, the Denver Health team diagnosed Mr. Taylor with chronic osteomyelitis of the left radius (forearm) with a draining sinus (wound).

243. On October 30, 2018, the Denver Health team also noted that Mr. Taylor had chronic multifocal osteomyelitis of *multiple* sites in his forearm.

244. Mr. Taylor's Denver Health medical team created a plan to remove the remaining parts of the forearm plates with the hope that Mr. Taylor would be left with some stable part of his left ulnar and could have his infection treated and possibly re-plated later.

245. On November 13, 2018, Denver Health specialists told Mr. Taylor that there is a risk his left forearm would need to be amputated. They warned him that additional surgical procedures would be required in the future. His surgeon noted that "it is still unclear if [Mr. Taylor] is going to heal the deep infection where he essentially has an osteomyelitis that appears to be radiographically disseminated throughout the forearm."

246. On November 16, 2018, Mr. Taylor had to undergo another surgery at Denver Health. His medical team removed the hardware that had been initially placed in his left forearm and inserted a cement spacer.

247. On July 8, 2019, Mr. Taylor had to undergo another surgery at Denver Health. His medical team performed an excisional bone biopsy of his left forearm, removing parts of his bone and an antibiotic spacer that had been previously implanted.

248. On September 9, 2019, Mr. Taylor underwent yet another surgery at Denver Health. His medical team performed an ulnar shortening osteotomy on his arm.

249. Mr. Taylor's medical team made the following note under indications for the procedure, "[Mr. Taylor's] initial postoperative course was complicated by osteomyelitis of his left forearm."

250. All told, to deal with the aftereffects of the chronic osteomyelitis that developed while he was denied medical care at the LCJ, and since leaving the LCJ in October 2018, Mr. Taylor has had to undergo four surgeries at Denver Health, including excisional irrigation and debridements, repair of numerous structures, soft-tissue flap for soft-tissue coverage, and long-term antibiotic treatment with multiple antibiotic spacer placements. Mr. Taylor has also had to undergo several additional bone biopsy procedures.

251. Mr. Taylor's Denver Health medical team still cannot say for certain if they have rid him of his osteomyelitis.

**E. As a Result of Defendants' Conduct, Mr. Taylor Has Experienced Significant Pain and Suffering and Loss of Employment, and He Faces the Potential Amputation of his Left Forearm.**



252. Mr. Taylor's forearm is now severely deformed. He has lost nearly all of his mobility in the five fingers of his left hand. His left hand is near constantly swollen and in pain. (See included pictures of Mr. Taylor's forearm from 4/2020.) The Denver Health medical team refers to his left forearm and hand as a "helper hand."

253. Since leaving the LCJ, Mr. Taylor has had regular contact and appointments with his Denver Health medical team and continues to work with

them as they attempt to preserve the length of his arm to allow him to continue using it as a "helper hand." Mr. Taylor's medical team at Denver Health believe that amputation may be inevitable.

254. Because of the condition of his forearm, Mr. Taylor's ability to use a prosthetic limb, should amputation be necessary, would be severely limited.

255. Because of the diminished capacity of his arm and hand, Mr. Taylor is no longer able to perform the work that he previously did as a welder. Mr. Taylor has been forced to do other types of jobs where his limited mobility is not an impediment or danger to others. As a result, Mr. Taylor is consigned to earn substantially less money than he was before his incarceration at LCJ and will earn substantially less income for the rest of his life.



256. As a result of the deliberate indifference of Defendants, Mr. Taylor has endured years of unnecessary pain. He was in constant pain during his incarceration at the LCJ and experienced bouts of nausea, weight loss, sleeplessness, and anxiety there. Additionally, Mr. Taylor has been forced to undergo surgery repeatedly, suffering through all the pain that accompanies serious surgical procedures over and over again.

257. Throughout this ordeal, Mr. Taylor has had to endure significant emotional distress. As a young man in the prime of his life, he spent months suffering from an infection that developed and spread in his forearm while person after person at the LCJ stood by and refused to provide him the medical care he needed. Emerging from incarceration deformed and barely able to use his left hand, Mr. Taylor has experienced severe depression, anxiety, self-consciousness, and hopelessness. Mr. Taylor's inability to perform the welding work he loved, to partake in his favorite activities, and to complete the basic tasks of adult life have been devastating to him.

**F. The Policies, Practices, and Customs of Larimer County and Armor Correctional Health Services Resulted in the Denial of Medical Care to Mr. Taylor and His Resulting Osteomyelitis.**

*a. The Cost of Jail Healthcare*

258. Healthcare is expensive. And healthcare for incarcerated people is no exception.

259. A 2017 report from the Pew Charitable Trusts on the costs of prison health care[1] reported that in 2015, the average state department of corrections spent $5,720 per inmate per year on health care.[2] That is $15.67 per incarcerated person per day. Some states spent up to $10,000 per incarcerated person per year, which would be $27.39 per incarcerated person per day.[3] In 2015, the Colorado Department of Corrections spent an average of $6,641 per incarcerated person, which is $18.19 per incarcerated person per day.[4]

[1] Though prisons and jails are different, research on the cost of prison health care is illustrative.
[2] Pew Charitable Trusts, *Prison Health Care: Costs and Quality*, 6 (Oct. 2017), available at http://www.pewtrusts.org/~/media/assets/2017/10/sfh_prison_health_care_costs_and_quality_final.pdf.
[3] *See id.*
[4] *Id.* at 8.

260. The National Institute of Corrections reported that in 1998, state departments of corrections paid an average of $7.15 per incarcerated person per day on healthcare.[5]

261. Two of the most expensive costs of providing healthcare to those incarcerated within jails are offsite treatment and staff salaries.

262. Offsite treatment requires the jail and the healthcare provider to coordinate to transport an individual out of a facility, which means the jail must expend money on additional staff resources to execute the transport and ensure proper staffing at the facility.

263. Transportation in and out of jail facilities implicates security concerns, so transports require not just the time of medical staff or corrections officers, but also security personnel.

264. When the medical providers in the facility cannot provide necessary treatment, such as when the need arises for a specialist consultation or surgery, incarcerated individuals must be taken from the facility to a hospital or specialist. Offsite treatment can often result in expensive medical bills from these specialists.

265. Compared to people incarcerated in state prisons, people in jail are usually there for relatively short periods of time. Some are able to bond out within days of arriving at the jail or are incarcerated for a few months before their criminal cases are resolved. Those serving sentences at county jails may be there for longer.

---

[5] Council of State Governments, *Corrections Health Care Costs*, 1 (Jan. 2004), available at https://www.prisonpolicy.org/scans/csg/Corrections+Health+Care+Costs+1-21-04.pdf.

266. Once someone is released from jail, the jail and its healthcare provider are no longer constitutionally obligated to provide that person medical care. Instead, just like any other free citizen, the individual must seek medical care at their own expense in the community.

267. Because Larimer County and Armor are no longer financially responsible for medical care for individuals once they are released from the LCJ, they have clear financial incentives to delay or refuse medical treatment to their incarcerated population.

268. In other words, if the LCJ and Armor staff postpone providing medical treatment to an individual until that individual is released, then Larimer County and Armor avoid the financial burden of paying for that person's medical care.

*b. Armor Has Repeatedly Caused Death and Serious Injury to Individuals*

269. These financial incentives to avoid providing care and thereby save costs and increase profits have played out through Armor's other contracts across the country. Indeed, Armor has a longstanding history of prioritizing its own profits over the health and safety of the people it is contracted and constitutionally obligated to care for.

270. Armor was founded in 2004 and grew to a multi-million-dollar company. In 2017, it reported revenue exceeding $242 million.

271. Time and time again, Armor has shown that its main goal is to make exorbitant amounts of money. To accomplish that goal, it has demonstrated a longstanding, widespread policy, practice, and custom of delaying or denying medical care and understaffing its facilities to reduce costs.

272. Since its inception, Armor has been named as a defendant in hundreds of lawsuits alleging constitutionally inadequate and/or negligent medical care evidencing its policy, practice,

and custom to be deliberately indifferent to prisoners' medical needs and delay or deny medical treatment to save costs and increase profits.

273. For example, in 2009, Armor provided inadequate medical care to Linda Stevenson, who was incarcerated at a jail where Armor provided medical care. When Ms. Stevenson arrived at the jail, she told Armor medical staff that she had recently been in the hospital for heart problems. Her medical records from the hospital showed that she needed an EKG, but Armor did not perform one for nine days. When it was finally completed, the results showed "critical significant abnormalities." Armor Doctor Willy Noel—who had only a limited medical license—reviewed Ms. Stevenson's results but did not send her to the hospital nor provide her further care. On her way home from the jail, Ms. Stevenson went into cardiac arrest. She was rushed to the hospital but had already suffered severe brain damage. Just over a week later, she died.

274. Armor settled a lawsuit with Ms. Stevenson's estate but maintained that its staff had acted appropriately according to Armor's policies and practices.

275. In 2010, Armor was deliberately indifferent to the serious medical needs of Raymond Delgado, who was incarcerated at a county jail in Florida where Armor provided medical care. Mr. Delgado, then 50 years old, informed Armor medical staff at the jail many times during his year-and-a-half long stay that he was experiencing excruciating abdominal pain, blood in his stool, and severe weight loss. Mr. Delgado told Armor staff that he feared he had colon cancer based on these symptoms and because his father had died from colon cancer. While Mr. Delgado was at the jail, Armor medical staff did not examine his colon, conduct a CT scan, or perform any other evaluation of his colon, nor did they screen Mr. Delgado for colon

cancer. It was not until Mr. Delgado was transferred to the state department of corrections that medical staff there rushed him to the hospital for emergency surgery. At the hospital, Mr. Delgado was diagnosed with colon cancer and given an 8% likelihood of surviving another five years. A lawsuit on Mr. Delgado's behalf argued that earlier detection of the cancer would have increased Mr. Delgado's survival rate, reduced his pain and suffering, and likely prevented the need for chemotherapy or a colostomy.

276. Armor settled the lawsuit with Mr. Delgado but maintained that Armor medical staff had acted appropriately according to Armor's policies and customs.

277. Also in 2010, Armor was deliberately indifferent to the serious medical needs of Austin Clary, who was incarcerated at a jail where Armor provided medical services. Mr. Clary had "hypokalemic periodic paralysis," which required him to take medication daily to avoid paralysis and other serious medical conditions. When Mr. Clary was arrested, he and his family informed the jail of his condition, but he was not given his necessary medication. Because of this, predictably, Mr. Clary woke up one day partially paralyzed, and as the day went on, his condition worsened. Mr. Clary repeatedly begged for his medication, but Armor staff brushed off his pleas for help, stating that he was faking his symptoms. Finally, Mr. Clary went to the hospital, where it was discovered that his potassium levels had dropped dangerously low. He stayed in the Intensive Care Unit for two days before recovering.

278. In 2014, Armor settled a lawsuit with Mr. Clary but maintained that its employees had acted appropriately according to Armor's policies and customs.

279. In 2012, Armor exhibited deliberate indifference to the medical needs of Raleigh Priester, a United States Army veteran incarcerated in a jail where Armor provided medical

services. Mr. Priester was found dead, lying in a puddle of his own vomit and weighing 120 pounds, which was half the weight he measured when he entered the jail 155 days earlier. Mr. Priester had died a slow death from starvation as he fell deeper into the spirals of his well-documented mental illness—schizophrenia—that was repeatedly ignored by Armor staff.

280. Armor settled a claim with Mr. Priester's estate but maintained that its staff had acted appropriately according to their policies and customs.

281. Also in 2012, Armor was deliberately indifferent to the serious medical needs of Allen Hicks, who was incarcerated at a jail where Armor provided medical services. Mr. Hicks died after suffering a stroke that went untreated for 36 hours, despite the fact that Mr. Hicks had arrived at the jail exhibiting symptoms of a stroke, including the inability to move his left arm and incoherent speech. He was not provided any medical treatment or even medically screened upon arrival. Instead, jail staff laid him face down on the floor in a cell and did not bring him to a hospital for a day and a half. When staff finally did collect him to take him to the hospital, he was soaked in urine. At the hospital, Mr. Hicks fell into a coma due to the stroke he had suffered. Three months later, he died.

282. Armor paid Mr. Hick's estate $800,000 to settle a lawsuit against it but maintained throughout the lawsuit that Armor staff had acted appropriately according to Armor's policies and customs.

283. Again in 2012, Armor failed to provide adequate treatment to Karen Ibarra at the Sarasota County Jail where Armor provided medical services, resulting in Ms. Ibarra's death. Ms. Ibarra told Armor medical staff that she was not receiving her necessary prescription medication and that she could not move her legs. Armor medical staff told her she was faking

her symptoms. Ms. Ibarra then began begging for water, but Armor medical staff ignored her. Later, when they finally tried to insert an IV, staff were unsuccessful. They decided to try again the next morning. But by that time, it was too late. Staff found Ms. Ibarra nonresponsive in her cell with blue lips. Ms. Ibarra reportedly died of cardiac arrhythmia induced in part by dehydration.

284. In 2014, Armor failed to provide emergency care to 22-year old Christopher Datta, which resulted in permanent injury and disability. Mr. Datta told Armor medical staff at the Sarasota County Jail that he had lost feeling below his waist. Rather than conduct tests or take him to the hospital, Armor staff gave Mr. Datta ice, the non-steroidal anti-inflammatory drug Aleve, a knee brace, and some pain medication. After Mr. Datta collapsed and then urinated and defecated on himself, Armor medical staff continued to ignore him and refused to provide him with medical care. Mr. Datta was not able to make it to a hospital until he was released from jail. Once there, he received emergency surgery. He now has chronic pain, bowel, bladder, and erectile dysfunction, and reduced sensation in his lower body. These problems are expected to be lifelong.

285. Armor has maintained that its staff acted appropriately in accordance with its policies and practices in relation to Mr. Datta’s care.

286. In 2015, at the Volusia County Jail where Armor provided medical services, Armor failed to provide James Herr necessary blood-pressure medicine, resulting in his death. When Mr. Herr, age 71, arrived at the jail and was acting strangely, Armor medical staff never called his wife nor his prior medical provider to determine if he had medical needs. Mr. Herr’s wife later called the facility to inform staff that Mr. Herr needed his blood-pressure medication,

but Armor staff still refused to provide it to him. On Mr. Herr's sixth day in the jail, jail staff found him breathing abnormally in his cell. Mr. Herr was then taken to the hospital, where he was pronounced dead due to hypertensive heart disease.

287. In 2016, Armor denied necessary medical treatment to another individual incarcerated at a jail where Armor provided medical services. John Kinlaw broke his finger while incarcerated and needed immediate medical attention to stabilize the finger and prevent it from healing incorrectly. But an Armor doctor merely provided him with an icepack and over-the-counter pain medication. Mr. Kinlaw told the doctor and other Armor medical staff repeatedly over the next several weeks that his finger needed medical attention, but no Armor staff addressed the issue or even took x-rays or other imaging of Mr. Kinlaw's hand. Over 100 days later, Armor medical staff finally arranged for Mr. Kinlaw to see an orthopedic specialist, who confirmed that Mr. Kinlaw's hand had healed incorrectly and that he needed surgery. Mr. Kinlaw's hand is permanently damaged.

288. Mr. Kinlaw prevailed at a trial, where a jury awarded him over $1 million dollars. Throughout the lawsuit, Armor never admitted any wrongdoing and instead maintained that its staff had acted appropriately according to Armor's policies and customs.

289. Also in 2016, Armor failed to provide medical care to Charles Jones, who died after experiencing severe abdominal pain for several weeks. Mr. Jones alerted Armor medical staff that he was experiencing sharp abdominal pains, fatigue, and constipation, which are symptoms of bowel obstruction. Mr. Jones was also experiencing anemia at the time. Two days before Mr. Jones died, an Armor nurse noted that his breath had "a fecal odor to it," which is a

sign of bowel blockage. Mr. Jones was finally taken to the hospital, but it was too late. He suffered septic shock and died.

290. In 2016, Armor was deliberately indifferent to the serious medical needs of April Brogan, a 28-year old mother who died in a jail where Armor provided medical services. Ms. Brogan died after exhibiting clear signs of opiate withdrawal but without having received any treatment for this condition, which is widely known by medical professionals to be potentially deadly if untreated. A lawsuit regarding this incident is still ongoing, but thus far, Armor has admitted no wrongdoing and has maintained that its employees acted appropriately according to Armor's policies and customs.

291. Many more of the deaths and serious injuries of prisoners in Armor's care have occurred because Armor medical staff have failed to recognize clear symptoms of a serious medical problem or need, similar to what happened with Mr. Taylor.

292. For example, Armor Nurse Linda Herlong was responsible for providing medical care to Amanda Lynette Freeman in February 2017, who was suffering a seizure, thrashing, and screaming due to methamphetamine withdrawal. Rather than provide medical treatment or care for the prisoner's drug withdrawal, Armor Nurse Herlong reportedly attempted to perform an exorcism on her, saying "I revoke your demons."

293. In 2016, Armor again failed to recognize obvious signs of drug and alcohol withdrawal in Kristina Fiebrink, who arrived at a Milwaukee County jail where Armor provided medical care and was subsequently denied medical treatment. Ms. Fiebrink was suffering hallucinations, vomiting, and diarrhea. Although her cries and pleas for help were heard throughout her unit, no medical staff attended to her, and she died on the floor of her cell.

294. Ms. Fiebrink's tragic death was just one of four that occurred at the Milwaukee County Jail during a six-month period in 2016 when Armor was providing medical care there.

295. That same year, Michael Madden also died after having repeatedly told Armor medical staff that he had a congenital heart defect and had previously used intravenous drugs, which put him at risk of a heart infection. During the month Mr. Madden spent at the jail, although he exhibited obvious signs of a serious, but treatable, heart infection, he did not receive proper medical care. On the day he died, he was crying out for help but was continuously ignored by Armor medical staff. Later that day, Mr. Madden died of a heart infection.

296. One of the other four deaths that occurred during this six-month period was of Shadé Swayzer's newborn baby girl. Ms. Swayzer arrived at the jail eight and a half months pregnant. Ms. Swayzer did not see a doctor at the facility, and Armor medical staff cancelled an appointment the day before she gave birth to her daughter in her cell, alone and without medical assistance. Ms. Swayzer's daughter was born alive, but several hours later, she died.

297. Terrill Thomas also died during that same period in Milwaukee County Jail while Armor was providing medical care. Mr. Thomas arrived at the jail showing signs of serious mental illness that were consistent with his known diagnosis of bipolar disorder. But Armor medical staff did not treat Mr. Thomas's serious mental illness. Instead, jail staff turned off the water in his cell, and nearly a week later, after he had lost more than 30 pounds, he died from dehydration.

298. Mr. Thomas's estate settled a lawsuit against Armor and other defendants for $6.75 million. Armor maintained that its staff had acted appropriately according to Armor's policies and customs.

299. The Milwaukee County Board of Supervisors Chairman Theodore Lipscomb called Mr. Thomas's death "unconscionable" and stated: "It just seemed so inconceivable that you are in custody, with medical professionals around you, that you're under monitoring, people are charged with your care, you do not have your normal ability to advocate for yourself, and that that could be the outcome in America."

300. In 2018, the State of Wisconsin criminally charged Armor for falsifying health care records to state that Armor staff had provided Mr. Thomas medical care during the week before his death. Contradicting the falsified written reports, video footage revealed that nurses and other Armor medical staff had only occasionally glanced inside Mr. Thomas's cell.

301. The criminal complaint against Armor stated that Armor employees "engaged in a pattern and practice of intentionally falsifying entries in inmate patient health care records," and that "[h]ad Armor Correctional medical staff actually performed the assessments that they falsely recorded in Mr. Thomas's patient health care records…medical staff may have identified Mr. Thomas's fatal medical distress." Armor moved to dismiss the criminal complaint, arguing that the employees had acted outside the scope of their employment with Armor, but the court denied this motion, stating that the employees "served a corporate goal of minimizing staffing cost at the workplace."

302. In 2018, Milwaukee County passed a measure to stop contracting with Armor and begin providing medical care to its own jail population, starting in 2021.

303. An audit of Armor's performance in Milwaukee County also revealed that over a span of 22 months, Armor's staff levels never hit 95% as required by its contract but on average

hovered around 89%. There were shortages of registered nurses, psychologists, and psychiatrists.

304. This situation in Wisconsin was not the first time Armor has had legal trouble. In 2016, the State of New York sued Armor after eleven individuals died in Armor's care at the Nassau County Jail. A state commission ruled that Armor played a part in at least five of those deaths.

305. One of those individuals was Roy Nordstrom. He died after Armor medical staff failed to take him to the hospital for chest pains.

306. Another was Batholomew Ryan, who committed suicide after Armor medical staff failed to provide him with mental-health treatment, even though they were aware of his mental illness. Armor settled a case with Mr. Ryan's estate for $7.9 million but maintained that its employees had acted appropriately according to Armor policies and customs.

307. Another was Kevin Brown, who died after Armor failed to treat him for seizures and hallucinations.

308. Another was John Gleeson, who died after Armor failed to treat his angioedema, which causes obvious symptoms such as swelling and difficulty breathing. On the day of Mr. Gleeson's death, he asked for medical care, but Armor staff gave him some Benadryl and sent him back to his cell. Then, other prisoners in the jail could hear Mr. Gleeson struggling to breathe and tried to alert staff, but Mr. Gleeson did not receive any care. When Mr. Gleeson was finally taken to the hospital, he was swollen and blue. Later that night, he died.

309. Finally, there was also Antonio Marinaccio, who died after suffering a heart attack after Armor medical staff refused to conduct tests or provide him any treatment. A year

later, New York state authorities received information that medical records related to Mr. Marinaccio's care had been falsified by Armor to state that medical staff had ordered a test for Mr. Marinaccio before his heart attack.

310. As part of the settlement with the State of New York, prompted by the lawsuit over the deaths of Mssrs. Nordstrom, Ryan, Brown, Gleeson, and Marinaccio, Armor agreed to pay $350,000 to New York and to refrain from bidding on any medical-provider contracts for any of New York State's jails for three years.

311. In February 2018, Jimmy Anglin died in a Florida jail where Armor provided medical services after informing staff that he was a frequent heroin user. Even though withdrawal from heroin for frequent users happens quickly and the symptoms can be life-threatening, an Armor nurse told Mr. Anglin that staff would assist him in the morning because he had already missed the window of opportunity to receive medication the evening he arrived at the jail. It was only after Mr. Anglin suffered a seizure that medical staff gave him Narcan, a common and relatively inexpensive medication for heroin withdrawal. But by that time, it was too late. Shortly thereafter, Mr. Anglin passed away. The Sheriff's Department had to make Armor medical staff implement detox protocols so that they could more closely monitor individuals suffering from withdrawal.

312. Armor has exhibited the same policies, patterns, and customs of providing inadequate medical care to save costs and increase profits in Colorado as well.

313. In October 2017, less than 200 miles away from the LCJ at El Paso County's Criminal Justice Center (CJC), where Armor provided medical services at the time, Madelyn Taylor Hemphill—a pregnant detainee—cried out for help when she felt herself going into labor,

but Armor medical staff ignored her. Ms. Hemphill was forced to birth her baby into the toilet in her cell, unassisted and alone. The baby inhaled toilet water and then spent the next three months in a hospital, suffering from an E. coli infection.

314. The child's guardian sued Armor, and Armor maintained that its employees acted appropriately according to its policies and practices.

315. In February 2017, also at the CJC in El Paso County, an Armor nurse delayed performing resuscitation efforts on Eliezer Tirado-Ortiz after he was assaulted by jail deputies, leading to his death. Before the assault, Mr. Tirado-Ortiz had told medical staff that he had ingested heroin and methamphetamine, and he was acting erratically.

316. Armor maintained that its nurse acted according to its policy and practice, but a "notice of concern" letter sent from the El Paso County Sheriff's Office named the Armor nurse and noted that she had failed to "take charge" of the situation with Mr. Tirado-Ortiz that led to his death. The letter also noted another, similar situation that had occurred in July 2017.

317. In August 2018, Deramus Lemuel died at El Paso County's CJC where Armor provided medical services. Mr. Lemuel was released from a local hospital for a methamphetamine overdose directly to the CJC, which was informed of his condition. At the CJC, Mr. Lemuel exhibited excessive sweating, muscle twitching, clenching of his jar, and a blank stare. He also would not communicate verbally. CJC deputies assaulted Mr. Lemuel for several minutes. After the assault, Mr. Lemuel was unconscious and he was not breathing, nor was his heart beating. Despite this, an Armor nurse who had observed the assault waited over four minutes before attempting CPR or any other procedure to save Mr. Lemuel's life. Mr. Lemuel never regained consciousness. Two weeks later, he died.

318. In the fall of 2017, the El Paso CJC lost its National Commission on Correctional Health Care accreditation after the organization conducted an audit of the facility and found issues with the medical services Armor had provided.

319. Armor medical staff also caused a hepatitis A outbreak at the CJC during their contract with El Paso County.

320. El Paso County no longer contracts with Armor.

321. In each of the above instances, not only did Armor provide inadequate medical care that resulted in serious injury or death, but it maintained nearly every time that its employees' actions were appropriate and according to its policies and practices.

322. Armor had the opportunity to change its policies and practices after each incident to ensure that it provided adequate medical care and placed the health and safety of the incarcerated people it was constitutionally obligated to care for over profit, but it did not do so.

323. In 2018, when Mr. Taylor entered the LCJ, Armor was still employing the same policies and practices of ignoring serious medical conditions and symptoms to save costs and increase profits. These policies and practices caused Mr. Taylor lasting injuries and permanent damage.

324. Even Armor's own former employees have acknowledged that Armor's policy and practice is to place profit above the health and safety of the incarcerated people it cares for, specifically by delaying offsite care.

325. In a 2016 article regarding Armor's lawsuit and settlement with New York, discussed above, an unnamed former Armor nurse stated: "Medications are being cut, supplies

are being cut, positions are not being there," and "I don't think there should be a price tag on anyone's life."

326. In a 2019 article discussing Armor's history of providing inadequate medical care, the Miami New Times reported that in her deposition related to Ms. Ibarra's case, discussed above, former Armor nurse Carolyn Rubin stated: "There was a strong corporate push for the doctor not to send patients out due to money," and "It was our duty to keep them there as long as possible, to prevent costs of the hospital, plus pulling deputies out of the jail that have to go sit with the patient at the hospital. The jail also frowned upon it too."

327. That same article reported that in a deposition related to Mr. Marinaccio's case, discussed above, Armor nurse Katherine McCormack Grange stated that the assistant director of nursing at the jail where she provided medical services through Armor told her that the jail had just received a $20,000 medical bill and they needed to use the medication they had. Nurse Grange stated that the jail would not order an albuterol pump for one of her patients because it was too expensive.

328. Ms. Grange also stated, "[E]mployees knew that Armor did not want nurses to send patients to the hospital," and that she thought Armor was "negligent at all times[.]"

329. Therefore, Armor has demonstrated that it has a policy, pattern, and practice of providing inadequate medical care to save costs and increase profit through refusing to bring people to the hospital or specialists for offsite care, refusing necessary medication or other treatment, employing incompetent staff who fail to recognize or ignore obvious signs of distress or illness and fail to act accordingly, and being chronically understaffed.

*c. Larimer County Contracts with Armor Despite Knowing About Armor's Pattern of Providing Inadequate Medical Care Resulting in Death and Serious Injury*

330. Larimer County was aware that providing adequate medical care to its jail population was a serious undertaking and grave responsibility, and it knew the risks at stake if it failed.

331. Between 2007 and 2017, two individuals committed suicide in the LCJ.

332. During that same time period, five individuals died in the LCJ due to untreated or improperly treated medical conditions.

333. Before signing the initial contract with Armor in 2017, Larimer County knew about at least some of the lawsuits that named Armor as a defendant and detailed the egregious and shameful denials of necessary medical care catalogued above.

334. But despite Larimer County's knowledge of the risks of providing inadequate medical care to its jail population, and despite that since Armor's inception as a company, it has repeatedly demonstrated that it will let individuals die or suffer serious injury rather than spend money on necessary medical care as detailed above, Larimer County signed a contract with Armor in February 2017 that was extended with slight amendments on January 25, 2018, for an additional 18-month term. Thus, the 2017 contractual provisions, slightly amended, applied while Mr. Taylor was incarcerated in the LCJ.

335. Both Defendant Smith and the BOCC signed the 2017 contract between Larimer County and Armor.

*d. Larimer County and Armor's Relationship Predictably Follows the Trend of Delaying and Denying Medical Care to Save Money*

336. In 2014, Larimer County booked 10,595 individuals into its jail. In 2015, Larimer County booked 11,125 individuals into its jail. Despite these high numbers, only 267 of these individuals in the LCJ were seen by a physician in 2014, and only 463 of these individuals in the LCJ were seen by a physician in 2015. A mid-level practitioner saw 2,705 individuals in the LCJ in 2014 and 4,665 individuals in the LCJ in 2015.

337. Larimer County was looking for a contractor who would keep with this trend of keeping costs low by limiting medical care provided to individuals within its jail.

338. To find this company, Larimer County created a request for bid that was posted online in September 2016. Armor responded to the bid, and the County and the company began negotiations.

339. The terms the two entities ultimately agreed upon evidenced that both Larimer County and Armor sought to make money while sacrificing the health and wellbeing of the jail's population.

340. The final contract, which expired on February 28, 2018, but has since been renewed, provided Armor $3,549,756 for the initial first-year term. That amount increased to $3,606,047 for the second-year term, which applied during the time that Mr. Taylor was incarcerated at LCJ.

341. In the 2017 contract, Armor and Larimer County agreed that the per incarcerated person per day rate for Larimer County would be $2.49.

342. In the 2018 extension and amendment of the contract, Armor and Larimer County agreed that the per incarcerated person per day rate would be lowered nearly 50%, to $1.26.

343. The contract denotes that this per diem rate is the amount used to adjust payment to Armor if the jail population fluctuates over or under a certain amount.

344. For example, if the jail population were 10 individuals higher than the average daily population of 585 for one 30-day month, then under the contract, Larimer County would be obligated to pay Armor an additional $378 above its standard monthly payment (10 X $1.26 X 30 = $378).

345. Thus, this per diem rate suggests that $1.26 was the amount Armor would put directly toward prisoner healthcare—and not exceed—per incarcerated person per day.

346. This rate in 2018, at $1.26 per incarcerated person per day, was less than one fifth of the average amount that the Colorado Department of Corrections spent per incarcerated person per day two decades earlier, in 1998, which was $7.15.

347. And this rate in 2018 was less than one tenth of what the Colorado Department of Corrections spent per incarcerated person per day three years earlier, in 2015, which was $18.19.

348. The contract between Larimer County and Armor also made clear that Armor would not pay offsite healthcare costs for the jail population without authorization from Larimer County, and that if Armor paid offsite healthcare costs that Larimer County did not think it should have paid, then Larimer County would not reimburse Armor for those costs.

349. In the breakdown of payment from Larimer County to Armor in the contract, offsite care costs were allotted $0. Therefore, any offsite costs incurred by Armor but not reimbursed by Larimer County would cut directly into Armor's profits.

350. Larimer County had a significant financial interest in avoiding offsite medical care, since prisoner or detainee transportation is expensive to orchestrate logistically, costs

money for the transportation, and requires an increase in staffing to provide jail security to, from, and at every single appointment.

351. Armor also had a financial incentive to avoid requesting approval from Larimer County for offsite medical care to avoid driving up costs for Larimer County, in order to curry favor with that entity which was paying it over $3 million a year, in furtherance of Armor's interest in ensuring that its contract with Larimer County would be renewed in the future.

352. Indeed, Larimer County did continue to renew Armor's contract, most recently for $4,224,078 for a one-year term, lasting through August 31, 2020.

353. Armor had a financial incentive to never permit anyone incarcerated at LCJ to obtain offsite care if that care had not been authorized by Larimer County because Larimer County would not reimburse Armor for the cost of that care.

354. Larimer County's request for contract and Armor's answering proposal makes clear that limiting offsite services is considered essential for cost-control purposes.

355. Armor's proposal notes that it understands that offsite care is expensive and that it would do its best to limit offsite trips.

356. Armor's proposal also states that once a prisoner is brought offsite, Armor will do its best to return that person to the LCJ as quickly as possible.

357. Larimer County's request for contract states that the medical provider is expected to exercise judgment regarding when to bring a person offsite.

358. Larimer County's request for contract also notes that its total costs for offsite medical care has previously averaged just $40,000 per year.

359. Armor's proposal explains that it has achieved hospital-length stays well below the national average. It seeks to maintain a 50% hospital acceptance rate, meaning that only 50% of patients brought to the hospital are admitted.

360. While contracting at Sarasota County, Armor reduced offsite utilization, or review, by 38% from the average of the previous two years.

361. While contracting at Santa Rosa County, Armor reduced offsite utilization by over 50%.

362. While contracting at Escambia County, Armor reduced hospital days by 50% and offsite visits by 40%.

363. Larimer County wanted fewer offsite visits to pay for, and Armor promised to limit its requests for such visits, even if it came at the expense of the health of the individuals in its care. As demonstrated by Mr. Taylor's situation detailed above and other allegations in this Complaint, Armor delivered on that promise.

364. The contract between Larimer County and Armor contained no details regarding the authorization process for offsite appointments, how or when Armor should seek such authorization, or when Larimer County would approve such authorization.

365. The contract between Larimer County and Armor contained no details regarding when this process—whatever it was—could be bypassed for emergency situations where an individual could not wait to hear back about authorization because they needed urgent offsite medical care.

366. Whatever the authorization process entailed, it necessarily slowed down, delayed, or sometimes prevented individuals from obtaining necessary care, since it created an additional, bureaucratic step before an LCJ incarcerated person could obtain offsite care.

367. Larimer County and Armor functioned under the understanding that to save costs, both parties would seek and authorize offsite care as little as possible, if at all, despite the repercussions both entities knew that would have on prisoner health.

368. Thus, the contract between Larimer County and Armor financially incentivizes delaying or denying medical care to minimize costs and maximize profit. Such financial incentives expressly denoted in a written contract represent an unconstitutional policy.

369. Medical staff are a costly part of providing healthcare in jails. Data compiled by the Bureau of Justice shows that "employee salaries, wages, and benefits represent between half and two-thirds of overall prison operating expenditures."[6] Additionally, the number of staff has been found to directly correlate with costs spent per incarcerated person; a higher amount of staff means a higher cost per incarcerated person, and a lower amount of staff means a lower cost per incarcerated person.[7]

370. Thus, there is also a financial incentive for both Larimer County and Armor to operate with the lowest possible amount of medical staff to avoid paying additional costly salaries and wages.

[6] *Prison Health Care: Costs and Quality*, *supra*, at 19.
[7] *Id.*

371. Indeed, Armor and Larimer County have demonstrated that they have policies and practices of placing profit over prisoner wellbeing by chronically understaffing the LCJ and repeatedly hiring medical staff who are incompetent.

372. Staffing numbers are agreed upon by Larimer County and Armor. Once the two agree on staffing numbers within the contract, Larimer County will not pay for additional staff, and Armor will not employ additional staff for which Armor will not be paid by Larimer County.

373. Around the country, as discussed above, as well as at the LCJ, Armor operated on a model of chronic understaffing and utilizing staff who were incompetent, including staff without proper medical licenses.

374. In 2018, LCJ's average daily prisoner population was 585.

375. In Larimer County's 2018 Comprehensive Annual Financial Report, it noted that the county was experiencing "severe overcrowding in the jail."[8]

376. A May 16, 2016, meeting among Sheriff Smith, Defendant Palmer, and the BOCC focused almost entirely on the rapidly rising jail population and resulting strain on Larimer County resources.

377. Despite this, the entire time Mr. Taylor was incarcerated at LCJ, Larimer County and Armor employed only one doctor for the facility.

378. A doctor was onsite at the facility only eight hours per week.

[8] Larimer County, Comprehensive Annual Financial Report (Dec. 2018), 39, available at https://www.larimer.org/sites/default/files/2018-cafr.pdf.

379. Because there was only one doctor for the nearly 600 incarcerated people present, available for only eight hours per week, Mr. Taylor was unable to see the doctor as frequently or as quickly as he needed to, as explained *supra*.

380. And Armor was understaffed at the LCJ in other ways besides the limited number of doctors.

381. Under the contract between Armor and Larimer County, there were never more than nine or ten medical staff total onsite during weekdays, and on weekends, there were no more than three medical staff available at one time.

382. Armor assumes the costs for all prescription medications used at the LCJ. The contract allotted a mere $330,405 per year for pharmaceuticals. Divided by the average of 585 prisoners per day, that allots $1.55 per incarcerated person per day for medications.

383. $1.55 per day per incarcerated person for medication is woefully inadequate to ensure that the medically vulnerable, high-needs population that cycles through the jail obtain the medications they need.

384. Thus, there is also a financial incentive for Armor to avoid or deny prescribing and providing medications to the jail population to ensure that the population's medication needs do not go over the $1.55 allotted per incarcerated person per day, which would diminish Armor's profits.

385. The contractual amount allotted for medication is also more than the per diem rate, meaning that if an individual is receiving daily medication, there is not a cent left to allocate for other medical needs, such as offsite medical care within the per diem rate.

386. Under its contract with Larimer County, Armor also bears the cost of all radiology or x-rays. Thus, Armor has a financial incentive to deny or limit the availability of these tests.

387. Given these financial constraints, it is unsurprising that Larimer County and Armor failed to provide adequate medical care to LCJ's population. In order to meet their respective bottom lines, Larimer County and Armor had to enforce and maintain policies, practices, and customs that were *designed* to save money by cutting costs.

388. In April 2017, just one month after Armor began its contract with Larimer County, Armor medical staff and Larimer County deputies denied LCJ incarcerated person Jeremy Bonde the proper medication he needed for his serious mental illnesses, despite many indications that he had serious medical needs. Mr. Bonde then had a psychotic break and attacked an LCJ deputy.

389. Despite this unacceptable failure, Larimer County continued to work with Armor and put its prisoners and detainees under Armor's care.

390. In 2018, during the same time Mr. Taylor was at the LCJ, Armor refused to provide LCJ incarcerated person Tom Grell with adequate medical and dental care to address a serious tooth infection. For nine months, Mr. Grell repeatedly asked Armor medical staff and jail deputies to see a dentist for his severe tooth, mouth, and throat pain. He complained that his teeth, mouth, and throat ached and felt like they were burning. When Mr. Grell told the Armor nurses who came around his unit during medication line that he was suffering from severe tooth, mouth, and throat pain and needed to see a dentist, the nurses repeatedly tried to pin the responsibility to care for Mr. Grell on someone else.

391. For example, Armor nurses working the day shift would tell Mr. Grell to talk to the nurses working the night shift because they would be able to "do more for him." But when Mr. Grell would tell the night nurses that he was experiencing pain and needed to see a dentist, the night nurses would not do anything for him. This process of delaying any treatment and ignoring worsening symptoms happened repeatedly over the nine months Mr. Grell was incarcerated at the LCJ. Nurses would also sometimes tell Mr. Grell to "put in a request," which he would do. A nurse was supposed to take the written request to the doctor who would then address Mr. Grell's needs. But each time Mr. Grell put in a written request, he would not hear anything about it for weeks, and even when he would eventually receive a response, it would just be someone again telling him to talk to the day or night nurse, which he had already done.

392. Larimer County staff also disregarded Mr. Grell's medical needs. Jail deputies repeatedly threatened Mr. Grell that if he continued complaining about his infection, they would send him to "the hole," which is the segregation/isolation unit. Jail deputies also threatened Mr. Grell that if he did not stop complaining about his infection, they would transfer him from the workers' unit where he resided—where he received additional privileges and was able to work to keep busy and build skills—back to general population. These jail deputies did not contact medical staff about Mr. Grell's condition, nor did they aid him in any way in his difficult and fruitless attempts to receive medical care.

393. During the nine months Mr. Grell was at the LCJ, he never once saw a dentist or a doctor for his tooth, mouth, and throat pain.

394. After Mr. Grell was released from the jail, he was finally able to get the medical care he needed. He had such a severe infection that he needed to have several teeth pulled. A standard dentist could not perform the operation. Instead, he had to go to an oral surgeon.

395. Also in 2018, around the same time that Mr. Taylor was at the LCJ, Austin Klen, an individual incarcerated there, injured his shoulder while cleaning the jail. Despite informing Armor medical staff and LCJ deputies about his injury, he never received care or treatment for it.

396. Many more individuals who have been incarcerated at the LCJ while Armor has provided medical care there have been unable to receive proper medical treatment despite repeatedly pleading for help and exhibiting symptoms necessitating treatment.

397. Larimer County was aware of these incidents of serious injuries suffered by individuals incarcerated in the LCJ.

398. Despite the fact that Armor continued to demonstrate it was unfit to provide constitutionally adequate care, Larimer County renewed its contract with Armor several times and continues to contract with them to this day, leading to more serious injuries and even death.[9]

399. Thus, Larimer County has demonstrated a policy, practice, and custom of financially incentivizing the delay and denial of medical care. Larimer County has chosen to hire a medical contractor that is incapable of providing adequate medical care to its jail population and that instead delays and denies medical care, hires incompetent medical staff, and understaffs its facilities to save costs.

[9] In 2019, after repeatedly exhibiting signs of mental illness, Daniel Reffet committed suicide at the LCJ. Shortly before his death, Daniel Reffet spoke to a close friend over a monitored phone call from the jail, expressing desire and intent to kill himself. Despite this, no Larimer County or Armor staff intervened to prevent Mr. Reffett's death.

400. Through its performance at the LCJ, Armor has continued to demonstrate its entrenched policies, practices, and customs of delaying and denying medical care to save costs and increase profits.

401. Larimer County's and Armor's actions and omissions led to violations of Mr. Taylor's constitutional rights by failing to appropriately treat his serious infection, which grew to chronic osteomyelitis in multiple sites after his infection was deliberately ignored for months.

*e. Larimer County's Failure to Adequately Supervise Armor and Armor Staff*

402. Larimer County has the ability and authority to inspect, review, and audit Armor's services and performance in its jail.

403. If Larimer County had conducted an inspection, review, or audit, including by surveying the LCJ's population regarding Armor's services, it would have discovered that Armor was providing inadequate care to many individuals, including Mr. Taylor.

404. But, on information and belief, after Armor began providing medical services to the LCJ in 2017, Larimer County did not conduct any inspection, review, or audit of those services.

405. Mr. Taylor never spoke to anyone conducting an audit or review of Armor's services during his time at the jail.

406. No one ever asked Mr. Taylor about his experience with Armor or whether he had any complaints regarding Armor or its staff.

407. For the months he suffered, Mr. Taylor complained to LCJ deputies about his deteriorating medical condition, but no staff took any actions to report the Armor staff or to ensure that Mr. Taylor's medical needs were properly taken care of.

408. Mr. Grell never spoke to anyone conducting an audit or review of Armor's services during his time at the jail.

409. No one ever asked Mr. Grell about his experience with Armor nor whether he had any complaints regarding them.

410. Mr. Klen never spoke to anyone conducting an audit or review of Armor's services during his time at the jail.

411. No one ever asked Mr. Klen about his experience with Armor nor whether he had any complaints regarding them.

412. If Larimer County did conduct an inspection, audit, or review, it did nothing to address or correct Armor's constitutionally deficient behavior, which it would have uncovered upon a legitimate inspection, audit, or review.

413. Thus, Larimer County failed to adequately supervise and provide oversight to its contractor.

414. Given Armor's history of providing inadequate medical care resulting in the permanent damage and death of many individuals, it is foreseeable that such a lack of oversight would lead to Armor violating the constitutional rights of those incarcerated at the LCJ.

415. Additionally, because incarcerated people suffer disproportionate health complications as outlined *supra*, including higher rates of addiction and mental illness, and because communicable diseases are more likely to exist and spread in populations cycling in and out of jails, jail populations more than most need adequate medical care and attention to their conditions. It is obvious and highly predictable that failing to supervise Armor in its provision of medical care at the LCJ would result in constitutional violations.

416. Larimer County's failure to supervise Armor medical staff led to the violation of Mr. Taylor's constitutional rights in the failure to appropriately treat his serious infection, which grew to osteomyelitis after being ignored for months.

*f. Armor and Larimer County's Failure to Train Medical Staff*

417. Armor failed to adequately train its medical staff to recognize obvious signs of infection warranting immediate and emergency treatment.

418. As outlined *supra*, Mr. Taylor exhibited obvious signs of infection, including swelling, redness, and pus around his wound; fever; loss of appetite; excessive weight loss; and nausea. All of these are symptoms that a competent medical professional would have realized are signs of a serious infection and necessitate immediate medical attention.

419. The fact that no Armor medical staff provided Mr. Taylor the proper care to treat his infection, instead allowing it to fester into osteomyelitis that caused him permanent damage and deformity, evidences that the medical staff were incompetent and not properly trained.

420. The fact that Armor medical staff attempted to address Mr. Taylor's infection by merely providing him Band-Aids, changing his dressing, and providing him basic oral antibiotics, none of which alleviated or cured the infection, evidences that the medical staff were incompetent and not properly trained.

421. Armor staff have a history of failing to recognize and treat symptoms of obvious illnesses with simple treatments, as outlined above.

422. Armor staff also have a history of employing incompetent medical staff, some of whom are not properly licensed.

423. Armor's history of incompetence, failures to recognize obvious symptoms of illnesses, failures to provide necessary and life-saving medical treatment to individuals over and over again, as well as its staff's failure to provide necessary medical treatment for Mr. Taylor's serious medical needs all demonstrate that Armor has a widespread and entrenched policy of failing to train its staff, which constitutes deliberate indifference.

424. Armor's failure to train its staff caused Mr. Taylor's infection to worsen and eventually cause serious, permanent damage and deformity.

425. Larimer County also failed to adequately train Armor's medical staff regarding how to properly care for individuals in need of immediate and emergency care.

426. As outlined *supra*, Mr. Taylor exhibited obvious signs of infection, including swelling, redness, and pus around the wound; fever; loss of appetite; excessive weight loss; and nausea that a competent medical professional would have realized necessitated immediate attention.

427. The fact that no Armor medical staff provided Mr. Taylor the proper care to treat his infection, instead allowing it to fester into osteomyelitis that caused permanent damage, evidences that the medical staff were incompetent and not properly trained.

428. Larimer County's failure to train Armor medical staff caused Mr. Taylor's injuries and suffering, which allowed his infection to worsen and eventually cause serious, permanent damage and deformity.

**G. Sheriff Justin Smith and Captain Timothy Palmer Maintained a Constitutionally Deficient Medical-Care System at the LCJ, Though They Knew Such a System Posed Substantial Risks to LCJ's Population.**

429. Defendant Smith has been the Sheriff of Larimer County since 2010.

430. As Sheriff of Larimer County, one of Defendant Smith's duties is overseeing the LCJ, including by overseeing the medical care provided to the incarcerated population there.

431. In overseeing the LCJ, Defendant Smith is responsible for creating and enforcing regulations, policies, practices, and customs at the jail.

432. Having served as the Sheriff of Larimer County for over a decade, and having overseen LCJ during those many years, Defendant Smith is aware of the serious injuries that people incarcerated at the LCJ have suffered during that time, including while Armor has been providing medical services.

433. Defendant Smith is aware of all of the deaths that have occurred at the LCJ during his time as Sheriff.

434. Defendant Smith was also responsible, with the BOCC, for approving the contract with Armor that began in 2017.

435. Having the responsibility to approve the medical provider for LCJ, Defendant Smith is also aware of the problematic work product of the chosen medical provider and aware of at least some of the serious injuries and deaths that occurred under Armor as a medical provider, in Colorado and across the country.

436. Indeed, it is Defendant Smith's responsibility to keep abreast of how his contactors operate their business and conduct their services.

437. Despite this knowledge and responsibility, Defendant Smith approved and signed a contract for Armor to provide medical services to those incarcerated at the LCJ in 2017 and every year since.

438. Despite this knowledge, Defendant Smith has done nothing to address the inadequacies of the medical-care system run by Armor at the LCJ and has instead maintained a system that has resulted in the deaths or serious injuries of many individuals, including Mr. Taylor.

439. Defendant Smith's lack of action has resulted in the failure to alleviate the risk of serious harm to individuals incarcerated at the LCJ, which is foreseeable based on Armor's entrenched history of bad acts and its own track record at the LCJ.

440. Defendant Timothy Palmer has worked for the Larimer County Sheriff's Office since 1983. In 2011, Mr. Palmer was appointed as Facility Administrator, or Captain, of the LCJ.

441. In this position, Defendant Palmer's primary responsibilities are to provide direct supervision, general management, and direction to the LCJ. This includes supervision, general management, and direction over the medical department at the LCJ.

442. In this position, Defendant Palmer, together with Sheriff Smith, creates and enforces regulations, policies, practices, and customs at the LCJ.

443. Defendant Palmer is aware of at least some of the serious injuries that individuals at the LCJ have suffered since Armor began providing medical care there.

444. Defendant Palmer is aware of all of the deaths that have occurred in the LCJ since he became the Captain.

445. Despite this knowledge, Defendant Palmer has done nothing to address the inadequacies of the medical-care system at LCJ and has instead maintained a system that has resulted in the serious injuries and death of many individuals.

446. Defendant Palmer's lack of action has resulted in the failure to alleviate the risk of serious harm to individuals incarcerated at the LCJ that is foreseeable based on Armor's entrenched history of bad acts and its own track record at the LCJ.

## V. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 — Deliberate Indifference to Serious Medical Needs
### Violation of the Eighth and Fourteenth Amendments
### (against Defendants Jarman, McLaughlin, Cook, Harmon, Hoisington, Mahloch, Morse, Schultz, Oakley, Peisert, Palmer, Wenzel, and Wilson)

447. Mr. Taylor incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

448. Mr. Taylor brings this claim against Defendants Jarman, McLaughlin, Cook, Harmon, Hoisington, Mahloch, Morse, Schultz, Oakley, Peisert, Palmer, Wenzel, and Wilson (the medical-provider Defendants).

449. At all times relevant to this claim, the medical-provider Defendants were acting under the color of state law.

450. The medical-provider Defendants actually knew of Mr. Taylor's serious medical needs and, with deliberate indifference to those needs, failed to provide him the appropriate medical care and failed to accurately record his symptoms and complaints for several months. Moreover, the medical-provider Defendants prevented Mr. Taylor from receiving the medical care he needed and denied him access to the medical personnel capable of evaluating his need for

treatment. They did so despite being aware of Mr. Taylor's serious medical needs and with reckless disregard for a substantial risk of physical harm to Mr. Taylor.

451. The medical-provider Defendants continued to act in bad faith and with deliberate indifference to Mr. Taylor's serious medical needs and constitutional rights when they willfully ignored his repeated requests for medical attention and intentionally denied and/or delayed his access to medical care.

452. The acts or omissions of the medical-provider Defendants as described herein intentionally deprived Mr. Taylor of his constitutional rights and were moving forces and substantial, significant, contributing, proximate causes of Mr. Taylor's injuries.

453. The acts or omissions of the medical-provider Defendants as described herein were taken maliciously, willfully, or with a reckless or wanton disregard of Mr. Taylor's constitutional rights.

454. As a direct result of the medical-provider Defendants' unlawful conduct, Mr. Taylor has suffered injuries, damages, and losses as described herein, each of which entitle him to compensatory damages and attorneys' fees in amounts to be determined at trial.

455. Mr. Taylor has also suffered lost past and future earnings and impaired earnings capacities in ongoing amounts to be determined at trial.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 — Deliberate Indifference to Substantial Risk of Harm**
**Violation of the Eighth and Fourteenth Amendments**
**(against Defendant Smith, in his individual capacity, and Defendant Palmer)**

456. Mr. Taylor incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

457. Mr. Taylor brings this claim against Defendants Sheriff Justin Smith and Captain Timothy Palmer in their respective individual capacities.

458. At all times relevant to this Complaint, Defendants Smith and Palmer were acting under the color of state law.

459. Defendants Smith and Palmer were aware of the substantial risk of harm to the prisoners at the LCJ by the County's contracting with Armor, which had exhibited deliberate indifference to the serious medical needs of hundreds of individuals across the country, including at the LCJ.

460. Defendants Smith and Palmer were aware of at least some of the serious injuries and deaths that had occurred due to Armor's fault across the country and were aware of the difficulties and necessity of providing adequate medical care to the population at the LCJ.

461. Defendants Smith and Palmer each had the responsibility to oversee the LCJ and each had the power and authority to create and enforce policies, regulations, practices, and customs within the LCJ.

462. Despite knowing of the risks posed by having Defendant Armor run the medical-care system at the LCJ, Defendant Smith signed a contract and continuously renewed that contract to allow Defendant Armor to provide medical care to individuals detained at the LCJ.

463. Despite knowledge of these risks, neither Defendant Smith nor Defendant Palmer did anything to address the inadequacies of the medical-care system at the LCJ and instead maintained the constitutionally deficient system.

464. Defendants Smith's and Palmer's actions in being aware of obvious, substantial risks to their jail population but turning a blind eye and failing to prevent or address those foreseeable risks, constitute deliberate indifference.

465. By ignoring obvious problems with the LCJ's medical contractor and continuing to allow Armor to provide inadequate medical care to the vulnerable LCJ population, Defendants Smith and Palmer permitted the constitutionally deficient medical-care system to persist.

466. This constitutionally deficient medical-care system that Defendants Smith and Palmer allowed to persist at the LCJ led to Mr. Taylor's inability to obtain proper care for his worsening infection, which eventually grew to severe osteomyelitis, as described above.

467. As a direct result of Defendant Smith's and Palmer's unlawful conduct, Mr. Taylor has suffered injuries, damages, and losses as described herein, which entitle him to compensatory damages and attorneys' fees in amounts to be determined at trial.

468. Mr. Taylor has also suffered lost past and future earnings and impaired earnings capacities in ongoing amounts to be determined at trial.

## THIRD CLAIM FOR RELIEF
## 42 U.S.C. § 1983 — Failure to Provide Adequate Medical Care / Failure to Train / Failure to Supervise
## *Monell* Claim
## Violation of the Eighth and Fourteenth Amendments
## (against Defendant Smith in his Official Capacity and BOCC)

469. Mr. Taylor incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

470. Mr. Taylor brings this claim against Defendant Sheriff Justin Smith in his official capacity and Defendant the BOCC (collectively Larimer County).

471. At all times relevant to this Complaint, Larimer County had a non-delegable duty under the U.S. Constitution to provide adequate medical care to its jail population.

472. Larimer County exhibited a policy, practice, and custom of maintaining an inadequate medical-care system to save costs when it contracted with Armor despite knowing about Armor's history of causing serious injury and death to dozens of individuals around the country, including in Colorado.

473. Larimer County further exhibited this policy, practice, and custom when it agreed to a contract that financially incentivized the delay or denial of medical care to save costs and increase profit and continued to contract with Armor despite knowing about Armor's repeated failings across the county and within the LCJ.

474. Larimer County also exhibited a policy, practice, and custom of ignoring prisoners' medical needs and refusing to coordinate with medical staff to ensure that individuals received the care they needed.

475. These policies, practices, and customs, which have caused deaths and serious injuries to individuals incarcerated in the LCJ, including Mr. Taylor, amount to deliberate indifference under the law.

476. Larimer County's policies, practices, and customs, were moving forces behind Mr. Taylor's inability to obtain adequate treatment for his severe infection, which caused him damages, including increased medical costs, physical pain and suffering, psychological and emotional trauma, permanent damage, limited mobility, and inability to perform daily tasks and work functions.

477. Larimer County knew that individuals in its jail could suffer serious consequences by the continued implementation of these policies and practices, but maintained them anyway.

478. Larimer County also failed to train Armor medical staff to recognize and treat obvious signs of infection.

479. Given the prevalence of individuals with severe health conditions and mental-health needs within jails and the likelihood that failure to properly treat conditions would result in injury or death, Larimer County's failure to train Armor staff constitutes deliberate indifference because it is highly likely, foreseeable, and obvious that failing to train medical staff to provide adequate medical care will result in constitutional violations.

480. This failure to train also was a moving force behind Mr. Taylor's inability to obtain adequate treatment for his severe infection, which caused him damages, including increased medical costs, physical pain and suffering, psychological and emotional trauma, permanent damage, limited mobility, and inability to perform daily tasks and work functions.

481. Larimer County also failed to properly supervise Armor to ensure that it was providing adequate medical care.

482. Given Armor's widespread history of providing inadequate care to incarcerated individuals, which has resulted in serious injuries and deaths and the company's losing contracts, being sued by individuals and the state, being criminally charged, and being banned from bidding on certain state contracts, Larimer County's failure to properly supervise Armor constitutes deliberate indifference.

483. Larimer County's failure to properly supervise Armor was also a moving force behind Mr. Taylor's inability to obtain adequate treatment for his severe infection, which caused

him damages, including increased medical costs, physical pain and suffering, psychological and emotional trauma, permanent damage, limited mobility, and inability to perform daily tasks and work functions.

**FOURTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983 — Failure to Provide Adequate Medical Care / Failure to Train**
***Monell* Claim**
**Violation of the Eighth and Fourteenth Amendments**
**(against Defendant Armor)**

484. Mr. Taylor incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

485. Mr. Taylor brings this claim against Defendant Armor.

486. At all times relevant to this Complaint, Defendant Armor was acting under the color of state law when it contracted with Larimer County to perform the traditional government function of providing medical services to the LCJ population. *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 51 U.S. 288, 296 (2001).

487. In failing to provide Mr. Taylor adequate medical care to address the serious infection that Armor staff were aware of, which allowed the infection to spread and fester and cause osteomyelitis, Armor staff acted deliberately and indifferently to Mr. Taylor's serious medical needs.

488. Defendant Armor has an entrenched policy, practice, and custom of delaying and denying medical care, understaffing its facilities, and hiring incompetent staff to save costs and increase profits, which has existed since the inception of the company both in jails within Colorado and in many other states, as evidenced by the repeated incidents and widespread practice of these acts as described above.

489. These entrenched policies, practices, and customs, which have cause deaths and serious injuries to many individuals incarcerated in jails where Armor provides care, including Mr. Taylor, constitute deliberate indifference under the law.

490. Defendant Armor's entrenched policies, practices, and customs were the moving forces behind Mr. Taylor's inability to obtain adequate treatment from Armor staff for his severe infection, which caused him damages, including increased medical costs, physical pain and suffering, psychological and emotional trauma, permanent damage, limited mobility, and inability to perform daily tasks and work functions.

491. Defendant Armor's failure to properly train its medical staff to recognize and treat obvious signs of infection also amounted to deliberate indifference, because given the prevalence of individuals with serious medical conditions within jails and the likelihood that failure to properly treat such conditions would result in injury or death, it is highly likely, foreseeable, and obvious that failing to train medical staff to provide adequate medical care would result in constitutional violations.

492. Defendant Armor's failure to properly train its medical staff as discussed in this Complaint was also the moving force behind Mr. Taylor's inability to obtain adequate treatment for his severe infection, which caused him damages, including increased medical costs, physical pain and suffering, psychological and emotional trauma, permanent damage, limited mobility, and inability to perform daily tasks and work functions.

493. Defendant Armor knew that individuals in its care could suffer serious consequences by the continued implementation of these policies and practices, but maintained them anyway.

## VI. PRAYER FOR RELIEF

WHEREFORE, Mr. Taylor respectfully asks this Court to enter judgment in his favor and against each of the Defendants, and award him all relief as allowed by law and equity, including, but not limited to, the following:

a) All appropriate relief at law and equity;

b) Compensatory, non-economic, consequential, and economic damages, including, but not limited to, emotional distress, suffering, humiliation, inconvenience, mental anguish, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

c) Punitive damages for all claims allowed by law in amount to be determined at trial;

d) Pre-judgment and post-judgment interest at the highest lawful rate;

e) Attorneys' fees and the costs associated with this action as allowed by law, including expert-witness fees; and

f) Any further relief that this Court deems just and proper, and any other relief as allowed by law.

MR. TAYLOR REQUESTS A TRIAL TO A JURY ON ALL ISSUES SO TRIABLE.

Dated this 15th day of May 2020.

Respectfully submitted,

s/Aurora L. Randolph
Gail K. Johnson
***Aurora L. Randolph***
Haley M. DiRenzo
JOHNSON & KLEIN, PLLC
1470 Walnut St., Suite 101
Boulder, CO 80302
Phone: (303) 444-1885
Fax: (866) 340-8286
E-mail: gjohnson@johnsonklein.com
arandolph@johnsonklein.com
hdirenzo@johnsonklein.com

ATTORNEYS FOR PLAINTIFF