**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:20-cv-01406-WJM-NYW

CLIFFORD TAYLOR,

      Plaintiff,

v.

ARMOR CORRECTIONAL HEALTH SERVICES, INC.,
SHERIFF JUSTIN SMITH, in his individual and official capacities,
THE BOARD OF COUNTY COMMISSIONERS FOR THE COUNTY OF LARIMER,
CAPTAIN TIMOTHY PALMER,
AMANDA JARMAN,
DR. KEITH MCLAUGHLIN,
DAYLA COOK,
KYRA HARMON,
LYNETTE HOISINGTON,
ALEX MAHLOCH,
JESSINA MORSE,
LYNN SCHULTZ,
LEAH OAKLEY,
CAROLYN PEISERT,
CHEYENNE PALMER,
KATIE WENZEL, and
MICHELLE WILSON,

      Defendants.

---

**RESPONSE TO ARMOR DEFENDANTS' MOTION TO DISMISS (Doc. 47) AND REQUEST FOR ORAL ARGUMENT**

---

      Plaintiff Clifford Taylor, through his attorneys Gail K. Johnson, Aurora L. Randolph, and Haley M. DiRenzo of Johnson & Klein, PLLC, hereby responds to the Armor Defendants' Motion to Dismiss (Doc. 47) and respectfully requests oral argument.

      Mr. Taylor has pleaded that each individual Armor Defendant was deliberately indifferent to the serious medical need created by his worsening and festering infection over the

course of several months.  Though the Armor Defendants attempt to argue that the surface-level "care" they provided Mr. Taylor meets their constitutional obligations, it does not.  Mr. Taylor has also sufficiently pleaded the ways that Defendant Armor's policies and practices to cut costs and increase profit—including by refusing Mr. Taylor the treatment he needed in favor of more inexpensive options and refusing to take him outside the facility for medical care so that he would be forced to obtain such care once he left on his own dime—caused the constitutional violations against him and thus meet the standard for a *Monell* claim.  For these reasons, the Armor Defendants' Motion to Dismiss (Doc. 47) should be denied.

## STANDARD OF REVIEW

On reviewing a motion to dismiss, the Court must accept as true all well-pleaded factual allegations.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A district court must also "construe [the pleaded facts] in the light most favorable to the plaintiff."  *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1224 (10th Cir. 2007).  The Court must then consider whether the factual allegations in the complaint allege a plausible claim for relief, which exists when the complaint allows the court to draw reasonable inferences that defendants are liable.  *Iqbal*, 556 U.S. at 678.  The question is not "whether a claim is 'improbable,' but instead whether the factual allegations "raise a right to relief above the speculative level.'"  *Kay v. Bemis*, 500 F.3d 1214, 1218 (10th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

## ARGUMENT

I.   **Mr. Taylor sufficiently alleged constitutional violations by the individual Armor medical providers.**

A prison official's deliberate indifference to an incarcerated person's serious medical needs violates the Eighth Amendment.  *See Estelle v. Gamble*, 429 U.S. 97, 102 (1976). "Deliberate indifference" involves both an objective and a subjective component.  *Farmer v.*

2

*Brennan*, 511 U.S. 825, 834 (1994).  The objective component is met if the deprivation is

"sufficiently serious."  *Id.*  The subjective component is met if a prison official "knows of and

disregards an excessive risk to inmate health or safety."  *Id.* at 837.

   "Deliberate indifference does not require a finding of express intent to harm."  *Mitchell*

*v. Maynard*, 80 F.3d 1433, 1442 (10th Cir. 1996).  It is enough that the official acted or failed to

act despite his knowledge of a substantial risk of serious harm.  *Farmer*, 511 U.S. at 842.  The

Tenth Circuit has also recognized a cognizable "gatekeeper" claim for deliberate indifference

against prison medical providers who "prevent an inmate from receiving treatment or deny him

access to medical personnel capable of evaluating the need for treatment," if the official knows

"his role in a particular medical emergency is solely to serve as a gatekeeper for other medical

personnel capable of treating the condition, and if he delays or refuses to fulfill that gatekeeper

role due to deliberate indifference."  *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000).[1]

---

[1] Defendants confined Mr. Taylor as a pretrial detainee at the Larimer County Jail (LCJ) until
May 31, 2018.  (Doc. 38 at ¶ 115.)  Therefore, up until May 31, 2020, the Fourteenth
Amendment governed his right to adequate medical care while incarcerated.  *See Lopez v.
LeMaster*, 172 F.3d 756, 759 n.2 (10th Cir. 1999) (*abrogated on other grounds by Brown v.
Flowers*, No. 19-7011, 2020 WL 5509683, at *3 (10th Cir. Sept. 14, 2020).  In the excessive-
force context, pretrial detainees are entitled to a lower standard than that applicable to convicted
individuals.  *Kingsley v. Hendrickson*, 576 U.S. 389, 400-02 (2015).  While the Tenth Circuit has
yet to decide whether, given *Kingsley*, a lower standard applies to pretrial detainees' medical and
conditions-of-confinement claims, other circuits have so held.  *See, e.g.*, *Darnell v. Pineiro*, 849
F.3d 17, 30 (2d Cir. 2017) ("*Kingsley* altered the standard for deliberate indifference claims
under the Due Process Clause"); *Castro v. County of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir.
2016) (noting that the *Kingsley* Court did not "limit its holding to 'force' but spoke to 'the
challenged governmental action' generally).  Mr. Taylor is entitled to review of his conditions of
confinement up to May 31, 2018, under the objective *Kingsley* standard but proceeds to show he
sufficiently stated claims for relief under the more stringent Eighth-Amendment standard.

**A.  The allegations support claims of deliberate indifference against each Defendant.**

Meeting the deliberate-indifference standard requires: 1) an objectively serious medical

need; 2) knowledge of the risk of harm posed by failing to treat that medical need; and 3)

disregard of that risk.  *Farmer*, 511 U.S. at 834, 837.

The Armor Defendants do not dispute that Mr. Taylor has pled an objectively serious

medical need—presumably because it is inarguable that he has done so.  *See, e.g., Goines v. Hill*,

139 F.3d 911 (10th Cir. 1998) (prostate infection constitutes a serious medical need); *Schaub v.*

*VonWald*, 638 F.3d 905, 915 (8th Cir. 2011) ("oozing sores and the smell of infection" were

"'more than obvious' to a layperson" and thus constituted a serious medical need).

Nor do the Armor Defendants dispute that Mr. Taylor has sufficiently pled they were

subjectively aware of the risk of harm posed by failing to provide him with adequate medical

treatment for his infection—presumably because the risk from his swollen, red, hot, oozing,

smelly wound was obvious, and Mr. Taylor has made detailed factual allegations about the

number of times they saw him, spoke with him about his infection, and assessed it.  *See, e.g.,*

*Farmer,* 511 U.S. at 842-43 ("Whether a prison official had the requisite knowledge of a

substantial risk is a question of fact subject to demonstration in the usual ways, including

inference from circumstantial evidence, and a factfinder may conclude that a prison official knew

of a substantial risk from the very fact that the risk was obvious."); *see also Garrett v. Stratman,*

254 F.3d 946, 950 (10th Cir. 2001) (same).

Instead, the individual Armor Defendants challenge whether Mr. Taylor has adequately

pled that they disregarded the risk of harm to him.  This Court should reject their argument that

Mr. Taylor's allegations reflect a simple disagreement in treatment.  (Doc. 47 at 6-7.)  The

Armor medical-provider Defendants' decisions not to treat the *infection itself* but merely to

sporadically provide palliative care for the resulting *symptoms*—despite knowing that failure to

4

treat the infection would result in known risks of harms attendant to surgical wound infections—demonstrate deliberate indifference to Mr. Taylor's serious medical need.

"Prison officials must provide inmates with medical care that is adequate in light of the severity of the condition and professional norms. *The receipt of some medical care does not automatically defeat a claim of deliberate indifference.*" *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) (emphasis added; internal quotations and citations omitted); *see also Chapman v. Santini*, 805 F. App'x 548, 557 (10th Cir. 2020) (unpublished) (medical providers who provided some diabetic care but disregarded known risk of hyperglycemia by failing to provide timely insulin were deliberately indifferent); *De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013). The Armor Defendants' argument that the provision of *any* medical care makes them immune from Eighth-Amendment liability is contrary to law.

The Armor Defendants failed to provide adequate medical treatment to Mr. Taylor in several ways. First, contrary to Mr. Taylor's surgeon's orders, and despite the Armor Defendants' awareness of the serious risks attendant to wound infections (Doc. 38 at ¶¶ 124-25) and Mr. Taylor's repeated complaints about the infection, *see infra*, no Armor Defendant contacted Mr. Taylor's surgical team at Denver Health nor any outside specialist during the months of his ongoing and worsening infection. Second, the "treatment" provided by the Armor medical-provider Defendants was patently inadequate, given how the infection in Mr. Taylor's arm progressively worsened. Defendants rely on the fact that they provided "medication for these symptoms [pain, anxiety, depression, and sleeplessness]," pain medication and Bacitracin, one general course of antibiotics, wound assessments or dressings, and prescribed Gatorade and Band Aids. (Doc. 47 at 9-16.) But medicating the mounting *symptoms* of Mr. Taylor's severe infection did not address his serious medical need—the infection itself, which the Armor

Defendants disregarded the obvious risk of failing to treat. *See De'lonta*, 708 F.3d at 526 ("just because [defendants] provided [plaintiff] with some treatment consistent with the GID Standards of Care, it does not follow that they have necessarily provided her with constitutionally adequate treatment"); *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) ("prisoner [does not] need to show that he was literally ignored"). Pursuant to Armor's cost-saving policy, the individual medical-provider Defendants gave Mr. Taylor the cheapest and easiest "care" available, biding their time until he was released. Their refusal to escalate the medical treatment provided to him in the face of his ongoing and worsening surgical-wound infection constitutes deliberate indifference. *See Chapman*, 805 Fed. App'x at 557.

The following timeline illustrates the inadequacy of the Armor Defendants' "care":

| | |
|---|---|
| Mar. 21-31: | Mr. Taylor is given basic antibiotics for 10 days (Doc. 38 at ¶¶ 65-66) |
| April 2: | Defendant McLaughlin prescribes pain medication for arm pain (¶¶ 69-70) |
| April 11: | Mr. Taylor complains of ongoing pain (¶ 73) |
| May 17: | Medical records show wound is swollen (¶ 81) |
| May 18: | Purulent (white, milky) discharge noted (¶¶ 88-89) |
| June 1: | Mr. Taylor reports ongoing pain and signs of infection (¶ 130) |
| June 13: | Mr. Taylor meets with mental health staff, reports anxiety, depression, and sleeplessness from infection (¶ 129) |
| June 29: | Mr. Taylor reports ongoing pain and signs of infection (¶ 131) |
| July 12: | Defendant Jarman reviews Mr. Taylor's medical records, notes "chronic arm issues" (¶ 139) |
| July 30: | Mr. Taylor reports ongoing pain and signs of infection (¶ 146) |
| August 26: | Mr. Taylor is given basic antibiotics and Bacitracin for 10 days (¶¶ 156-57) |
| Aug. 28: | Defendant Cook notes "Purulent=Thick white blood cells and living or dead organisms; yellow, green or brown color can suggest the type of infecting organism. A pungent, strong, foul, fecal or musty odor suggests infection" (¶ 168) |
| Aug. 31: | Mr. Taylor reports continuing symptoms of infection (¶ 176) |
| Sept. 2: | Defendant Cook notes wound was twice as large as previous day (¶ 195), notes slough tissue and drainage of wound (¶¶ 192-93) |
| Sept. 5: | Basic prescription of antibiotics ended (¶¶ 156-57) |

Signs of infection
"Treatment"
Miscellaneous

| | |
|---|---|
| Sept. 5: | Note in records showing slough tissue and drainage of wound; Defendant Wenzel stops dressing changes, tells Mr. Taylor to use a Band Aid (¶¶ 196-98) |
| Sept. 12: | Mr. Taylor reports ongoing pain and signs of infection (¶¶ 205, 207) |
| Sept. 30: | Mr. Taylor reports ongoing pain and signs of infection (¶¶ 203, 207) |
| Oct. 2: | Mr. Taylor complains of infection, medical records state nurse "[e]ncouraged patient to use [over the counter medication] for discomfort and to notify medical if symptoms worsen or persist." (¶ 210) |
| Oct. 3: | Mr. Taylor declares medical emergency from repeated vomiting from infection (¶ 211); Defendant Wilson prescribes Gatorade (¶ 213) |
| Oct. 7: | Mr. Taylor reports ongoing pain and signs of infection (¶ 214) |
| Oct. 11: | Mr. Taylor released from Larimer County Jail (LCJ) (¶ 237) |
| Oct. 16: | X-ray of Mr. Taylor's arm shows chronic, severe infection (¶ 239)[2] |

Thus, the "treatment" provided by the medical-provider Defendants allowed Mr. Taylor to develop a severe and deep infection. The first set of antibiotics prescribed to Mr. Taylor in March 2018 failed to address the infection (Doc. 38 at ¶¶ 65-66, 81), and unsurprisingly, after Defendants had let the infection worsen for five months, another set of antibiotics also failed to resolve it (*id.* at ¶¶ 156-57, 207). Nonetheless, the individual medical-provider Defendants allowed Mr. Taylor's infection to further worsen and his pain to continue for *over a month* after the completion of the second round of antibiotics, until he was released. (*See id.* at ¶¶ 210-12.) *See De'lonta*, 708 F.3d at 526 ("[I]magine that prison officials prescribe a painkiller to an inmate who has suffered a serious injury from a fall, but that the inmate's symptoms, despite the medication, persist to the point that he now, by all objective measure, requires evaluation for surgery. Would prison officials then be free to deny him consideration for surgery, immunized from constitutional suit by the fact they were giving him a painkiller? We think not.")

Moreover, the Armor Defendants' failure to treat Mr. Taylor between the March 2018 and late-August 2018 antibiotics prescriptions is also deliberate indifference. Mr. Taylor repeatedly reported his ongoing and worsening infection (*see, e.g.*, Doc. 38 at ¶¶ 121, 136, 147),

---

[2] This does not include all of Mr. Taylor's near-daily complaints. (Doc. 38; *id.* at ¶¶ 8, 128.)

and Defendants made repeated notations about the condition in his file (*id*. at ¶¶ 88-89, 129). Defendant McLaughlin's decision to merely give Mr. Taylor basic antibiotics again, after they had not worked and after five months of worsening infection, was deliberately indifferent. *See Arnett*, 658 F.3d at 754 ("[A] medical professional's actions may reflect deliberate indifference if he 'chooses an easier and less efficacious treatment without exercising professional judgment.' A prison physician cannot simply continue with a course of treatment that he knows is ineffective in treating the inmate's condition.") (internal citations omitted).

Additionally, all the individual medical-provider Defendants can be liable under the "gatekeeper" theory outlined in *Sealock*, 218 F.3d at 1211.  The wound assessments, basic antibiotics, pain medication, Gatorade, and Band Aids were facially ineffective at addressing Mr. Taylor's infection.  (*See, e.g.*, Doc. 38 at ¶¶ 73, 81, 130, 168, 195, 196, 207, 210, 213.)  Mr. Taylor was locked up and at the mercy of the medical-provider Defendants to ensure his surgical wound would not get infected and cause him to potentially require an amputation of his forearm. (*Id*. at ¶¶ 151-52.)  They knew that his surgical team needed to be made aware of his infection to monitor the hardware that was implanted and to avoid further damage.  (*Id*. at ¶¶ 42, 124-25.) But the medical-provider Defendants refused to consult those specialists *or any others* to see what else could be done to provide medical care for a severely infected wound from a complex surgery.  (*Id*. at ¶¶ 137, 148, 189, 208, 221.)  They were the gatekeepers for "other medical personnel capable of treating the condition," and their "delays or refus[als] to fulfill that gatekeeper role due to deliberate indifference," makes them also "liable for deliberate indifference from denying access to medical care."  *Sealock*, 218 F.3d at 1211.

**B.  Allegations against the Armor medical-provider Defendants are also sufficient.**

The Amended Complaint pleads that all of the Armor medical-provider Defendants knew that a wound that is 1) red with a scab, 2) excreting discharge, 3) causing prolonged pain or

discomfort, or 4) swollen or hot is a concerning sign of infection given their field and experience. (*Id.* at ¶ 122.)  The Amended Complaint also pleads that the medical-provider Defendants knew that nausea, fever, chills, weight loss, and sleeplessness—when coupled with indications of pain, redness, swelling, discharge, and heat at the site of a wound—are signs of a severe infection (*id.* at ¶ 123) and that patients who have recently undergone significant surgery, like Mr. Taylor, need to have their surgical wounds and implants closely monitored and cared for to ensure proper healing and to avoid infection, and need to follow up with their specialists to ensure proper healing and success of the surgery.  (*Id.* at ¶¶ 124-25.)

Mr. Taylor was supposed to see his surgical team at Denver Health every few months to monitor his healing and implanted hardware, and was instructed to see them if he had any signs of infection.  (*Id.* at ¶ 42.)  At his last x-ray before he was incarcerated, Mr. Taylor's arm showed no indications of infection or osteomyelitis.  (*Id.* at ¶ 55.)  Mr. Taylor endured significant pain that worsened from April 2018 (*id.* at ¶ 69) to October 2018 (*id.* at ¶ 220) due to his untreated infection.  As soon as he was released from the LCJ and able to obtain adequate medical care, he was diagnosed with osteomyelitis at multiple sites in his forearm.  (*Id.* at ¶¶ 237-38, 243.)  To address the osteomyelitis, Mr. Taylor has been forced to undergo repeated surgery of his forearm, which has resulted in years of unnecessary pain and suffering, diminished capacity in his arm, and major deformity, among other injuries.  (*Id.* at ¶¶ 252, 256.)

Additional allegations specific to each individual medical-provider Defendant include:

<u>Defendant Jarman:</u> Defendant Jarman is the Health Services Administrator and a medical provider working in the LCJ for Armor.  (Doc. 38 at ¶ 21.)  She was aware of Mr. Taylor's surgery and wound by August 9, 2017.  (*Id.* at ¶¶ 45-46.)  When she delivered Mr. Taylor his medication in August of 2018, Mr. Taylor complained about the worsening condition of his arm.

(*Id*. at ¶¶ 181, 188.)  But Defendant Jarman did not contact Mr. Taylor's surgical team at Denver

Health, request his medical record from Denver Health, or consult any outside medical specialist

regarding Mr. Taylor's worsening condition.  (*Id*. at ¶ 189-90.)  Defendant Jarman oversaw all

medical staff at LCJ but failed to ensure that Mr. Taylor's prolonged, worsening condition was

addressed.  (*Id*. at ¶ 224.)  Despite knowing about Mr. Taylor's worsening infection and the

attendant risks of harm from inaction, Defendant Jarman did nothing to ensure proper medical

treatment, evincing deliberate indifference.  *See Oxendine v. Kaplan*, 241 F.3d 1272, 1279 (10th

Cir. 2001); *Mata*, 427 F.3d at 758; *Sealock*, 218 F.3d at 1211; *De'lonta*, 708 F.3d at 526.

    <u>Defendant McLaughlin:</u> Defendant McLaughlin was the doctor at LCJ.  (Doc. 38 at ¶ 22.)

He was made aware of Mr. Taylor's surgery and wound as early as August 8, 2017.  (*Id*. at ¶ 50.)

On April 2, 2018, Defendant McLaughlin saw Mr. Taylor regarding pain from his wound, but he

merely prescribed Mr. Taylor pain medication and did not contact anyone at Denver Health nor

an outside specialist about the proper course of treatment for Mr. Taylor's post-surgical wound

care—even though he knew that a course of antibiotics had just failed to alleviate Mr. Taylor's

infection.  (*Id*. at ¶¶ 66, 69-70.)  Despite the fact that Mr. Taylor's wound was noted as a

chronic-care condition warranting regular consultation, Defendant McLaughlin did not see him

for months.  (*Id*. at ¶¶ 58, 155 (describing a phone call, not an appointment, regarding Mr.

Taylor's condition).)  On August 26, 2018, Defendant McLaughlin spoke with other staff about

Mr. Taylor's worsening condition, and merely ordered one course of general antibiotics—even

though he knew that the antibiotics previously ordered for Mr. Taylor had not resolved the

infection, and the infection had dramatically worsened over the months.  (*Id*. at ¶¶ 66, 155-56.)

Defendant McLaughlin did not contact Denver Health nor any other medical professional to

report Mr. Taylor's condition or receive guidance on the proper treatment for the long-term

infection of a wound from a complicated surgery, even after it became clear that the second course of antibiotics had not resolved the infection. (*Id.* at ¶ 158.) Defendant McLaughlin's failure to adequately address Mr. Taylor's serious medical need for months sufficiently states deliberate indifference at this stage. *See Oxendine*, 241 F.3d at 1279; *Mata*, 427 F.3d at 758; *Sealock*, 218 F.3d at 1211; *De'lonta*, 708 F.3d at 526.

Defendant Cook: Defendant Cook was a medical provider working for Defendant Armor in the LCJ. (Doc. 38 at ¶ 23.) She saw Mr. Taylor on: June 4 and 27, 2018; July 23, 30, and 31, 2018; August 21, 27, and 28, 2018; September 2, 3, 4, and 16, 2018; and October 8, 2018. (*Id.* at ¶¶ 133, 136, 146-47, 162, 166-68, 187-88, 192-93, 201, 219-20.) On these occasions, Mr. Taylor complained to her about his arm's worsening pain, discharge, and need for treatment. (*Id.* at ¶¶ 133, 136, 147, 166-68, 188, 192-93, 201, 219-20.) On August 28, 2018, Defendant Cook twice noted in Mr. Taylor's medical record that his symptoms indicated infection, stating she noticed a potential "type of infecting organism" and an "odor suggest[ing] infection." (*Id.* at ¶¶ 166-68.) She noted drainage from the wound in early September. (*Id.* at ¶¶ 192-93.) But despite all this, she did not do anything to alleviate the infection, seek guidance from an outside specialist or contact Mr. Taylor's surgical team at Denver Health, or even request records from Denver Health. (*Id.* at ¶¶ 137-38, 148, 169, 208, 221.) And Defendant Cook falsely wrote that Mr. Taylor thought a Band-Aid was sufficient for his oozing wound and did not want a dressing change. (*Id.* at ¶¶ 163-64.) Despite the fact that Defendant Cook was aware that a second round of antibiotics had failed to address the infection and Mr. Taylor's severe symptoms persisted, she still did not seek any emergency medical intervention, or contact any outside medical specialist or Mr. Taylor's surgical team regarding his severe infection. (*Id.* at ¶¶ 156, 208, 236.) From May to October 2018, Defendant Cook saw Mr. Taylor at least 18 times, and on each such

occasion, she observed that Mr. Taylor's wound was becoming increasingly infected but did nothing to adequately treat the infection.  (*Id*. at 225.)  This sufficiently alleges deliberate indifference at this stage.  *See Oxendine*, 241 F.3d at 1279; *Mata*, 427 F.3d at 758; *Sealock*, 218 F.3d at 1211; *De'lonta*, 708 F.3d at 526.

<u>Defendant Harmon</u>: Defendant Harmon was a medical provider working for Defendant Armor in the LCJ.  (Doc. 38 at ¶ 24.)  She was aware of Mr. Taylor's arm wound in March 2018. (*Id*. at ¶ 68.)  She saw Mr. Taylor on: July 11 and 12, 2018; August 9-10, 17, 22, 26, 29, and 31, 2018; September 12, 2018; and October 7 and 10, 2018.  (*Id*. at ¶¶ 144, 184, 205, 217.)  On these occasions, Mr. Taylor told Defendant Harmon his wound was painful and had discharge and that he was experiencing weight loss, fever, and nausea that he thought were associated with his infection, and he asked to see a medical professional or his Denver Health team to address the infection.  (*Id*. at ¶¶ 147, 188, 207, 220.)  On August 26, 2018, when Defendant Harmon saw Mr. Taylor regarding his wound, she noted the several signs of infection and the history of problems with the arm, and she finally called Defendant McLaughlin to report the worsening wound and purulent drainage.  (*Id*. at ¶¶ 154-55.)  But Defendant Harmon did nothing to treat the underlying infection; she did not seek any outside or specialist care or guidance on the proper treatment for the long-term infection of a wound from a complicated surgery for Mr. Taylor, nor did she obtain his medical records from Denver Health—despite the fact that she was aware that the second round of antibiotics had not resolved the infection and Mr. Taylor's severe symptoms persisted. (*Id*. at ¶¶ 148-49, 156, 158, 208, 220-21, 236.)  From May-October 2018, Defendant Harmon saw Mr. Taylor on at least 13 occasions, and despite the fact that she observed Mr. Taylor's arm was becoming increasingly infected, she did nothing to adequately treat the infection.  (*Id*. at

¶ 226.)  This sufficiently evinces deliberate indifference.  *See Oxendine*, 241 F.3d at 1279; *Mata*, 427 F.3d at 758; *Sealock*, 218 F.3d at 1211; *De'lonta*, 708 F.3d at 526.

Defendant Hoisington: Defendant Hoisington was a medical provider working for Defendant Armor in the LCJ.  (Doc. 38 at ¶ 25.)  She saw Mr. Taylor on: June 10, 17, 19, 24, and 26, 2018; July 1, 3, 8, 10, 16, 21, and 28, 2018; August 2, 4, 6, 13, and 24, 2018; September 1, 3, 7, 9, 25, and 30, 2018; and October 6, 2018.  (*Id*. at ¶¶ 134, 142, 180, 191, 203, 216.)  On each of these occasions, Mr. Taylor complained that his wound was painful, hot, swelling, and excreting discharge, and asked to see a medical professional.  (*Id*. at ¶¶ 136, 147, 188, 207, 220.)  Defendant Hoisington did not contact any outside medical specialist or his surgical team at Denver Health, nor did she even request Mr. Taylor's medical records from Denver Health.  (*Id*. at ¶¶ 137-38, 148-49, 189, 221.)  Even after Defendant Hoisington was aware that a second round of antibiotics had failed to resolve the infection and that Mr. Taylor's severe symptoms persisted, she still did not seek any emergency medical intervention or contact any outside medical specialist or Mr. Taylor's surgical team regarding his severe infection.  (*Id*. at ¶¶ 191, 208, 236.)  Such allegations sufficiently state a claim of deliberate indifference.  *See Oxendine*, 241 F.3d at 1279; *Mata*, 427 F.3d at 758; *Sealock*, 218 F.3d at 1211; *De'lonta*, 708 F.3d at 526.

Defendant Mahloch: Defendant Mahloch was a medical provider working for Defendant Armor in the LCJ.  (Doc. 38 at ¶ 26.)  She saw Mr. Taylor on May 17, 20, 24, and 29, 2018; June 1, 2, and 18, 2018; July 2 and 9-10, 2018; August 7, 19, 27 and 29, 2018; and September 27 and 29, 2018.  (*Id*. at ¶¶ 119, 130, 140, 183, 206.)  On each of these occasions, Mr. Taylor complained to Defendant Mahloch about the worsening pain from his arm, the discharge it was excreting, his need for treatment and to see a specialist who could address the infection.  (*Id*. at ¶¶ 121, 126-27, 136, 147, 188, 207.)  Despite clear signs of infection, she did not provide

medical treatment, contact Mr. Taylor's surgical team or any outside specialist regarding his developing infection, nor did she even request his Denver Health medical record. (*Id*. at ¶¶ 80-83, 98-99, 126-27, 137-38, 148-49, 189.) Even though Defendant Mahloch was aware that a second round of antibiotics had failed to resolve the infection and Mr. Taylor's severe symptoms persisted, she still did not seek any emergency medical intervention or contact any outside medical specialist or Mr. Taylor's surgical team regarding his severe infection. (*Id*. at ¶¶ 156, 208, 236.) This evinces deliberate indifference. *See Oxendine*, 241 F.3d at 1279; *Mata*, 427 F.3d at 758; *Sealock*, 218 F.3d at 1211; *De'lonta*, 708 F.3d at 526.

Defendant Morse: Defendant Morse was a medical provider working for Defendant Armor in the LCJ. (Doc. 38 at ¶ 27.) She saw Mr. Taylor on May 2-3, 12, 16-18, 24-27, and 30, 2018; June 1, 13-16, 18-19, 21-23, 25, 27, and 29, 2018; July 2, 7, 8, 11, 12, and 26, 2018; August 31, 2018; and September 1, 3-4, 11-12, 16, 19-21, and 26, 2018; (*Id*. at ¶¶ 88, 107, 116, 131, 141, 178, 200.) On each of these occasions, Mr. Taylor told Defendant Morse about the pain from his wound, that it had discharge coming out of it, that he needed to see a medical professional to address the infection or see his Denver Health team to address the ongoing infection, and eventually that he was experiencing weight loss, fever, and nausea he thought were associated with his infection. (*Id*. at ¶¶ 88, 109, 121, 136, 141, 147, 178, 207.) On May 18, 2018, Defendant Morse noted that Mr. Taylor's wound was excreting a purulent discharge, but did not provide Mr. Taylor any medical treatment, merely advising him to keep the area clean. (*Id*. at ¶¶ 88, 91.) Defendant Morse provided no medical treatment to Mr. Taylor, nor did she seek guidance from an outside specialist. Even though Defendant Morse knew that a second round of antibiotics had failed to resolve the infection and Mr. Taylor's severe symptoms persisted, she did not seek any emergency medical intervention or contact any outside medical

specialist or Mr. Taylor's surgical team.  (*Id*. at ¶¶ 156, 208, 236.)  These allegations adequately

allege deliberate indifference at this stage of the case.  *See Oxendine*, 241 F.3d at 1279; *Mata*,

427 F.3d at 758; *Sealock*, 218 F.3d at 1211; *De'lonta*, 708 F.3d at 526.

Defendant Schultz: Defendant Schultz was a medical provider working for Defendant

Armor in the LCJ.  (Doc. 38 at ¶ 28.)  On March 11, 2018, Defendant Schultz noted Mr. Taylor's

surgery and wound in his medical records and flagged his wound as a chronic-care condition.

(*Id*. at ¶ 58.)  Defendant Schultz saw Mr. Taylor on May 15 and 21, 2018; July 6, 16, and 30,

2018; August 19, 2018; and September 10, 2018.  (*Id*. at ¶¶ 74, 120, 143, 186, 204.)  On each

occasion, Mr. Taylor told Defendant Schultz that his wound was seeping discharge, was not

getting any better, was hot and painful, and eventually that he was experiencing weight loss,

fever, and nausea he thought were associated with his infection; he also asked Defendant Schultz

to treat the infection or contact his Denver Health surgical team.  (*Id*. at ¶¶ 74-76, 121, 147, 188,

207.)  Defendant Schultz provided no medical treatment to Mr. Taylor, nor did she contact any

other medical provider, nor request his Denver Health medical records; instead, she just told Mr.

Taylor to come back when signs of infection appear.  (*Id*. at ¶¶ 74-76, 120-21, 148-49, 189.)

Even though Defendant Schultz was aware that a second round of antibiotics had failed to

resolve the infection and Mr. Taylor's severe symptoms persisted, she did not seek any

emergency medical intervention or contact any outside medical specialist or Mr. Taylor's

surgical team regarding his severe infection.  (*Id*. at ¶¶ 156, 208, 236.)  Months of inaction in the

face of such worsening symptoms constitutes deliberate indifference.  *See Oxendine*, 241 F.3d at

1279; *Mata*, 427 F.3d at 758; *Sealock*, 218 F.3d at 1211; *De'lonta*, 708 F.3d at 526.

Defendant Oakley: Defendant Oakley was an Armor medical provider working in the

LCJ.  (Doc. 38 at ¶ 29.)  She saw Mr. Taylor on: August 18, and 25-27, 2018; September 2, 9,

13, and 23, 2018; and October 7 and 9, 2018.  (*Id*. at ¶¶ 159, 202, 214.)  On each occasion, Mr.

Taylor told Defendant Oakley about the condition of his arm, the severe pain he was

experiencing, the discharge oozing from his wound, and eventually about his fever and nausea

and the fact that his infection was making him vomit and unable to eat; he also asked her for

medical attention and to contact his surgical team.  (*Id*. at ¶¶ 159, 185, 188, 207, 218.)  But

Defendant Oakley provided no medical treatment to Mr. Taylor, nor did she contact any other

medical provider, nor request his Denver Health medical records.  (*Id.* at ¶¶ 161, 189-90, 207-

08, 215, 221.)  Instead, she falsely documented there was no drainage from the wound and that

Mr. Taylor had refused wound care.  (*Id.* at ¶ 160.)  Even though she knew that a second round

of antibiotics had failed to address Mr. Taylor's infection and that his severe symptoms persisted,

Defendant Oakley did not seek any emergency medical intervention nor contact any outside

medical specialist nor Mr. Taylor's surgical team.  (*Id*. at ¶¶ 156, 208, 236.)  These allegations

sufficiently state deliberate indifference at this stage.  *See Oxendine*, 241 F.3d at 1279; *Mata*,

427 F.3d at 758; *Sealock*, 218 F.3d at 1211; *De'lonta*, 708 F.3d at 526.

    <u>Defendant Peisert:</u> Defendant Peisert was a medical provider working for Defendant

Armor in the LCJ.  (Doc. 38 at ¶ 30.)  Defendant Peisert saw Mr. Taylor on: May 9, 12, 16, 18,

19, 23, 25, and 30, 2018.  (*Id*. at ¶¶ 92, 118.)  On each occasion, Mr. Taylor told Defendant

Oakley about the condition of his arm, the severe pain he was experiencing, the discharge oozing

from his wound, and eventually his fever and nausea, the fact that his infection was making him

vomit and unable to eat.  He requested medical attention and for her to contact his surgical team.

(*Id*. at ¶¶ 93, 121.)  Defendant Peisert provided no medical treatment and did not contact any

other medical provider for guidance on treatment, nor did she even request medical records from

Denver Health.  (*Id*. at ¶¶ 87, 95, 126-27.)  On May 18 and 19, 2018, Defendant Peisert falsely

recorded that there were no signs of infection including discharge, despite other records from the same day reflecting obvious purulent discharge. (*Id*. at ¶¶ 86, 94; *compare* ¶ 88.) Even though Defendant Peisert knew that a second round of antibiotics had failed to resolve the infection and Mr. Taylor's severe symptoms persisted, she still did not seek any emergency medical intervention or contact any outside medical specialist or Mr. Taylor's surgical team regarding his severe infection. (*Id*. at ¶¶ 156, 208, 236.) Such repeated inaction in the face of a worsening medical crisis constitutes deliberate indifference. *See Oxendine*, 241 F.3d at 1279; *Mata*, 427 F.3d at 758; *Sealock*, 218 F.3d at 1211; *De'lonta*, 708 F.3d at 526.

Defendant Cheyenne Palmer: Defendant Palmer was a medical provider working for Defendant Armor in the LCJ. (Doc. 38 at ¶ 31.) She saw Mr. Taylor on May 2, 14, 16, 21-23, and 27-29, 2018; June 5, 2018; July 18, 22, 24-25, and 29, 2018; and August 5, 7-8, 12, and 14, 2018. (*Id*. at ¶¶ 77-78, 100-06, 111, 117, 135, 145, 182.) On each occasion, Mr. Taylor told her about the pain from his wound, that it had discharge coming out of it, that he needed to see a medical professional to address the infection or see his Denver Health team to address the ongoing infection, and eventually that he was experiencing weight loss, fever, and nausea he thought were associated with his infection. (*Id*. at ¶¶ 78, 100-06, 112, 136, 147, 188.) Defendant Palmer provided no medical treatment, did not seek guidance from an outside specialist or contact Mr. Taylor's surgical team at Denver Health, or even request records from Denver Health. (*Id*. at ¶¶ 79, 103, 106, 113, 126, 137-38, 148-49, 189.) This evinces deliberate indifference. *See Oxendine*, 241 F.3d at 1279; *Mata*, 427 F.3d at 758; *Sealock*, 218 F.3d at 1211; *De'lonta*, 708 F.3d at 526.

Defendant Wenzel: Defendant Wenzel was a medical provider working for Defendant Armor in the LCJ. (Doc. 38 at ¶ 32.) She was aware of Mr. Taylor's arm wound as early as

September 2017, when she noted the wound and the "importance of follow up with specialist" and wrote "[i]f he is not bonded out, would like to try to have the patient seen while incarcerated for follow up with [his outside specialist]." (*Id*. at ¶ 57.)  Defendant Wenzel saw Mr. Taylor on: March 21, 2018; April 11 and 20, 2018; and August 31, 2018; and reviewed his medical records on August 28, 2018.  (*Id*. at ¶¶ 67, 73, 170.)  In August, Defendant Wenzel reviewed Mr. Taylor's records and noted that he had an open wound with drainage that should be covered if he was to continue to work in the kitchen.  (*Id*. at ¶ 170.)  But Defendant Wenzel did not contact Denver Health nor put in a request for Mr. Taylor to see a medical specialist for his worsening condition; instead, Defendant Wenzel did nothing to provide Mr. Taylor with medical care.  (*Id*. at ¶ 171.)  On August 31, 2018, even after speaking with him about the continuing pain despite antibiotics, again Defendant Wenzel did nothing; she did not contact any specialist or other provider regarding Mr. Taylor's worsening condition.  (*Id*. at ¶¶ 176-77.)

On September 5, 2018, despite the fact that Mr. Taylor's wound was still open, discharging, hot, swollen, and tender (*id*. at ¶¶ 196, 199), Defendant Wenzel stopped the order for Mr. Taylor to receive dressing changes and told Mr. Taylor to cover the wound with a Band Aid.  (*Id*. at ¶¶ 197-98.)  Defendant Wenzel did not contact Denver Health nor seek any other urgent medical care for Mr. Taylor's infection.  (*Id*. at ¶ 199.)  Her months of inaction—when she reportedly knew he needed to see a specialist as early as 2017—and the infection only worsened more than sufficiently alleges deliberate indifference at this stage.  *See Oxendine*, 241 F.3d at 1279; *Mata*, 427 F.3d at 758; *Sealock*, 218 F.3d at 1211; *De'lonta*, 708 F.3d at 526.

Defendant Wilson: Defendant Wilson was a medical provider working for Defendant Armor in the LCJ.  (Doc. 38 at ¶ 33.)  On October 3, 2018, she saw Mr. Taylor when he declared a medical emergency because he had been vomiting throughout the night and unable to sleep.

(*Id*. at ¶¶ 211-12.)  Mr. Taylor told Defendant Wilson his wound was infected, hot, discharging, and painful, and further reported he had been vomiting for several days, had been unable to eat for several days, was experiencing fever/chills, and was having episodes of diarrhea.  (*Id*. at ¶ 212.)  Given her review of Mr. Taylor's medical record, Defendant Wilson knew about Mr. Taylor's wound and long history of symptoms of infection—including that two rounds of antibiotics had not worked.  (*Id*. at ¶ 156, 208, 236.)  She knew that nausea, fever, chills, weight loss, and sleeplessness—when coupled with indications of pain, redness, swelling, discharge, and heat at the wound site—are signs of a severe infection.  (*Id*. at ¶ 123.)  Nonetheless, she did not seek any outside care for Mr. Taylor nor provide any other care herself for Mr. Taylor's serious and worsening infection, and she did not contact Denver Health.  (*Id*. at ¶ 213.)  Instead, Defendant Wilson excused Mr. Taylor from his work with food in the kitchen for one day and added Gatorade to his medication list.  (*Id*.)  Defendant Wilson was aware Mr. Taylor was exhibiting myriad symptoms of severe infection yet did nothing to adequately treat it.  (*Id*. at ¶ 235.)  This sufficiently alleges deliberate indifference.  *See Oxendine*, 241 F.3d at 1279; *Mata*, 427 F.3d at 758; *Sealock*, 218 F.3d at 1211; *De'lonta*, 708 F.3d at 526.

For these reasons, Mr. Taylor has adequately pleaded claims against all of the individual Armor Defendants.  Therefore, the Court should deny this part of the Motion to Dismiss.

## II.  **Mr. Taylor has sufficiently plead a *Monell* claim against Defendant Armor.**

Mr. Taylor may hold Defendant Armor liable under the municipal liability theory laid out in *Monell v. Department of Social Services*, 436 U.S. 658 (1978), by demonstrating that Armor has a policy, custom, or practice that caused or contributed to a constitutional violation against him.  *See, e.g.*, *Gonzales v. Salt Lake Cty.*, 768 F.2d 303, 307 (10th Cir. 1985); *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003) (extending the *Monell* theory of liability to private entities).  Absent an official policy, a party may demonstrate liability through a

widespread practice that is so permanent and well-settled as to constitute a custom or the failure to adequately train or supervise its employees if that failure results from deliberate indifference. *Bryson v. City of Oklahoma*, 627 F.3d 784, 788 (10th Cir. 2010). A party establishes causation when the challenged practice is "closely related" to the plaintiff's constitutional violation or the "moving force" behind the injury. *Board of Cty. Com'rs v. Brown*, 520 U.S. 397, 404 (1997).

The Tenth Circuit has indicated that a widespread practice amounting to a custom for the purposes of *Monell* liability exists when the plaintiff puts forth evidence that the practice has been in place for a significant period of time or that other individuals have experienced similar conduct. *See e.g.*, *Cannon v. City and Cty. of Denver*, 998 F.2d 867, 877-78 (10th Cir. 1993) (finding evidence from which jurors could reasonably infer the existence of a policy or custom when plaintiff presented similar accounts by other individuals); *Watson v. City of Kansas City*, 857 F.2d 690, 696 (10th Cir. 1988) (finding arrest statistics and other evidence sufficient to avoid summary judgment on municipal-liability claim). The Supreme Court has held that failure to train or supervise may serve as the basis for Section 1983 liability of counties when the failure "amounts to deliberate indifference." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). This happens when the need for training and supervision is so obvious and the inadequacy so likely to result in constitutional violations that the policymakers can reasonably be said to have been deliberately indifferent. *Id.* at 390.

### A. Mr. Taylor has pleaded an underlying constitutional violation.

Defendants argue that Mr. Taylor cannot establish a *Monell* claim in the absence of any underlying constitutional violation, and that none exists here. (Doc. 47 at 4-17.) But as discussed, *supra* section I, an underlying constitutional violation has been adequately pled.

To the extent Defendants argue that Mr. Taylor must prove *individual* liability to establish a *Monell* claim, the Tenth Circuit has held that this is not required:

> [M]unicipal liability under *Monell* may exist without individual
> liability. *Garcia v. Salt Lake Cty.*, 768 F.2d 303, 310 (10th Cir.
> 1985) ("*Monell* does not require that a jury find an individual
> defendant liable before it can find a local governmental body
> liable."). *Indeed, we concluded in* Garcia *that even where 'the acts
> or omissions of no one employee may violate an individual's
> constitutional rights, the combined acts or omissions of several
> employees acting under a governmental policy or custom may
> violate an individual's constitutional rights.' Id.*

*Quintana v. Santa Fe County Board of Comm'rs*, No. 19-2039, 2020WL5087899, at *7 (10th

Cir. 2020) (emphasis added); *see also Todaro v. Ward*, 565 F.2d 48, 52 (2d Cir. 1977) ("While a

single instance of medical care denied or delayed, viewed in isolation, may appear to be the

product of mere negligence, repeated examples of such treatment bespeak a deliberate

indifference by prison authorities to the agony engendered by haphazard and ill-conceived

procedures."). Regardless of whether this Court agrees that Mr. Taylor has plead a constitutional

violation against one individual defendant, his Amended Complaint is sufficient to meet the

*Monell* test because the isolated instances of each individual Defendants' denial of medical care

also constitute deliberate indifference when considered together.

**B. Mr. Taylor has pleaded a *Monell* claim.**

1. Armor has an official policy of delaying and denying care for financial purposes.

Mr. Taylor's Amended Complaint details how the contract between Larimer County and

Armor incentivizes cost-saving instead of proper medical treatment. The Amended Complaint

discusses several in-depth descriptions of the price of various line items and how these

disincentivize providing expensive but necessary medical care to LCJ prisoners, such as offsite

medical care. The Amended Complaint also alleges that when Mr. Taylor was incarcerated at

the LCJ, Larimer County and Armor spent $1.26 per prisoner per day, and how this number is

much less than what other facilities spend. (Doc. 38 at ¶¶ 340-87.) The contract also makes

clear that even though both entities had a significant financial interest in avoiding offsite medical

21

care, Armor would be responsible for any offsite costs that Larimer County did not reimburse. (*Id.* at ¶¶ 349-68.)  This evidences a policy for *Monell* purposes.  *See McGill v. Correctional Healthcare Companies, Inc.*, 2014 WL 2922635, at *8 (D. Colo. June 27, 2014) (finding the plaintiff's allegations that "Jefferson County defendants have created financial incentives that discourage appropriate hospitalization of inmates as well as sanctions for instances of improper care" based on statements in the county's contract supported a *Monell* claim against the county).[3]

This policy is "closely related" to the conduct that led to Mr. Taylor's rights being violated because he was denied outpatient medical care and more intensive treatment for his worsening infected wound, including proper medication and treatments, which are expensive and which Defendant Armor had an incentive not to provide to increase profit and save Larimer County costs, increasing the likelihood that that Defendant Armor would secure additional multimillion dollar contracts from Larimer County in the future.  *See Brown*, 520 U.S. at 404; (Doc. 38 at ¶¶ 121-235, 258-68, 339-68, 382-87.)  Instead, Armor medical providers opted for cheap treatments such as prescribing Mr. Taylor the same course of antibiotics that had already failed to work and providing him with an over-the-counter ointment intended to treat minor cuts and scrapes (Bacitracin), Gatorade, and Band-aids.  (*Id.* at ¶¶ 156-57, 163, 199, 214.)

      2.   Armor's longstanding history of delaying and denying care for financial gain evidences a widespread practice.

Mr. Taylor's Amended Complaint also discusses Defendant Armor's longstanding history of prioritizing profit and cost-saving over the health and safety of people who are

---

[3] *Sherman v. Klenke*, 653 Fed. App'x 580, 592 (10th Cir. 2016) (unpublished), which Defendant Armor relies on (Doc. 47 at 7), is easily distinguished because the cost-saving allegations there were bare and conclusory.  Mr. Taylor makes detailed allegations that Armor prioritizes profit at the expense of adequate prisoner health care by discussing the contract, making comparisons to costs at comparable facilitates, and giving examples of several prisoners who have been denied needed medical care under this profit-focused practice.  (Doc. 38 at ¶¶ 340-87, 390-96.)

incarcerated, including dozens of instances of individuals dying or becoming severely injured under Armor's care. (*Id.* at ¶¶ 269-329, 390-96.) Several of these instances were very similar to Mr. Taylor's experience in that they involved Armor professionals who failed to identify obvious signs of illness or infection and failed to provide standard care. (*Id.* at ¶¶ 290-95, 308, 329.) For example, Armor medical staff have repeatedly failed to treat clear symptoms of an obvious medical problem such as withdrawal, mental illness, and bowel obstruction. (*Id.* at ¶¶ 279, 289-294.) Armor has a longstanding practice of cutting corners regarding offsite medical-care costs in particular. Armor medical staff have repeatedly refused to take individuals outside of a facility to receive care despite symptoms of serious medical problems like signs of a stroke, severe weight loss, and lost feeling in limbs and body. (*Id.* at ¶¶ 273, 275, 277, 281, 284.) And in its proposal to Larimer County, Defendant Armor detailed its history of keeping offsite medical costs low by ensuring that only 50% of its patients brought to the hospital are admitted, and those who are admitted are returned to the facility as soon as possible. (*Id.* at ¶¶ 353-68.)

The Amended Complaint also discusses Larimer County's understaffing in their "severe[ly] overcrowd[]" jail. (*Id.* at ¶¶ 375-81.) During the entire time Mr. Taylor was incarcerated at the LCJ, there was only one Armor doctor available for eight hours a week for the entire facility of hundreds of prisoners. (*Id.* at ¶¶ 374, 378.) Additionally, there were never more than nine or ten medical staff onsite during weekdays, and on weekends, there were no more than three medical staff available. (*Id.* at ¶ 381.) Obviously, Armor saved money by employing fewer staff, one of the biggest expenses in providing healthcare in jails. (*Id.* at ¶ 369.)

Other prisoners at LCJ have also experienced denial of necessary medical care by Armor. In 2018 at the LCJ, Armor refused to provide Tom Grell with adequate medical and dental care to address his seriously infected tooth. (*Id.* at ¶ 390.) For nine months, Mr. Grell repeatedly

asked Armor medical staff and jail deputies to see a dentist for severe pain in his tooth, mouth, and throat. (*Id.*)  When Mr. Grell told the Armor nurses who came to his unit during medication line that he was suffering and needed to see a dentist, Armor nurses repeatedly attempted to shift responsibility for Mr. Grell's care on others, without ever doing anything themselves. (*Id.* at ¶ 391.)  During the nine months Mr. Grell was at the LCJ, he never once saw a dentist or a doctor for his pain. (*Id.* at ¶ 393.)  After his release, when he was finally able to visit a dentist, that dentist told him that he had such a severe infection that he needed to see an oral surgeon to have several teeth pulled. (*Id.* at ¶ 394.)  Austin Klen encountered similar roadblocks when trying to obtain care from Armor at the LCJ.  After injuring his shoulder, he never received any care or treatment, despite notifying Armor medical staff about his injury. (*Id.* at ¶ 395.)

It is reasonable to infer, as is proper at this stage of the case, *see Iqbal*, 556 U.S. at 678, 681, that these practices contributed to Mr. Taylor's situation, which included, in part, him being "unable to see the doctor as frequently or as quickly as he needed to," despite that he was flagged as a chronic-care patient, and being unable to obtain the medical care he needed, including a referral for outside treatment, due to cost concerns, overcrowding, and understaffing. *See Brown*, 520 U.S. at 404.  (Doc. 38 at ¶¶ 58, 139, 155, 379.)

      3.  <u>Armor failed to train and supervise its staff despite the likelihood of problems and knowledge of actual problems.</u>

Armor also failed to properly train or supervise its medical employees on how to properly treat a serious wound infection, provide chronic care, and seek specialist guidance for conditions they were unable to treat.  This is apparent given that Mr. Taylor exhibited obvious signs of infection, including swelling, redness, and pus around his wound; fever; loss of appetite; excessive weight loss; and nausea, but no Armor medical provider treated him for the serious infection that these symptoms obviously demonstrated he had, and instead, they merely offered

him Gatorade and Band-aids.  (*Id.* at ¶¶ 402-40.)  Additionally, the Amended Complaint discusses a National Commission on Correctional Health Care (NCCHC) audit that found significant deficiencies in LCJ's medical system during the time Armor provided medical care there (*id.* at ¶¶ 414-24), which included: (i) LCJ's failure to comply with an "Essential Standard" regarding Infirmary-Level Care, which Mr. Taylor likely required for his wound and worsening infection (*id.* at ¶¶ 416-17); and (ii) LCJ inappropriately treated wounds and administered antibiotics.  (*Id.* at ¶ 420.)  As a result of this audit, NCCHC issued a corrective action to LCJ that it had to complete before receiving accreditation in this area.  (*Id.* at ¶ 421.)

Given the complex medical problems of a revolving jail population, the need for training and supervision here was so obvious, and the lack of it so likely to result in constitutional violation, that the failure to adequately train and supervise here rose to deliberate indifference. *See Harris*, 489 U.S. at 390.  The *Harris* court recognized that this occurs when the applicable law and circumstances mandate that individuals have a sufficient understanding of the law through training and supervision.  For example, a need to train officers on the use of deadly force is obvious because armed officers will undoubtedly arrest fleeing felons.  489 U.S. at 390 n.10. Similarly, an obvious need for training and supervision exists when a private medical-care contractor will provide medical care to a population of individuals incarcerated in a county jail.

Thus, the Amended Complaint sufficiently pleads a *Monell* claim against Armor.

## CONCLUSION

For the reasons stated herein, this Court should deny the Armor Defendants' Motion.

Respectfully submitted,


s/ Aurora L. Randolph
Gail K. Johnson
***Aurora L. Randolph***
Haley DiRenzo
JOHNSON & KLEIN, PLLC
1470 Walnut Street, Suite 101
Boulder, CO 80302
Phone: (303) 444-1885
Fax: (866) 340-8286
Email:  gjohnson@johnsonklein.com
          arandolph@johnsonklein.com
          hdirenzo@johnsonklein.com

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on October 2, 2020, I electronically filed the foregoing **RESPONSE TO ARMOR DEFENDANTS' MOTION TO DISMISS (Doc. 47) AND REQUEST FOR ORAL ARGUMENT** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record, including:

Michael Lowe
Daniel Jacobs
Bruno, Colin, & Lowe, PC
1999 Broadway
Ste. 4300
Denver, CO 80202
mlowe@brunolawyers.com
djacobs@brunolawyers.com
*Attorneys for Defendants Sheriff Smith,*
*Board of County Commissioners for the County*
*of Larimer, and Timothy Palmer*

David P. Ayraud
Jeannine S. Haag
Larimer County Attorney's Office
224 Canyon Ave., Suite 200
Ft. Collins, CO80522
dayraud@larimer.org
jeanninehaag@larimer.org
*Attorneys for Defendants Sheriff Smith,*
*Board of County Commissioners for the County*
*of Larimer, and Timothy Palmer*

Simone Montoya
Daniel DeLay
Messner Reeves, LLP
1430 Wynkoop St. #300
Denver, CO 80202
smontoya@messner.com
ddelay@messner.com
*Attorneys for Defendant Armor*
*and individual Armor providers*

s/ Aurora L. Randolph
**Aurora L. Randolph**