**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:20-cv-01406-WJM-NYW

CLIFFORD TAYLOR,

      Plaintiff,

v.

ARMOR CORRECTIONAL HEALTH SERVICES, INC.,
SHERIFF JUSTIN SMITH, in his individual and official capacities,
THE BOARD OF COUNTY COMMISSIONERS FOR THE COUNTY OF LARIMER,
CAPTAIN TIMOTHY PALMER,
AMANDA JARMAN,
DR. KEITH MCLAUGHLIN,
DAYLA COOK,
KYRA HARMON,
LYNETTE HOISINGTON,
ALEX MAHLOCH,
JESSINA MORSE,
LYNN SCHULTZ,
LEAH OAKLEY,
CAROLYN PEISERT,
CHEYENNE PALMER,
KATIE WENZEL, and
MICHELLE WILSON,

      Defendants.

_____

**RESPONSE TO LARIMER COUNTY DEFENDANTS' MOTION TO DISMISS (Doc. 46)**
**AND REQUEST FOR ORAL ARGUMENT**
_____

      Plaintiff Clifford Taylor, through his attorneys Gail K. Johnson, Aurora L. Randolph, and

Haley M. DiRenzo of Johnson & Klein, PLLC, hereby responds to the Larimer County

Defendants' Motion to Dismiss (Doc. 46) and respectfully requests oral argument.

Mr. Taylor's Amended Complaint sufficiently alleges facts supporting his *Monell* claim against Larimer County and his state and federal constitutional claims against Defendants Smith (individually) and Timothy Palmer.  The law governing the federal conduct is clearly established, and Defendants' other arguments are unpersuasive.  The Court should deny Defendants' Motion.

## STANDARD OF REVIEW

At the motion-to-dismiss stage, the Court must accept as true all well-pleaded factual allegations.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A court must also construe all facts in the light most favorable to the plaintiff.  *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1224 (10th Cir. 2007) (internal citations omitted).  The Court must find factual allegations plausible when the allegations support reasonable inferences that defendants are liable.  *Iqbal*, 556 U.S. at 678. The focus of the Court's inquiry is not whether a claim is probable but rather whether the factual allegations "raise a right to relief above the speculative level."  *Kay v. Bemis*, 500 F.3d 1214, 1218 (10th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

## ARGUMENT

### I.    Mr. Taylor has sufficiently pleaded an underlying constitutional violation.

The Eighth-Amendment deliberate-indifference standard requires Mr. Taylor to demonstrate that he had a "sufficiently serious" medical need and that the Defendants "kn[e]w of and disregard[ed]" that need.  *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005).  Thus, the standard requires Mr. Taylor allege: (1) his serious medical need, (2) Defendants' knowledge of the risks posed by failure to treat that need, and (3) Defendants' disregard of those risks.[1]  *Id.*

---

[1] Defendants confined Mr. Taylor as a pretrial detainee at the Larimer County Jail (LCJ) until May 31, 2018.  (Doc. 38 at ¶ 115.)  Therefore, up until May 31, 2020, the Fourteenth

Mr. Taylor notes that Defendants do not challenge that the infection he suffered is sufficiently serious under the objective prong of the deliberate-indifference inquiry.  (*See* Docs. 46, 47.) Defendants have thus waived these arguments.  *See In re: Motor Fuel Temperature Sales Practices Litigation*, 872 F.3d 1094, 1112, n.5 (10th Cir. 2017).

The Motions to Dismiss focus on how the Armor Defendants monitored and occasionally treated Mr. Taylor's *symptoms*, but they do not identify allegations demonstrating treatment of his underlying and worsening infection.  (Doc. 46 at 11; Doc. 47 at 6-7.)  Defendants focus on palliative "treatment" for the infection's symptoms, which over the course of ten months included Band Aids, Gatorade, over-the-counter ointments and medications, and antibiotics that had failed to work in the past.  But such "treatment" fell so far below the standard of care *for the infection* as to amount to no treatment at all—the equivalent of treating cancer with Advil or a broken bone with an Ace bandage.  It is well understood that providing an individual *some* medical treatment, particularly treatment that is obviously going to be ineffective given the gravity of the medical problem, is not enough to meet constitutional obligations.  *See, e.g.*, *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) ("If all the Eighth Amendment required was that

---

Amendment governed his right to adequate medical care while incarcerated.  *See Lopez v. LeMaster*, 172 F.3d 756, 759 n.2 (10th Cir. 1999) (*abrogated on other grounds by Brown v. Flowers*, No. 19-7011, 2020 WL 5509683, at *3 (10th Cir. Sept. 14, 2020).  In the excessive-force context, pretrial detainees are entitled to a lower standard than that applicable to convicted individuals.  *Kingsley v. Hendrickson*, 576 U.S. 389, 400-02 (2015).  While the Tenth Circuit has yet to decide whether, given *Kingsley*, a lower standard applies to pretrial detainees' medical and conditions-of-confinement claims, other circuits have so held.  *See, e.g.*, *Darnell v. Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017) ("*Kingsley* altered the standard for deliberate indifference claims under the Due Process Clause"); *Castro v. County of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016) (noting that the *Kingsley* Court did not "limit its holding to 'force' but spoke to 'the challenged governmental action' generally").  Mr. Taylor is entitled to review of his conditions of confinement up to May 31, 2018, under the objective *Kingsley* standard but proceeds to show he sufficiently stated claims for relief under the more stringent Eighth-Amendment standard.

prison officials provide some immediate and ongoing attention, they could shield themselves from liability (and save considerable resources) by shuttling sick or injured inmates to perfunctory medical appointments wherein no meaningful treatment is dispensed") (internal quotations omitted).

Here, the individual Armor Defendants offered assessments that provided perfunctory monitoring without any actual meaningful treatment, as evidenced by Mr. Taylor's worsening infection, which eventually resulted in several additional surgeries and permanent injury.  (Doc. 38 at ¶¶ 238-57.)  But "*some* treatment does not foreclose [a] deliberate indifference claim if the treatment received was so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate his condition."  *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) (internal citations omitted).  Defendants' "treatments" proved as good as no treatment at all, demonstrating the individual Defendants' deliberate indifference.  (*See* Doc. 56 at 4-19.)

Additionally, to the extent Defendants argue that Mr. Taylor must prove *individual* liability to establish a claim under *Monell v. Department. of Social Services*, 436 U.S. 658 (1978), the Tenth Circuit has expressly held that this is not required.  *See Garcia v. Salt Lake Cty.*, 768 F.2d 303, 310 (10th Cir. 1985) (where no one employee is deliberately indifferent, "the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights"); *see also Todaro v. Ward*, 565 F.2d 48, 52 (2d Cir. 1977) (same).  Regardless of whether this Court agrees that Mr. Taylor pled a constitutional violation against any individual, his Amended Complaint is sufficient to meet the *Monell* test because the combined effect of the Defendants' actions amounts to deliberate indifference.

II.     **Mr. Taylor has sufficiently plead a *Monell* claim against Larimer County.**

Mr. Taylor may plead his *Monell* claim by alleging that Larimer County had a policy, custom, or practice that caused or contributed to a constitutional violation against him.  *See Garcia*, 768 F.2d 303 at 307.  In the absence of an official policy, a party may allege a widespread practice that is so permanent and well-settled as to constitute a custom or the County's deliberately indifferent failure to adequately train or supervise its employees.  *Bryson v. City of Oklahoma*, 627 F.3d 784, 788 (10th Cir. 2010).  Causation exists when the practice is "closely related" to the constitutional violation or the "moving force" behind the injury.  *Board of Cty. Com'rs v. Brown*, 520 U.S. 397, 404 (1997).

When a plaintiff alleges the challenged practice has been in place for a significant period of time or that other individuals have experienced similar conduct, his allegations support a *Monell* claim.  *See*, *e.g.*, *Cannon v. City and Cty. of Denver*, 998 F.2d 867, 877-78 (10th Cir. 1993); *Watson v. City of Kansas City*, 857 F.2d 690, 696 (10th Cir. 1988).  A municipality's failure to train or supervise its employees amounts to deliberate indifference when the need for training and supervision is so obvious and the inadequacy is likely to result in constitutional violations.  *City of Canton v. Harris*, 489 U.S. 378, 389-90 (1989).

A.  **Larimer County has an official policy of ratifying the delay and denial of care for financial purposes, as set forth in its contract.**

Mr. Taylor's Amended Complaint details how the contract between Larimer County and Armor incentivizes cost-saving over properly caring for individuals.  (Doc. 38 at ¶¶ 340-87.) The Amended Complaint also notes that the contract required Larimer County and Armor to spend $1.26 per prisoner per day during the time Mr. Taylor was incarcerated at the facility and how this number is significant less than what that other facilities spend.  (*Id.*)  This evidences a

policy for *Monell* purposes.  *See McGill v. Correctional Healthcare Companies, Inc.*, 2014 WL 2922635, at *8 (D. Colo. June 27, 2014) (finding the plaintiff's allegations that "defendants have created financial incentives that discourage appropriate hospitalization of inmates as well as sanctions for instances of improper care" based on statements in the county's contract supported a *Monell* claim against the county).[2]

  This cost-saving policy is "closely related" to the rights violation at issue: Defendants denied Mr. Taylor expensive outpatient medical care and costly treatments (like proper medication) for his worsening infection.  Instead, Armor medical providers opted to ignore or merely assess his wound or provide cheap palliative "treatments" (amounting to no treatment at all), such as prescribing Mr. Taylor the same course of basic antibiotics that had failed to work in the past, an over-the-counter ointment intended to treat minor cuts and scrapes (Bacitracin), Gatorade, and Band-aids.  (*Id.* at ¶¶ 156-57, 163, 199, 214.)  Larimer County had a contractual incentive to ratify this denial of care in order to cut costs.  *Brown*, 520 U.S. at 404; (Doc. 38 at ¶¶ 121-235, 258-68, 351-68, 382-87.)

### B. Larimer County contracted with Armor because of its widespread practice of cutting costs and allowed the unconstitutional practice to continue.

  Mr. Taylor's Amended Complaint details Armor and Larimer County's long history of prioritizing profit and cost-saving over the health and safety of people who are incarcerated,

---

[2] *Sherman v. Klenke*, 653 Fed. App'x 580, 592 (10th Cir. 2016) and *Swan v. Physician Health Partners, Inc.*, 212 F. Supp. 3d 1000, 1008-10 (D. Colo. Sept. 8, 2016), on which Defendants rely (Doc. 46 at 12, 17), are easily distinguished because the cost-saving allegations in those cases were bare and conclusory.  Mr. Taylor makes detailed allegations that Larimer County prioritizes cost-saving at the expense of adequate prisoner health care by discussing the contract, making comparisons to costs at comparable facilitates, and giving examples of several prisoners who have been denied needed medical care under this practice.  (Doc. 38 at ¶¶ 340-87, 390-96.)

including dozens of instances of individuals dying or becoming severely injured under Armor's care.  (Doc. 38 at ¶¶ 269-329, 390-96.)  Several of these instances, like Mr. Taylor's, involved Armor professionals who disregarded obvious signs of problems and failed to provide standard care.  (*Id.* at ¶¶ 290-95, 308, 329.)  Yet despite Armor's egregious record and Larimer County officials' knowledge of that record, Larimer County signed a contract with Armor.  (*Id.* at ¶¶ 330-35.)  Larimer County's assertions that whether it knew of Armor's business model of delaying and denying care for financial purposes is irrelevant is wholly unsupported by any case law, including *Waller v. City and County of Denver*, 932 F.3d 1277, 1286 (10th Cir. 2019), which Defendants cite for the proposition.  (Doc. 46 at 16 n.4.)  Larimer County and Defendants Smith's and Palmer's decision to enter into a contract knowing of Armor's unconstitutional policies is entirely relevant in an analysis that asks whether the government actors disregarded a known risk.  *See Mata*, 427 F.3d at 752.  Longstanding precedent requires a government entity to provide constitutionally adequate medical care.  *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976).  There is no law saying Defendants can avoid that duty by contracting with a private company.

Larimer County officials' knowledge of Armor's history is supported by its role in the contract process (*id.* at ¶ 335) as well as the intensive contract negotiation during which the two entities discussed Armor's having cut costs at other facilities (*id.* at ¶¶ 354-63).  It is reasonable to infer, as is proper at this stage, *see Iqbal*, 556 U.S. at 678, 681, that an entity with an obligation to provide constitutionally adequate medical care to its jail population would exercise due diligence and be aware of Armor's business practices.  It is also reasonable to infer that Larimer County would be aware of this practice by the sheer number of allegations and lawsuits against Armor, which are publicly available.  (*Id.* at ¶¶ 269-329, 390-96.)

Mr. Taylor also alleged other instances of detainees at LCJ being ignored and denied adequate medical care.  (*Id.* at ¶¶ 390-96.)  The Amended Complaint also detailed Larimer County's understaffing in their "severe[ly] overcrowd[ed]" jail.  (*Id.* at ¶¶ 375-81.)  Despite this overcrowding, Larimer County only had one doctor available for 8 hours a week, who needed to care for the hundreds of prisoners incarcerated in the jail.  (*Id.* at ¶¶ 374, 378.)   Additionally, no more than nine or ten medical staff worked onsite during weekdays; on weekends, no more than three medical staff worked at the same time.  (*Id.* at ¶ 381.)  This understaffing practice, which resulted in detainees being unable to see medical staff, has existed at Larimer County for many years, even before it worked with Armor.  In 2014, Larimer County booked 10,595 individuals into its jail.  (*Id.* at ¶ 336.)  In 2015, Larimer County booked 11,125 individuals into its jail.  (*Id.*)  Despite these high numbers, in 2014, only 267 detainees in the LCJ saw a doctor in 2014, and in 2015, only 463 detainees in the LCJ saw a doctor.  (*Id.*)  Obviously, where medical staff are one of the costliest expenses in jail management, Armor's choice to employ fewer staff saves Larimer County money by lowering contractual costs.  (*Id.* at ¶¶ 369-70.)

These widespread practices (including cost-cutting, overcrowding, and understaffing) contributed to the constitutional violation in this case, where Mr. Taylor could not "see the doctor as frequently or as quickly as he needed to" nor obtain the medical care he needed, including a referral for costly outside treatment.  *See Brown*, 520 U.S. at 404.  (Doc. 38 at ¶ 379.)

### C. Despite the likelihood of problems and its knowledge of actual problems, Larimer County failed to train and supervise Armor staff.

It is also evident that Larimer County failed to properly train or supervise Armor medical professionals about how to properly treat a serious wound infection, provide chronic care, and seek specialist guidance for conditions they were unable to treat.  This is apparent given that Mr.

Taylor exhibited obvious signs of infection, including wound discharge and swelling, fever, loss of appetite, excessive weight loss, and nausea, but no Armor medical provider treated him for the serious infection that these symptoms obviously demonstrated he had, instead offering him Gatorade and Band-aids.  (Doc. 38 at ¶¶ 402-40.)  Additionally, the Amended Complaint describes a National Commission on Correctional Health Care (NCCHC) audit that found significant failings of LCJ's medical system that were not identified or remedied by Larimer County itself, evidencing a lack of oversight.  (*Id.* at ¶¶ 414-24.)

Defendants attempt to argue that it is not "highly predictable" that "engaging Armor or otherwise allegedly failing to supervise or train them" would lead to the constitutional violation against Mr. Taylor.  (Doc. 46 at 16.)  But the Amended Complaint details Armor's long history of denying care in similar ways as to what occurred with Mr. Taylor, as discussed *supra*.  (Doc. 38 at ¶¶ 269-329, 390-96.)  In *Harris*, the Court noted that when the applicable law and circumstances mandate that individuals have a sufficient understanding of the law, the need for training and supervision is obvious.  489 U.S. at 390 n.10.  For example, just as there is an obvious need for police departments to train officers on the use of deadly force, so too is there an obvious need for jails to train their staff to provide adequate medical care.  *Id.* at 390.  Though Armor has its own responsibility to train and supervise its staff, Larimer County cannot contract out of its constitutional obligation to provide its jail population adequate medical care.  *See Estelle*, 429 U.S. at 103.  This Court should reject its attempt to shirk this responsibility.

## III.    Mr. Taylor sufficiently pleads individual claims against Defendants Smith and Palmer.

To demonstrate his claims against Defendants Smith and Palmer, Mr. Taylor must show that: "(1) the defendant promulgated, created, implemented or possessed responsibility for the

continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010). This requires showing "that a supervisor established or utilized an unconstitutional policy or custom," setting "in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights." *Burke v. Regalado*, 935 F.3d 960, 997 (10th Cir. 2019) (internal citations omitted). Local government policymakers are deliberately indifferent when they purposefully fail to act in response to obvious risks of harm "which will almost inevitably result in constitutional injury." *Hollingsworth v. Hill*, 110 F.3d 733, 745 (10th Cir. 1997).[3]

### A. Defendants Smith and Palmer maintained a constitutionally-deficient medical-care system knowing of an urgent need for reform.

Defendants Smith and Palmer knew of Armor's deficient policies and the problems with their own deficient medical-care system yet disregarded them. (Doc. 38 at ¶¶ 441-63.) In *Burke*, the Tenth Circuit found individual liability against jail supervisors under similar facts. There, the plaintiff demonstrated that a sheriff provided "insufficient medical resources and training, chronic delays in care, and indifference toward medical needs at the jail, *and that he did so knowing of an urgent need for reform*." 935 F.3d at 999 (emphasis added). The *Burke* court discussed how, as here (Doc. 38 at ¶¶ 415, 441-24), the NCCHC had identified recurring issues with the jail's medical care system, demonstrating that the sheriff maintained a policy or custom of providing deficient medical care at the jail. *Id.* The court also noted the sheriff's awareness

---

[3] Because the applicable standard here is essentially the same as the *Monell* standard, the evidence and analysis discussed *supra* is also relevant to Defendants Smith's and Palmer's liability.

of the jail's understaffing, which exists here (*id.* at ¶¶ 375-81), and the evidence demonstrating the jail's "chronic deficiencies" as "consistent with" the plaintiff's situation. *Id.* at 999-1000.

The NCCHC audit here demonstrates Defendants' liability even more strongly than the audit in *Burke*, because the NCCHC found that the LCJ had failed to comply with an "Essential Standard" regarding Infirmary-Level Care, which Mr. Taylor required for his wound and worsening infection. (*Id.* at ¶¶ 416-17.) The audit also found that LCJ had inappropriately treated wounds and administered antibiotics, causing NCCHC to issue a corrective action LCJ had to address before reaccreditation. (*Id.* at ¶¶ 420-21.)

Defendants Smith and Palmer were also aware of other issues with the medical system there, including problems resulting in significant injury and death. (*Id.* at ¶¶ 441-45, 454-58.) Both Defendants knew of understaffing at the jail. (*Id.* at ¶¶ 375-81.) And Defendants Smith and Palmer knew of the general need to provide quality medical care to the jail's population due to its vulnerability and tendency for illness and injury. (*Id.*) Yet both disregarded the need for a more sufficient medical-care system, opting instead to maintain the deficient one. (*Id.* at ¶¶ 450, 459.) This shows deliberate indifference. *See Hollingsworth*, 110 F.3d at 745.

## IV.   The law governing Defendants Smith's and Palmer's conduct in violating Mr. Taylor's rights was clearly established.

For the purpose of a qualified-immunity analysis, a right is clearly established when it is "sufficiently clear that a reasonable official would have understood that his conduct violated the right." *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001). A law is clearly established when "Tenth Circuit or Supreme Court precedent . . . makes the unlawfulness of the officers' actions apparent," *Mascorro v. Billings*, 656 F.3d 1198, 1208 (10th Cir. 2011), or a "robust consensus of persuasive authority" demonstrates the same, *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). To

defeat a qualified-immunity defense, plaintiffs need not "find a case with exact corresponding factual circumstances;" instead, defendants must "make 'reasonable application of the prevailing law to their own circumstances.'" *Mascorro*, 656 F.3d at 1208 (citation omitted). The inquiry "involves more than a scavenger hunt for prior cases with precisely the same facts." *Perea v. Baca*, 817 F.3d 1198, 1204 (10th Cir. 2016). The focus is on "whether the violative nature of [the] *particular conduct* is clearly established." *Id.* (emphasis added).

### A. Focusing on the conduct alleged reveals the law is clearly established.[4]

Mr. Taylor alleges that Defendants Smith and Palmer maintained policies and customs at the LCJ that prioritized cost-saving over health, resulting in rote denial of necessary treatment, understaffing and overcrowding, problems in the jail identified by audits, and a failure to properly train and supervise staff—all of which led to constitutional violations. (Doc. 38 at

---

[4] Defendants attempt to define the conduct at issue so specifically that it takes up ten lines of text. (Doc. 46 at 20.) Essentially, Defendants ask for the "exact corresponding factual circumstance," to demonstrate that it was clearly established that these Defendants' conduct violated Mr. Taylor's right, but such specificity is not required. *See Mascorro*, 656 F.3d at 1208. Moreover, this Court has correctly noted that additional specificity under the clearly-established analysis is most important in the Fourth-Amendment context, which is not at issue here:

> The Court is keenly aware of the Supreme Court's recent emphasis on defining clearly established rights with specificity. Nearly all of these recent Supreme Court decisions, however, have arisen from allegations of excessive force under the Fourth Amendment . . . In the Court's view, this acknowledgement at a minimum urges caution by the district courts of simply assuming the broadest application of *White* and similar per curiam reversals outside the context of excessive force cases brought under the Fourth Amendment. In any event, qualified immunity does not demand an absurd level of specificity.

*Estate of Walter by and through Klodnick v. Correctional Healthcare Companies*, 323 F. Supp. 3d 1199, 1212 (D. Colo. 2018) (J., Martinez) (internal citations omitted). For these same reasons, this Court should reject Defendants' attempt to define the conduct at issue so narrowly.

¶¶ 340-90, 414-24.)  Defendants Smith and Palmer did all this knowing of the need for change but failing to effectuate any change, *see supra* section II, thereby showing deliberate indifference to Mr. Taylor's medical needs.  Such deliberate indifference resulted in unnecessary pain and suffering, permanent injury, and disability.  *See Burke*, 935 at 999-1000.  (Doc. 38 at ¶¶ 121, 238-57.)

Since 1976, it has been clearly established that prison officials' "deliberate indifference to the serious medical needs of prisoners" violates the Eighth Amendment.  *Estelle*, 429 U.S. at 97.  It has also been clearly established that delay in providing medical care resulting in pain is deliberate indifference.  *Ramos v. Lamm*, 639 F.2d 559, 576 (10th Cir. 1980).  The Tenth Circuit has since decided many cases making clear that prison officials' deliberate indifference to serious medical needs, including the risk of infection and unnecessary and prolonged pain, violates the Constitution.  *See, e.g.*, *Mata*, 472 F.3d at 755; *Sealock*, 218, F.3d at 1210.  It is also clearly established that jail supervisors may be held liable due to their knowledge and continued maintenance of policies and systems that contribute to constitutional violations even when they are not aware of a specific risk to a specific prisoner.  *See, e.g.*, *Farmer v. Brennan*, 511 U.S. 825, 843 (1994); *Sanders v. Glanz*, 138 F.Supp.3d 1248, 1263-64 (10th Cir. 2015).

Thus, "reasonable application" of "prevailing law to [these] circumstances," *see Mascorro*, 656 F.3d at 1208, demonstrates that the law was sufficiently clear in this area in 2018 such that Defendants Smith and Palmer would have understood that deliberately disregarding the known risk of serious injury to people incarcerated in their jail due to their faulty medical-care system was unconstitutional.  *See Currier*, 242 F.3d at 923.  Because the necessary focus of the qualified immunity analysis is on Defendants Smith's and Palmer's *conduct*, *Perea*, 817 F.3d at

1204, it is unreasonable to conclude they may evade liability simply because the clearly

established law comes from several cases rather than one.  *See Boswell v. Sherburne County*, 849

F.2d 1117, 1121-22 (8th Cir. 1988) (denying qualified immunity and recognizing that the law

can be clearly established by multiple cases governing supervisors' conduct).[5]

      For these reasons, this Court should decline to extend qualified immunity to these

Defendants and allow Mr. Taylor's claims to proceed.

## V.    Application of Colo. Rev. Stat. § 13-21-131 as to Defendants Smith and Palmer is not unconstitutionally retrospective.

      Defendants argue application of the new remedy provided for in SB 20-217, the Law

Enforcement Accountability and Integrity Act (LEAIA) (Exhibit 1), codified at Colo. Rev. Stat.

§ 13-21-131, as to Defendants Smith and Palmer is unconstitutionally retrospective under article

II, section 11 of the Colorado Constitution.  (Doc. 46 at 21-25.)  *City of Colorado Springs v.

Powell*, 156 P.3d 461, 465 (Colo. 2007) (recognizing that retroactive changes in the law are "not

necessarily unconstitutional" but cautioning that "'retrospective' legislation is constitutionally

prohibited.")  Colorado retroactivity and retrospectivity analysis go hand-in-hand: a court must

first determine whether the legislatures intended the statute to operate retroactively.  If the

legislature so intended, the court must then determine whether the statute is unconstitutionally

---

[5] Moreover, although Mr. Taylor does not believe looking to other circuits is necessary, he notes that a "robust consensus" of cases from other circuits make clear that prison and jail supervisors denying prisoners adequate medical care through policies to cut corners and save costs, as well as failing to train and supervise, violates the Constitution.  *See, e.g.*, *McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004); *Thompson v. Upshur Cty., TX*, 245 F.3d 447, 462 (5th Cir. 2001); *Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241, 1247 (6th Cir. 1989); *Boswell*, 849 F.2d at 1123; *Bass by Lewis v. Wallenstein*, 769 F.2d 1173, 1184 (7th Cir. 1985); *Ancata v. Prison Health Services, Inc.*, 769 F.2d 700, 705-06 (11th Cir. 1985).

retrospective, *i.e.*, whether it takes away or impairs vested rights, creates a new obligation, imposes a new duty, or attaches a new disability to conduct that occurred in the past.  *Id.*

### A.  Defendants waived any argument as to LEAIA's retroactivity.

Defendants Smith and Palmer stated they assumed for purposes of their Motion to Dismiss that Colorado legislators intended Colo. Rev. Stat. § 13-21-131 to operate retroactively and stated in a footnote that they "reserve … [an argument regarding retroactivity] for potential future argument."  (Doc. 46 at 23-24, n.6.)  "[C]ourts have held that arguments are waived when parties fail to provide proper support or only superficially develop them."  *Grimaldo v. Reno*, 189 F.R.D. 617, 619 (D. Colo. 1999) (citing *Franklin Savings Corp. v. U.S.*, 180 F.3d 1124, 1128 n.6 (10th Cir. 1999) (argument was "develop[ed] ... so superficially ... as to waive it")). While Defendants note this part of the analysis (*i.e.* whether a provision is retroactive), they completely fail to argue it and have therefore waived any further argument on this point.  *See, e.g., Jewell v. State Farm Mut. Auto. Ins. Co.*, No. 18-CV-02536-KLM, 2020 WL 1627348, at *5 (D. Colo. Feb. 26, 2020) (unpublished) (faulting party for failing to raise an argument in its initial motion).

Defendants' justification for failing to fully articulate their argument (that they "have not been able to secure to-date the complete legislative history of S.B. 217") is unpersuasive.  (Doc. 46 at 23 n.6.)  Defendants cite no authority that such circumstances justify their waiver. Moreover, legislative history is publicly available.[6]  And Defendants admit that review of

---

[6] For example, considerable information regarding SB 20-217—such as vote summaries at various committees, amendments, and iterations of the bill—is available on the Colorado General Assembly website, available at https://leg.colorado.gov/bills/sb20-217.  Additionally, legislative hearings—including those discussing SB 20-217—can be viewed online at https://www.coloradochannel.net/watch-meetings/.

legislative history is only a part of any analysis regarding retroactivity.  (Doc. 46 at 23, n.6.)  Yet

they fail to offer *any* analysis here.  Therefore, this Court should reject any attempt by

Defendants to raise belated arguments as to this point.[7]

**B.  This provision is not retrospective.**

Defendants Smith and Palmer argue that Colo. Rev. Stat. § 13-21-131 as applied to their

conduct at issue in this case is unconstitutionally retrospective.  (Doc. 46 at 21-24.)  It is well

established under Colorado law that "[a]pplication of a statute is not rendered retroactive and

unlawful merely because the facts upon which it operates occurred before adoption of the

statute."  *Cont'l Title Co. v. Dist. Court In & For City & Cty. of Denve*r, 645 P.2d 1310, 1314

(Colo. 1982).  Defendants Smith and Timothy Palmer argue that the claims against them under

---

[7] If the Court is inclined to consider a belated retroactivity argument on its merits, Mr. Taylor will briefly address it here.  By enacting LEAIA, the Colorado legislature intended to add a remedy to further allow victims of certain law-enforcement officers to vindicate their longstanding rights under the Colorado Constitution.  Under Colorado law, a legislature's intent that a statute operate retroactively may be implied.  *Ficarra v. Dep't of Regulatory Agencies, Div. of Ins.*, 849 P.2d 6, 13-14 (Colo. 1993) ("We have never held that express language of retroactive application is necessary to express such intent.")  Even though lawmakers provided for several provisions of LEAIA to take effect in the future, the particular provision at issue here "takes effect upon passage," (*see* Exhibit 1, (SB 20-217, Section 18)), and its remedial mechanism provides for a two-year statute of limitation. Colo. Rev. Stat. § 13-21-131(5); *see also* Exhibit 1 (SB 20-217, Section 3).  Thus, the plain language of the law supports the conclusion that it can be used to redress the constitutional violation at issue here.

    Moreover, Colorado lawmakers did not limit this remedy to violations occurring after the effective date of the Act, as they did in other situations.  For example, in the 2019 Equal Pay for Equal Work Act (EPEWA), Colorado legislators created additional remedies for employees against their employers for illegal pay discrimination.  *See* SB 19-085, Section 6 (amending Colo. Rev. Stat. § 8-5-104) (Exhibit 2).  In EPEWA, lawmakers expressly precluded retroactive application of the new law, stating "[t]his act applies to violations that occur on or after the applicable effective date of this act."  *See* SB 19-085, Section 9.  And earlier in 2020, Colorado lawmakers removed the ability for the death penalty to be imposed in Colorado for sentences charged on or after July 1, 2020, and the law expressly stated that the provision did not alter any death sentence imposed prior to that date.  *See* Colo. Rev. Stat. § 16-11-901.

LEAIA would be impermissibly retrospective because prior to LEAIA's passage, they could assert a one-year statute of limitations defense to all claims that could exist against them.  (*See* Doc. 46 at 22-24.)  This is incorrect in two ways: (1) Colorado case law shows that the one-year statute of limitations set out in Colo. Rev. Stat. § 13-80-103(c) does not necessarily apply here; and (2) loss of a statute-of-limitations defense does not make the law impermissibly retrospective.

> 1.  <u>Colorado case law shows that Defendants Smith and Palmer aren't necessarily entitled to the one-year statute of limitations set out in Colo. Rev. Stat. § 13-80-103(c).</u>

Defendants argue that despite LEAIA's statement that "a civil action pursuant to this section must be commenced within two years after the cause of action accrues," under Colo. Rev. Stat. § 13-80-103(c) (entitled "General limitations of actions—one year," referred to herein as "general statute of limitations") the statute of limitations on this claim would be one year from the date an action accrues but for LEAIA.  (Doc. 46 at 21-22.)  But the one-year general statute of limitations for tort actions against sheriffs or other law enforcement would not apply here.

First, because LEAIA is the more specific statute at issue, its statute of limitations provision applies.  *See, e.g.*, *Reg'l Transp. Dist. v. Voss*, 890 P.2d 663, 668 (Colo. 1995) ("[O]rdinarily a more specific statute should be applied rather than a more general statute if both statutes deal with the same or similar subject matter.") (internal citation omitted); *Jones v. Cox*, 828 P.2d 218, 223 (Colo. 1992).  In *Jones*, the Colorado Supreme Court noted:

> Our rules of statutory construction are that a special statute preempts a general statute, that a later statute is given effect over an earlier statute, and that because statutes of limitation are in derogation of a presumptively valid claim, a longer period of limitations should prevail where two statutes are arguably applicable.

828 P.2d at 222.  Here, although the general statute of limitations delineates the *general* time limit for *tort* claims against sheriffs and law enforcement officers, LEAIA delineates the time limit for state *constitutional* claims brought against peace officers.  Colo. Rev. Stat. § 13-21-131(1).  As such, LEAIA is much more specific and is therefore applicable here.  *See, e.g., Dawson v. Reider*, 872 P.2d 212, 217 (Colo. 1994) (holding plaintiffs were entitled to three-year statute of limitations of the No-Fault Act applied in tort for actions under the Colorado Auto Accident Reparations Act against a sheriff and his deputy).  Second, LEAIA applies, as it is the later statute; the general statute of limitations was last updated in 2017.  *See* S.B. 17-294 (amending language in Colo. Rev. Stat. § 13-80-103 unrelated to then-existing provision regarding claims against law enforcement).  LEAIA's two-year statute of limitations should prevail over the general, one-year statute of limitations because it is longer.  *See Jones*, 828 P.2d at 222.

> 2.   The potential loss of a statute-of-limitations defense does not necessarily make application of a retroactive statute impermissibly retrospective.

Defendants argue that prior to the passage of LEAIA "law enforcement officials like the Individual Defendants were long-entitled to a one-year statute of limitations for any cause of action."  (Doc. 46 at 22.)  As noted above, that is not accurate.  They proceed to argue that any imposition on their ability to present that defense renders the applicability of LEAIA here retrospective.  (Doc. 46 at 23-24.)  But, given that this is a new remedy (with its own statute of limitations), Defendants never had a vested right to that defense for constitutional claims.  A new remedy does not "constitute[] the impairment of a vested right nor the imposition of a new duty,

for there is no such thing as a vested right in remedies."  *Cont'l Title*, 645 P.2d at 1315 (internal

quotations omitted).

Defendants note that "where a statute of limitations has run and the bar attached,"

retroactive legislation impermissibly infringes on vested rights and is retrospective.  (Doc. 46 at

23 (quoting *Jefferson County Dep't of Social Servs. v. G.*, 607 P.2d 1004, 1006 (Colo. 1980))

(alterations omitted).)  But the statute of limitations as to this claim did not exist in November

2019, so here there is not a resurrection of a claim that has come and gone.  Indeed, Defendants'

only cited authority for this argument, *Jefferson County,* beautifully illustrates why the

Defendants' argument is without merit.  In *Jefferson County*, a child, through her mother and the

Department of Social Services brought an action against the father regarding determination of

paternity and child support in 1977 for a child born in 1970.  607 P.2d at 1005.  Under the law

that existed on the date the child was born, such an action had to be brought within five years of

birth.  *Id*.  Thus, under that law the statute of limitations would have run in 1975.  But, in 1977,

the Uniform Parentage Act (U.P.A.), became effective, repealed the previous paternity statute

and adopted a new, longer statute of limitations.  *Id*.  The Colorado Supreme Court held that the

"paternity action, prosecuted by *the Department*, which was barred after September 10, 1975 by

the then applicable statute of limitations may [not] be constitutionally revived by the U.P.A."  *Id*.

(emphasis added).  But the court differentiated that impermissible claim from the

constitutionally-acceptable claim stemming from the new remedy created for *the child* by the

U.P.A.:

> An action brought by the child does not suffer the same
> constitutional infirmities as does an action brought by the mother,
> the father or the Department in this case. . . . ***The prior statute of
> limitations did not bar a suit by the child, as the child could not***

> *institute an action under the prior paternity statute, and thus, there is no revival of a previously barred action.  The U.P.A. merely creates a remedy which the child previously did not possess.*

*Id*. at 1006 (internal citation omitted) (emphasis added).  Defendants are like the child in *Jefferson County*—they never had a statute of limitations to have any vested interest in because, prior to the passage of LEAIA, Mr. Taylor could not seek this remedy against Defendants.

### C.  Defendants waived other arguments as to why LEAIA is retrospective as applied.

Again, in a footnote, Defendants state they "do not raise now and reserve for potential future argument whether" LEAIA creates a new obligation, imposes a new duty, or attaches a new disability when applied to their conduct here."  (Doc. 46 at 23, n.6.)  Other than this perfunctory note, Defendants make no argument that allowing Mr. Taylor to assert his state constitutional claims here results in unconstitutional retrospectivity for any reason other than their inability to assert a one-year statute of limitations defense.  For the reasons stated above, Defendants waived any other argument as to retrospectivity.  *See Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 880 & n. 9 (10th Cir. 1997).[8]

---

[8] But in case the Court is inclined to entertain belated arguments on this point from Defendants, Mr. Taylor also briefly addresses that issue here.  As noted, laws that take away or impair vested rights, create a new obligation, impose a new duty, or attach a new disability are unconstitutionally retrospective.  *Cont'l Title Co.*, 645 P.2d at 1314 (Colo. 1982) (internal citations omitted).  As argued *supra* [section], LEAIA does not impose on Defendants' proffered vested right to a statute of limitations defense.  But it also does not violate any other vested rights.  Notwithstanding Defendants' assertion (Doc. 46 at 23),

> '[T]here are no bright line tests to determine what constitutes a vested right or when that right accrues.'  In determining whether a statute impairs vested rights, among other factors we must consider whether the provision defeats the reasonable expectations of affected persons or surprises persons who have long relied on a contrary state of law.

## VI.   Mr. Taylor has sufficiently stated a state constitutional violation.

### A.  The state constitutional standard is not identical to the federal constitutional standard.

Defendants state that it can be "confidently predicted" that the Colorado constitutional

standards will be identical to the standards crafted for federal constitutional standards.  (Doc. 46

at 24-25.)  But the Colorado Supreme Court very recently reiterated "[w]hen interpreting our

own constitution, we do not stand on the federal floor; we are in our own house."  *Rocky*

*Mountain Gun Owners v. Polis*, 2020 CO 66, ¶ 36.  In *Rocky Mt. Gun Owners*, the Court stated it

leaned on federal analysis primarily where: "the text of the two provisions is identical or

substantially similar," "where consistency between federal and state law has been a goal of our

---

*Kuhn v. State*, 924 P.2d 1053, 1059 (Colo. 1996) (*quoting Ficarra v. Department of Regulatory Agencies*, 849 P.2d 6, 16-17 (Colo. 1993)).  Although the remedy available for a violation of the Colorado Bill of Rights has changed, Defendants Smith and Palmer have been obligated to abide by the constitutional provisions therein long before LEAIA.  They do not assert—nor could they—that they were surprised that they were obligated to follow the Colorado Constitution. In *Cont'l Title Co.*, the Court considered whether a statute enacted *after* unlawful, discriminatory actions of an employer—actions which were prohibited under law at the time of the conduct— could be relied upon to establish jurisdiction for a discrimination claim.  645 P.2d at 1313-14. The Court permitted application of the new, retroactive law because:

> [t]he effect of that section is only to provide an alternative remedy
> for vindication of the alleged discriminatory and unfair
> employment practice […].  It does not remove an affirmative
> defense that might otherwise be asserted by [defendant], nor does
> it create substantive rights by retroactively changing what was
> formerly a lawful employment practice into a discriminatory
> practice.

645 P.2d at 1315.  As in *Cont'l Title Co.*, applying LEAIA here does not create substantive rights or duties by retroactively changing formerly lawful conduct into unlawful conduct; it merely provides a new remedy for vindication of unlawful conduct.  A statute that creates only a procedural or remedial change in existing law is not unconstitutionally retrospective.  *Id.* at 1315. "[T]here is no such thing as a vested right in remedies."  *Jefferson County*, 607 P.2d at 1006. Application of LEAIA to Defendants Smith and Palmer in this case is not impermissibly retrospective, and the Court should allow the claims to proceed on the merits.

own precedent," where the U.S. Supreme Court's reasoning is sound, and "where no party has argued that the Colorado provision calls for a distinct analysis."  2020 CO 66 at ¶¶ 37-38.  But the *Rocky Mt. Gun Owners* Court specifically noted "parallel text does not mandate parallel interpretation."  *Id*. at ¶ 37.  For example, in *People v. McKnight*, 2019 CO 36, ¶¶ 38-43, the Colorado Supreme Court departed from federal Fourth-Amendment jurisprudence in determining the parameters of the identically worded article II, section 7 of the Colorado Constitution.  The Court noted that because the protections afforded by both article II, section 7 and the Fourth Amendment are "'highly generalized,' we discern no reason to reflexively assume that there must be 'just one meaning over a range of differently situated sovereigns.'"  *McKnight*, 2019 CO at ¶ 39 (quoting *Imperfect Solutions* at 174).  The *McKnight* court justified its departure from federal jurisprudence by noting state courts "have a freer hand in doing something the Supreme Court cannot: allowing local conditions and traditions to affect their interpretation of a constitutional guarantee and the remedies imposed to implement that guarantee."  *Id*. at ¶ 40 (internal quotations and citations omitted).

Here, Mr. Taylor has brought a claim for cruel and unusual punishment and deprivation of due process under article II, sections 20 and 25 of the Colorado Constitution.  (Doc. 38 at 90-92.)  Although these provisions largely mirror parts of the U.S. Constitution, the Colorado Supreme Court has demonstrated that it can interpret the state constitution as providing greater protections than the federal constitution.  *See* section VI.C., *supra*.  Moreover, the protections at issue here are "highly generalized," so there is not necessarily one meaning that need apply in all circumstances.  *See McKnight*, 2019 CO at ¶ 39.  Lastly, the Colorado provisions call for a

distinct analysis here because the Supreme Court's interpretation of the parallel federal

provisions is unsound, and Colorado precedent dictates stronger protections.

**B. The Colorado Supreme Court could easily find that the U.S. Supreme Court's Eighth-Amendment jurisprudence is insufficiently protective.**

The Eighth Amendment reads: "Excessive bail shall not be required, nor excessive fines

imposed, nor cruel and unusual punishments inflicted."  The doctrine governing claims

challenging conditions of confinement derives from the last part of the amendment, which

prohibits cruel and unusual punishment.  *See Farmer*, 511 U.S. at 832.  Supreme Court

jurisprudence interpreting the Eighth Amendment in the context of prison conditions has become

increasingly focused on punishment; this focus has led to the development of the deliberate-

indifference test, which includes inquiry into the objective seriousness of the conditions and the

subjective intent of the defendant prison official.  *See id.* at 835-37.  The Supreme Court has

narrowly focused on the word "punishment," rather than the words "cruel and unusual."  The

Colorado Supreme Court could well find that this focus is off base because the punishment is

*incarceration*, and the proper question should be whether the incarceration conditions have

become so harsh, they should be considered "cruel and unusual."[9]  *See* Margo Schlanger, *The*

*Constitutional Law of Incarceration, Reconfigured*, 103 Cornell L. Rev. 357, 362 (2018)

(explaining how the Supreme Court has adopted "an unjustified and unproductive Eighth

Amendment doctrine that made jailers' hearts the touchstone for prisoners' rights litigation,

---

[9] Justice White predicted the problems with the subjective deliberate-indifference standard, noting "[n]ot only is the majority's intent requirement a departure from precedent, it likely will prove impossible to apply in many cases ... In truth, intent simply is not very meaningful when considering a challenge to an institution, such as a prison system."  *Wilson v. Seiter*, 501 U.S. 294, 310 (1991) (White, J., concurring in the judgment).

rather than the objective impact of their choices").  Therefore, a different standard should be applied for violations of the Colorado Constitution that recognizes incarceration as the punishment and focuses on whether prison conditions are cruel and unusual.

### C.  The Colorado Constitution's prohibition on cruel and unusual punishment is *more protective* than its federal counterpart.

"The Colorado Constitution provides more protection for our citizens than do similarly or identically worded provisions of the United States Constitution" because the Colorado Constitution "is a source of protection for individual rights that is independent of and supplemental to the protections provided by the United States Constitution."  *People v. Young*, 814 P.2d 834, 842-43 (Colo. 1991).  In *Young*, the Colorado Supreme Court held that the Colorado death-penalty statute, which was substantially similar to other states' death-penalty statutes upheld by the U.S. Supreme Court applying the Eighth Amendment, was unconstitutional under the Colorado Constitution's due-process and cruel-and-unusual-punishments clause.  *Id*. at 842-845.  Therefore, the Colorado Constitution's cruel-and-unusual-punishments clause provides greater protection than the Eighth Amendment.

### D.  The appropriate standard for the Colorado Constitutional claim is akin to the standard outlined in *Kingsley*, which has been sufficiently alleged here.

Given the greater protect of the Colorado Constitution's cruel-and-unusual-punishments clause as compared to the Eighth Amendment, Mr. Taylor urges this Court to look to the more protective, objective standard articulated in *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015) as the standard to be applied to Mr. Taylor's state claims.[10]  By using an objective inquiry to

_____

[10] *See Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018) (setting out the objective deliberate-indifference standard in context of medical-care claims; listing elements).

interpret article II, section 20, the Court can focus on the conditions of confinement at issue and not unduly focus on the individuals' intent.  *See Estelle*, 429 U.S. at 116-17 (J. Stevens, dissenting) ("[W]hether the constitutional standard has been violated should turn on the character of the punishment, rather than the motivation of the individual who inflicted it.")

Mr. Taylor respectfully suggests that this Court find that under article II, section 20 of the Colorado Constitution, he may establish his claim using either evidence of subjective knowledge (*i.e.*, that the officials knew, constructively or otherwise, of a substantial risk of serious harm) or objective knowledge (*i.e.*, that a reasonable official should have known about the risk because it was obvious).  Allowing evidence of either subjective or objective knowledge to establish deliberate indifference under the Colorado Constitution ensures that the Colorado Constitution is more protective of its citizens' rights than the federal constitution, as recognized under Colorado law.

Nonetheless, under either standard, Mr. Taylor has stated a claim that Defendants violated the Colorado Constitution.  As noted *supra*, section III, Mr. Taylor sufficiently states a claim against the Larimer County Defendants under the Eighth Amendment.  Therefore, it also follows that he sufficiently stated a claim under the objective standard articulated herein.  The Court should also deny Defendants' Motion to Dismiss as to these claims.

## CONCLUSION

For the reasons stated herein, this Court should Deny Defendants' Motion after oral argument on the matter.

DATED this 2nd day of October, 2020.

Respectfully submitted,

s/ Aurora L. Randolph
Gail K. Johnson
*Aurora L. Randolph*
Haley DiRenzo
JOHNSON & KLEIN, PLLC
1470 Walnut Street, Suite 101
Boulder, CO 80302
Phone: (303) 444-1885
Fax: (866) 340-8286
Email: gjohnson@johnsonklein.com
       arandolph@johnsonklein.com
       hdirenzo@johnsonklein.com

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on October 2, 2020, I electronically filed the foregoing **RESPONSE TO LARIMER COUNTY DEFENDANTS' MOTION TO DISMISS (Doc. 46) AND REQUEST FOR ORAL ARGUMENT** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record, including:

Michael Lowe
Daniel Jacobs
Bruno, Colin, & Lowe, PC
1999 Broadway
Ste. 4300
Denver, CO 80202
mlowe@brunolawyers.com
djacobs@brunolawyers.com
*Attorneys for Defendants Sheriff Smith,*
*Board of County Commissioners for the County*
*of Larimer, and Timothy Palmer*

Simone Montoya
Daniel DeLay
Messner Reeves, LLP
1430 Wynkoop St. #300
Denver, CO 80202
smontoya@messner.com
ddelay@messner.com
*Attorneys for Defendant Armor*
*and individual Armor providers*

David P. Ayraud
Jeannine S. Haag
Larimer County Attorney's Office
224 Canyon Ave., Suite 200
Ft. Collins, CO80522
dayraud@larimer.org
jeanninehaag@larimer.org
*Attorneys for Defendants Sheriff Smith,*
*Board of County Commissioners for the County*
*of Larimer, and Timothy Palmer*

s/ Aurora Randolph
**Aurora Randolph**