## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-01406-WJM-NYW

CLIFFORD J. TAYLOR,

      Plaintiff,

v.

ARMOR CORRECTIONAL HEALTH SERVICES, INC.,
SHERIFF JUSTIN SMITH, in his individual and official capacities,
THE BOARD OF COUNTY COMMISSIONERS FOR THE COUNTY OF LARIMER,
CAPTAIN TIMOTHY PALMER,
AMANDA JARMAN,
DR. KEITH MCLAUGHLIN,
DAYLA COOK,
KYRA HARMON,
LYNETTE HOISINGTON,
ALEX MAHLOCH,
JESSINA MORSE,
LYNN SCHULTZ,
LEAH OAKLEY,
CAROLYN PEISERT,
CHEYENNE PALMER,
KATIE WENZEL, and
MICHELLE WILSON,

      Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

Magistrate Judge Nina Y. Wang

      This matter comes before this court on Larimer County Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) [#46,[1] filed August 31, 2020] and Armor Defendants' Motion to Dismiss Plaintiff's Amended Complaint Pursuant to F.R.C.P. 12(b)(6) [#47, filed August 31, 2020] (collectively, the "Motions" or "Motions to Dismiss").

---

[1] This court uses the convention [#__] to refer to docket entries in the District of Colorado's Electronic Court Filing ("ECF") system.

This court considers the Motions pursuant to 28 U.S.C. § 636(b), the Amended Order Referring Case dated June 29, 2021 [#102], and the Memorandum dated June 29, 2021 [#103]. The court concludes that oral argument will not materially assist in the resolution of these matters.[2]   Accordingly, upon review of the Motions, their respective briefing, applicable case law, and the entire case file, I respectfully **RECOMMEND** that the Motions to Dismiss [#46; #47] be **GRANTED** and that Plaintiff's claims be **DISMISSED without prejudice**.

## BACKGROUND

The court draws the following facts from the Amended Civil Rights Complaint and Jury Demand (the "Amended Complaint") [#38] and presumes they are true for purposes of the Motions to Dismiss.   In July of 2017, Plaintiff Clifford Taylor ("Mr. Taylor" or "Plaintiff") was involved in an accident which caused, among other injuries, a distal left radial and ulnar fracture and radial artery rupture in his left forearm.   [#38 at ¶ 38].   Mr. Taylor underwent surgery at Denver Health and was directed to be seen by his Denver Health doctors "every few months" to monitor his healing progress.   [*Id.* at ¶¶ 40-42].

---

[2] In Plaintiff's Responses to the Motions to Dismiss, *see* [#56; #57], Plaintiff requests oral argument on the Motions.   [#56 at 1; #57 at 1].   The court respectfully denies Plaintiff's request.   As an initial matter, Plaintiff's request does not comply with the Local Rules, which state that "[a] motion shall not be included in a response or reply to the original motion" but should instead "be filed as a separate document."   D.C.COLO.LCivR 7.1(d). Moreover, this District's Local Rules provide that "[a] motion may be decided without oral argument, at the court's discretion,"   D.C.COLO.LCivR 7.1(h), and the Tenth Circuit has held that "a hearing on a motion to dismiss is not required."   *Rudnick v. Raemisch*, 774 F. App'x 446, 448 (10th Cir. 2019) (unpublished).   The court finds that oral argument is not necessary here, particularly where Plaintiff has presented no argument explaining why oral argument would assist the court in ruling on the Motions to Dismiss.   *See* [#56; #57].

Throughout 2017 to 2018, Defendant Armor Correctional Health Services Inc. ("Armor") provided medical care to prisoners and detainees at the Larimer County Jail ("LCJ"). [*Id.* at ¶¶ 3, 334]. On March 11, 2018, Mr. Taylor was arrested and placed in the custody of the LCJ.[3] [*Id.* at ¶ 58]. Defendant Lynn Schultz ("Nurse Schultz"), an LCJ nurse, conducted Plaintiff's medical intake. [*Id.* at ¶ 58]. Mr. Taylor informed Nurse Schultz of his recent surgery and stated that he would need to be seen soon at Denver Health for continuing care. [*Id.*]. Nurse Schultz noted in the medical record that Mr. Taylor had undergone multiple surgeries within the last 30 days and noted Mr. Taylor's arm injury as a "chronic-care condition." [*Id.*]. Nurse Schultz obtained a Denver Health release of information from Mr. Taylor. [*Id.* at ¶ 59].

On March 19, 2018, Mr. Taylor reported a rash on his left arm to an unnamed LCJ nurse. [*Id.* at ¶ 63]. The nurse noted the rash in in Mr. Taylor's jail medical records, prescribed Mr. Taylor a hydrocortisone cream, and instructed Mr. Taylor to increase his hydration and avoid irritants. [*Id.* at ¶¶ 63-64]. On March 21, 2018, an unnamed medical assistant conducted a health assessment of Mr. Taylor and noted a possible abscess on his left arm. [*Id.* at ¶ 65]. Antibiotics were ordered for Mr. Taylor,[4] the use of which was discontinued ten days later. [*Id.* at ¶ 66]. In March of 2018, Defendants Carolyn Peisert ("Nurse Peisert"), Cheyenne Palmer ("Nurse Palmer"),[5] and Kyra Harmon ("Nurse

---

[3] This was Plaintiff's second stay at LCJ. In August 2017, Mr. Taylor was arrested for failure to appear at a court hearing and was placed in the custody of LCJ. [#38 at ¶¶ 43-44].

[4] The Amended Complaint does not allege who ordered these antibiotics. *See* [#38 at ¶ 66].

[5] There are two Defendants in this case with the last name of Palmer. *See* [#38 at 1]. Accordingly, the court refers to Nurse Cheyenne Palmer as "Nurse Palmer" and Captain Timothy Palmer as "Captain Palmer."

Harmon") all personally delivered Mr. Taylor antibiotics for an abscess to his left arm.  [*Id.* at ¶ 68].

On April 2, 2018, Mr. Taylor was seen by Defendant Keith McLaughlin ("Dr. McLaughlin"), at which point Mr. Taylor informed Dr. McLaughlin about his injuries, pain, and discomfort and that he believed he should be seen by the specialists at Denver Health to evaluate his arm.  [*Id.* at ¶ 69].  Dr. McLaughlin prescribed Mr. Taylor a pain medication, but did not contact anyone at Denver Health concerning Plaintiff's arm.  [*Id.* at ¶ 70].  Also in April 2018, Mr. Taylor had medical appointments with Defendant Katie Wenzel ("Nurse Practitioner Wenzel"); at these appointments, Mr. Taylor reported his arm pain and discomfort and told Nurse Practitioner Wenzel that he thought he should be seen by specialists at Denver Health.  [*Id.* at ¶ 73].

Throughout the month of May 2018, Mr. Taylor had medical visits with Nurse Schultz, Nurse Palmer, Defendant Alex Mahloch ("Nurse Mahloch"), Nurse Peisert, and Defendant Jessina Morse ("Nurse Morse"), at which time these Defendants assessed Plaintiff's wound.  *See, e.g.*, [*id.* at ¶¶ 74, 77, 80, 84, 88].  Mr. Taylor told Nurse Schultz and Nurse Morse that he needed to go to Denver Health to receive treatment for his arm, [*id.* at ¶ 75, 90], and asked Nurses Palmer, Mahloch, and Peisert that his providers at Denver Health be contacted and that he receive medical care outside of LCJ.  [*Id.* at ¶¶ 78, 82, 85].  In addition, Mr. Taylor reported the pain, discomfort, discharge, and heat in his arm to Nurses Palmer, Mahloch, Peisert, and Morse.  [*Id.* at ¶¶ 93, 98, 102, 109].  None of these Defendants contained Denver Health, prescribed antibiotics, or sought

specialized care for Mr. Taylor.  [*Id.* at ¶¶ 76, 79, 83, 87, 91].[6]  In addition, Nurse Peisert "falsely reported in Mr. Taylor's medical records that on May 18, 2018, there were no signs of infection" present on Mr. Taylor's arm despite the fact that, on that date, "Mr. Taylor's left forearm showed clear signs of infection."  [*Id.* at ¶ 86].

Similar circumstances persisted in the following months.  In June 2018, Nurses Mahloch, Morse, Schultz, and Palmer, as well as Defendant Lynette Hoisington ("Nurse Hoisington") and Defendant Dayla Cook ("Nurse Cook"), delivered medications to Mr. Taylor.  [*Id.* at ¶¶ 130-35].  At each of these medication administrations, Mr. Taylor informed the nurse about the worsening condition of his arm and stated he needed to go to Denver Health or see some other medical professional who could treat his arm.  [*Id.* at ¶ 136].  None of these Defendants contacted Denver Health or any outside medical specialist.  [*Id.* at ¶ 137].  Additionally, Mr. Taylor received medications from Nurses Mahloch, Morse, Hoisington, Schultz, Harmon, Palmer, and Cook in July 2018.  [*Id.* at ¶¶ 140-46].  Again, Mr. Taylor complained of his worsening condition at each of the medication administrations and asked to see outside specialists or his doctors at Denver Health, but none of the Defendants who delivered medication in July contacted outside

---

[6] Mr. Taylor also alleges that Nurses Morse, Palmer, Peisert, Mahloch, and Schultz delivered medications to him in May 2018 and that, at each medication administration, he complained about the condition of his arm, his worsening pain, and the discharge from his wound, but that none of these Defendants contacted Denver Health or any outside specialist concerning Plaintiff's condition.  [#38 at ¶¶ 116-21, 126].

help.  [*Id.* at ¶¶ 147-48].  Mr. Taylor asserts similar allegations arising out of August,[7] September,[8] and October 2018.[9]

Meanwhile, Mr. Taylor's condition was worsening; in August 2018, his "arm took another sharp turn for the worse," his condition causing severe nausea, fever, chills, weight loss, and sleeplessness.  [*Id.* at ¶ 150].  On August 26, 2018, Mr. Taylor reported to Nurse Harmon that his seeping wound had been present for months and was not improving, and informed Nurse Harmon of his symptoms.  [*Id.* at ¶ 154].  Nurse Harmon spoke with Dr. McLaughlin about Plaintiff's condition, and Dr. McLaughlin ordered a ten-day dose of antibiotics and a week-long dose of Bacitracin, which is an over-the-counter antibiotic ointment "intended for the treatment of minor cuts and scrapes."  [*Id.* at ¶¶ 155-57].  Neither Dr. McLaughlin nor Nurse Harmon contacted Plaintiff's physicians at Denver Health.  [*Id.* at ¶ 158].  Later, Mr. Taylor separately saw Nurses Oakley and Cook for his infection, reported that his wound was not improving, and asked to see his Denver Health doctors.  [*Id.* at ¶¶ 159, 162, 166].  Nurse Oakley then "falsely documented" that Mr.

---

[7] With respect to August 2018, Mr. Taylor alleges that Nurses Hoisington, Palmer, Mahloch, Harmon, Schultz, and Cook, as well as Defendants Amanda Jarman ("Nurse Jarman") and Leah Oakley ("Nurse Oakley"), delivered medications to him, [#38 at ¶¶ 180-87], that he complained of his worsening condition and sought outside treatment at each of these deliveries, [*id.* at ¶ 188], but that none of these Defendants contacted outside treatment.  [*Id.* at ¶ 189].

[8] Mr. Taylor alleges that, in September 2018, Nurses Morse, Cook, Oakley, Hoisington, Schultz, Harmon, and Mahloch delivered medications to him.  [#38 at ¶¶ 200-06].  Despite Mr. Taylor informing these nurses of his worsening symptoms and requesting to see his physicians at Denver Health, [*id.* at ¶ 207], no Defendant contacted Denver Health.  [*Id.* at ¶ 208].

[9] In October 2018, Nurses Hoisington, Harmon, Oakley, and Cook delivered medications to Mr. Taylor.  [#38 at ¶¶ 216-19].  None of these Defendants contacted Denver Health despite being alerted to Mr. Taylor's worsening condition and Mr. Taylor's request that Denver Health be contacted.  [*Id.* at ¶¶ 220-21].

Taylor's arm had no drainage and "falsely reported" that Mr. Taylor refused wound care; Nurse Cook "falsely wrote" that Mr. Taylor thought a Band-Aid was sufficient for his wound and did not want a dressing change.  [*Id.* at ¶¶ 160, 163].  Nurse Cook did note that the drainage coming from Mr. Taylor's wound was purulent and that its odor "suggest[ed] infection."  [*Id.* at ¶ 168].  Neither nurse contacted Denver Health.  [*Id.* at ¶¶ 161, 164, 169].  In addition, on August 31, 2018, Nurse Practitioner Wenzel and Nurse Morse spoke with Mr. Taylor about his wound; Mr. Taylor reported to both Defendants of his pain and infection and asked to see his team at Denver Health; Nurse Practitioner Wenzel and Nurse Morse did not contact Denver Health or any outside medical specialist.  [*Id.* at ¶¶ 176-79].

In September 2018, Mr. Taylor's condition continued to worsen.  [*Id.* at ¶ 199].  Mr. Taylor spoke with both Nurse Hoisington and Nurse Cook about his wound, informing them of the pain and infection and asking to be seen at Denver Health.  [*Id.* at ¶¶ 191-92].  Nurse Hoisington measured the wound and Nurse Cook put Bacitracin on the wound, but neither nurse contacted Denver Health.  [*Id.*].  On September 5, 2018, Nurse Practitioner Wenzel ordered that Mr. Taylor stop receiving dressing changes and told Mr. Taylor that he could cover his wound with a Band-Aid.  [*Id.* at ¶¶ 197-98].  Although Mr. Taylor informed Nurse Practitioner Wenzel of his worsening condition, including that his wound was hot, swollen, tender, draining discharge, and causing "immense pain," Nurse Practitioner Wenzel did not contact Denver Health or "seek any other urgent medical care for Mr. Taylor's infection."  [*Id.* at ¶ 199].

On October 3, 2018, Mr. Taylor declared a medical emergency after he was kept awake throughout the night vomiting.  [*Id.* at ¶ 211].  Mr. Taylor was then seen by

Defendant Michelle Wilson ("Medical Assistant Wilson").  [*Id.* at ¶ 212].  He reported to Medical Assistant Wilson that he had been vomiting for days, had not been able to eat in days, and was experiencing fever, chills, and diarrhea.  [*Id.*].  He "pleaded" with Medical Assistant Wilson to see outside medical care for his symptoms.  [*Id.*].  Medical Assistant Wilson did not contact Denver Health, but noted that Mr. Taylor had visible shakes and chills and was pale and put Mr. Taylor on bedrest and excused him from his kitchen work for one day.  [*Id.* at ¶¶ 212-13].  On October 7, 2018, Mr. Taylor approached Nurse Oakley complaining of his condition and informing her that his infection was making him vomit, preventing him from eating, causing him to lose weight, and interfering with his sleep.  [*Id.* at ¶ 214].  Nurse Oakley did not contact any other health provider, including Denver Health.  [*Id.* at ¶ 215].

Mr. Taylor was released from LCJ on October 11, 2018.  [*Id.* at ¶ 237].  He was seen at Denver Health on October 16, 2018 and underwent multiple tests; Mr. Taylor was diagnosed with chronic osteomyelitis of the left radius with a draining sinus and chronic multifocal osteomyelitis[10] of multiple sites in his forearm.  [*Id.* at ¶¶ 241-42].  Mr. Taylor has had to undergo multiple surgeries on his left forearm, *see* [*id.* at ¶¶ 246-48], and Denver Health doctors noted that Mr. Taylor's "initial postoperative course was complicated by osteomyelitis of his left forearm."  [*Id.* at ¶ 249].  Mr. Taylor's forearm is now "severely deformed," he has lost nearly all of the mobility in the fingers in his left hand, and his left hand is "near constantly" swollen and in pain.  [*Id.* at ¶ 252].  Plaintiff represents that his medical team is still unsure if they have completely resolved the

---

[10] Osteomyelitis is a chronic bone infection.  [#38 at ¶ 9, #46 at 2].  *See also* U.S. National Library of Medicine, *Osteomyelitis*, https://medlineplus.gov/ency/article/000437.htm (last visited July 21, 2021).

osteomyelitis, [*id.* at ¶ 251], and Plaintiff's medical team "believe[s] that amputation may be inevitable." [*Id.* at ¶ 253].

Mr. Taylor initiated this civil action, through counsel, on May 15, 2020. [#1].[11] Mr. Taylor filed the Amended Complaint on July 20, 2020, raising claims against seventeen Defendants: Dr. McLaughlin, Nurse Practitioner Wenzel, Medical Assistant Wilson, and Nurses Jarman, Cook, Harmon, Hoisington, Mahloch, Morse, Schultz, Oakley, Peisert, and Palmer (the "individual Armor Defendants"), as well as Armor, the contracted health provider for the LCJ (collectively, the "Armor Defendants"), as well as Larimer County Sheriff Justin Smith ("Sheriff Smith"), Captain Timothy Palmer, the commander of the Larimer County Sheriff's Office's Jail Division ("Captain Palmer"), and the Board of County Commissioners for Larimer County ("BOCC") (collectively, the "Larimer County Defendants"). *See* [#38]. Specifically, Plaintiff asserts the following claims: (1) a 42 U.S.C. § 1983 medical deliberate indifference claim against the individual Armor Defendants, [*id.* at 82]; (2) a § 1983 deliberate indifference claim against Sheriff Smith and Captain Palmer in their individual capacities, [*id.* at 83]; (3) a § 1983 *Monell* claim based on the alleged failure to provide adequate medical care, to train, or to supervise against Defendant Smith, in his official capacity, and BOCC, [*id.* at 85]; (4)  a § 1983

---

[11] On March 2, 2021, this court granted Plaintiff's counsel's motions to withdraw from representation in this case after briefing on the instant Motions to Dismiss were completed. *See* [#82; #83; #84; #87]. Thus, Mr. Taylor now proceeds pro se. Nevertheless, because Mr. Taylor proceeded through counsel for the filing of his pleadings and all the briefing associated with the Motions to Dismiss, this court does not construe his filings with the liberal constructions afforded to pro se litigants without legal training. *Cf. Tatten v. City & Cty. of Denver,* 730 F. App'x 620, 623 (10th Cir. 2018) (unpublished) (declining to extend liberal construction rule to pro se litigant who was a licensed attorney, observing that "[t]he obvious reason for according liberal construction to pro se litigants is that a typical pro se plaintiff does not have legal training and is 'unskilled in the law.'").

*Monell* claim alleging a failure to provide adequate medical care or to train against Armor; (5) a claim asserting cruel and unusual punishment and deprivation of due process pursuant to Colo. Rev. Stat. § 13-21-131 against Sheriff Smith and Captain Palmer in their individual capacities.  [*Id.* at 90].

On August 31, 2020, Defendants filed two Motions to Dismiss: one filed by the Larimer County Defendants, *see* [#46], and the other filed by the Armor Defendants, *see* [#47].  Generally, Defendants argue that Plaintiff's claims should be dismissed for failure to state a claim under Rule 12(b)(6).  Plaintiff responded to each Motion through counsel, *see* [#56; #57, filed October 2, 2020], and the Larimer County Defendants [#66, filed October 23, 2020] and the Armor Defendants [#63, filed October 16, 2020] have since replied.  With leave of court, Mr. Taylor filed sur-replies [#104; #105] on November 25, 2020.  *See* [#71; #72].[12]  Because the Motions are ripe for consideration, I consider the Parties' arguments below.

## LEGAL STANDARD

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In deciding a motion under Rule 12(b)(6), the court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff."  *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)).  A plaintiff may not rely on mere labels or conclusions, "and a formulistic formulaic recitation of the elements of a cause of action will not do."  *Bell*

---

[12] Judge Martínez granted Plaintiff leave to file the sur-replies on November 30, 2020. *See* [#72].  However, the sur-replies were not filed as separate docket entries until June 23, 2021.  *See* [#104; #105].

*Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Rather, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (explaining that plausibility refers "to the scope of the allegations in a complaint," and that the allegations must be sufficient to nudge a plaintiff's claim(s) "across the line from conceivable to plausible.").  The court must ultimately "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed."  *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

## ANALYSIS

### I.   Deliberate Indifference

Plaintiff's Claims One and Two raise claims of deliberate indifference under the Eighth and Fourteenth Amendments against the Armor Defendants and the Larimer County Defendants in their respective individual capacities.  *See* [#38 at 82-83].  "Failure to provide adequate medical care is a violation of the Eighth Amendment if it is a result of deliberate indifference to a prisoner's serious medical needs."  *Garcia v. Salt Lake Cty.*, 768 F.2d 303, 307 (10th Cir. 1985) (citing *Estelle v. Gamble*, 429 U.S. 97 (1976)).  In addition, pretrial detainees are entitled to the same protections under the Fourteenth Amendment due process clause.[13]  *See Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th

---

[13] Insofar as Plaintiff's claims arise out of actions occurring while he was in custody of LCJ prior to May 31, 2018—the day Mr. Taylor entered his guilty plea in his case, *see* [#38 at ¶ 115]—Plaintiff's claims arise under the Fourteenth Amendment because he was, at that time, a pretrial detainee.  *Barron v. Macy*, 268 F. App'x 800, 801 (10th Cir. 2008) (unpublished).  The standard for determining whether a pretrial detainee's due process rights were violated involves "an analysis identical to that applied in Eighth Amendment cases brought pursuant to § 1983."  *Id.*

Cir. 2009) (citation omitted).   To establish a prison official's constitutional liability, a plaintiff must satisfy both the objective and subjective components of the deliberate indifference test.  *See generally Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000).

The objective component requires Mr. Taylor to allege objective facts that demonstrate that the deprivation is "sufficiently serious."  *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  "[A] medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999) (internal quotations and citation omitted)).  The Armor Defendants do not dispute that Mr. Taylor's arm wound or infection constitutes a serious medical need, *see* [#47]; *see also* [#63 ("The objective component is not in dispute as the allegations of Plaintiff's forearm injuries are sufficiently serious to meet the necessary pleading requirements of the objective component.")], and the Larimer County Defendants do not argue that an objectively serious medical need was not present here.  *See* [#46 at 9-11 (arguing only that the subjective component is not met)].  The court independently concludes that Mr. Taylor's alleged forearm injury and infection and the alleged associated symptoms constitute a sufficiently serious medical need for which a lay person would recognize the need for a doctor's attention.  *See Schaub v. VonWald*, 638 F.3d 905, 915 (8th Cir. 2011) (affirming district court finding that "oozing sores and the smell of infection made [inmate's] serious medical needs 'more than obvious' to a layperson"); *Brooks v. Sanders*, No. 2:07CV00156 JLH/JTR, 2008 WL 5427631, at *4 (E.D. Ark. Dec. 29, 2008) (finding

that infections of inmate's toes "unquestionably were an 'objectively serious' medical need").

The subjective component requires the plaintiff to produce evidence of the defendant's culpable state of mind, i.e., to establish that the defendant(s) knew the plaintiff faced a substantial risk of harm, yet disregarded that risk. *Estelle*, 429 U.S. at 106; *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001) (quotations and citation omitted). To satisfy this element, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Deliberate indifference requires more than mere negligence." *Sealock*, 218 F.3d at 1211; *Est. of Martinez v. Taylor*, 176 F. Supp. 3d 1217, 1227 (D. Colo. 2016) (comparing the subjective component to recklessness in criminal law, where, to act recklessly, a person must "consciously disregard a substantial risk of serious harm."). Whether a defendant had the requisite knowledge of a substantial risk of serious harm may be inferred from circumstantial evidence, which may be satisfied upon a showing that the serious medical need was "obvious." *See DeSpain v. Uphoff*, 264 F.3d 965, 975 (10th Cir. 2001) (quotations and citations omitted).

### A.   The Individual Armor Defendants – Claim One

Armor Defendants move to dismiss Plaintiff's Claim One against the individual Armor Defendants on the basis that Plaintiff has not sufficiently alleged facts supporting the subjective component; specifically, Armor Defendants assert that Mr. Taylor's own allegations demonstrate that the individual Armor Defendants provided Plaintiff medical care and thus Mr. Taylor cannot show that the individual Armor Defendants knew of and disregarded a substantial risk of harm. [#47 at 4, 6]. In other words, according to the

Armor Defendants, "Plaintiff improperly conflates his disagreement with the particular course of treatment he received[] with a deliberate indifference to provide medical treatment." [*Id.*].   Armor Defendants then address the allegations concerning each individual Armor Defendant and assert why those allegations are insufficient to state a deliberate indifference claim as to each individual Armor Defendant. [*Id.* at 8-16].

Mr. Taylor disagrees, asserting that this case does not involve a simple disagreement in treatment, but rather concerns the individual Armor Defendants' conscious choice to treat Mr. Taylor's symptoms—not his condition—all while knowing that his condition was worsening, which evidences a deliberate indifference to Plaintiff's medical needs. [#56 at 4-5].  In addition, Mr. Taylor asserts that "all of the [individual Armor Defendants] can be liable under the 'gatekeeper' theory," [*id.* at 8], which applies to individuals who prevent an inmate from medical treatment or from access to medical providers who are capable of providing treatment, if the individual knows that his or her role is to serve as a gatekeeper for medical personnel. [*Id.* at 3].

The Armor Defendants are correct that, generally, a claimant cannot state a deliberate indifference claim solely due to a disagreement with the medical professional's exercise of medical judgment.  *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006). Indeed, "[t]he subjective part of the [deliberate-indifference] test is not satisfied when a physician evaluates a patient's symptoms and provides care consistent with those symptoms, but still misdiagnoses the patient, . . . particularly where there is evidence of a good faith effort to treat and diagnose the condition."  *Oakley v. Phillips*, No. 15-cv-01004-CMA, 2015 WL 5728734, at *7 (D. Colo. Sept. 30, 2015).  And the "negligent failure to provide adequate medical care, even one constituting medical malpractice, does not

give rise to a constitutional violation." *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999).   However, the subjective prong may be met "if prison officials intentionally deny or delay access to medical care or intentionally interfere with . . . treatment once prescribed." *Redmond v. Crowther*, 882 F.3d 927, 940 (10th Cir. 2018) (brackets and quotation omitted).

In addition, deliberate indifference can also be present where "prison officials prevent an inmate from receiving treatment or deny [the inmate] access to medical personnel capable of evaluating the need for treatment." *Sealock*, 218 F.3d at 1211. Specifically, if "the medical professional knows that his role in a particular medical emergency is solely to serve as a gatekeeper for other medical personnel capable of treating the condition, and if he delays or refuses to fulfill that gatekeeper role due to deliberate indifference, it stands to reason that he also may be liable for deliberate indifference from denying access to medical care." *Id.*   "The typical gatekeeper case involves non-medical personnel, such as prison guards, who fail to request medical assistance on behalf of a prisoner." *Oakley*, 2015 WL 5728734, at *8; *see also Swan v. Physician Health Partners, Inc.*, 212 F. Supp. 3d 1000, 1008 (D. Colo. 2016) ("Generally speaking, a medical professional cannot be said to be acting in a gatekeeper role, as he or she is the one providing treatment."). "However, medical personnel themselves may also be liable under this theory if their 'role in a particular medical emergency is solely to serve as a gatekeeper for other medical personnel capable of treating the condition,' and, with the requisite intent, they refuse to fulfill that role." *Oakley*, 2015 WL 5728734, at *8 (quoting *Sealock*, 218 F.3d at 1211).

Mr. Taylor raises claims against thirteen individual Armor Defendants.  *See* [#38]. The Amended Complaint contains numerous allegations concerning specific actions taken or lack of action by the Individual Armor Defendants, but also contains general allegations with respect to those Defendants.  *See, e.g.*, [#38 at ¶ 467 ("[T]he [individual Armor] Defendants prevented Mr. Taylor from receiving the medical care he needed and denied him access to the medical personnel capable of evaluating his need for treatment.")].  These general allegations are insufficient to support Mr. Taylor's deliberate-indifference claim, as a complaint must specifically set out the actions allegedly taken by *each defendant* so as to establish that *each defendant* engaged in a constitutional violation.  *Cf. Brown v. Montoya*, 662 F.3d 1152, 1164-66 (10th Cir. 2011) (holding that generalized allegations concerning "Defendants" were insufficient to establish a defendant's personal participation in the alleged constitutional violation).  The court thus addresses Mr. Taylor's defendant-specific allegations to determine whether he has sufficiently stated a claim against each individual Armor Defendant.

**Dr. McLaughlin.**   In the Amended Complaint, Mr. Taylor alleges that Dr. McLaughlin, the LCJ physician, saw Mr. Taylor in April 2018 and that, at this visit, Mr. Taylor informed Dr. McLaughlin about the pain and discomfort in his arm and that he believed he should be seen by the specialists at Denver Health.  [#38 at ¶¶ 22, 69].  Dr. McLaughlin noted that Mr. Taylor had significant left arm trauma and pain and prescribed Mr. Taylor a pain medication, but did not contact anyone at Denver Health, or any other specialist, regarding Mr. Taylor's condition.  [*Id.* at ¶¶ 69-70].   In addition, in August 2018, Dr. McLaughlin spoke to Nurse Harmon concerning Mr. Taylor's wound and purulent drainage.   [*Id.* at ¶ 155].   Dr. McLaughlin then ordered a ten-day dose of general

16

antibiotics for Mr. Taylor, "even though Defendant McLaughlin knew that the antibiotics Mr. Taylor had been prescribed several months earlier for the same infected wound had not resolved the infection," and approved an order for a week-long prescription of Bacitracin, an over-the-counter antibiotic treatment "intended for the treatment of minor cuts and scrapes." [*Id.* at ¶¶ 156-57].  Dr. McLaughlin did not contact Mr. Taylor's doctors at Denver Health after speaking with Nurse Harmon.  [*Id.* at ¶ 158].

Mr. Taylor argues that these allegations are sufficient to state a deliberate indifference claim against Dr. McLaughlin because they demonstrate that Dr. McLaughlin "fail[ed] to adequately address Mr. Taylor's serious medical need for months."  [#56 at 11].  The court respectfully disagrees.  Although Mr. Taylor questions Dr. McLaughlin's decision to prescribe antibiotics to Plaintiff a second time "even though he knew that the antibiotics previously ordered for Mr. Taylor had not resolved the infection, [*id.* at 10], "the subjective component is not satisfied, absent an extraordinary degree of neglect, where a doctor merely exercises his considered medical judgment."  *Self*, 439 F.3d at 1232. Indeed, "a mere disagreement with treatment [is not] enough to demonstrate a medical provider's deliberate indifference, even if the rendered treatment is subpar," as "an inmate does not have a constitutional right to a particular course of treatment."  *Est. of Medina v. Samuels*, No. 20-cv-01443-NYW, 2020 WL 7398772, at *6 (D. Colo. Dec. 17, 2020). Here, although Mr. Taylor takes obvious issue with Dr. McLaughlin's *course* of treatment, Plaintiff's allegations demonstrate that Dr. McLaughlin treated Plaintiff by prescribing him pain medication and antibiotics for his condition.  *See, e.g.*, [#38 at ¶¶ 70, 156-57].  There are no allegations that support a conclusion that Dr. McLaughlin knew that the course of antibiotics would be insufficient, or that he ignored his training in engaging in such

17

treatment or that he lacked the requisite training to evaluate and treatment Mr. Taylor. The facts as pled do not permit a factfinder to conclude that Dr. McLaughlin's actions constituted an "extraordinary degree of neglect" so as to call into question Dr. McLaughlin's exercise of medical judgment. *Compare Medina*, 2020 WL 7398772, at \*5-6 (rejecting defendant's argument that the allegations failed to satisfy the subjective component where the defendant "*did nothing* to abate [the plaintiff's] pain and discomfort" and "*knowingly did not provide* [the plaintiff's] prescribed chemotherapy treatment") (emphasis added)).

In the alternative, Plaintiff argues that Dr. McLaughlin could be found liable for deliberate indifference under a gatekeeper theory, [#56 at 8], based on Dr. McLaughlin's failure to contact Denver Health or any other medical professional concerning Plaintiff's condition. [*Id.* at 10; #38 at ¶ 158]. However, medical personnel may be held liable under a gatekeeper theory only if "their 'role in a particular medical emergency is solely to serve as a gatekeeper for other medical personnel capable of treating the condition,' and, with the requisite intent, they refuse to fulfill that role." *Oakley*, 2015 WL 5728734, at \*8 (quoting *Sealock*, 218 F.3d at 1211). The Amended Complaint does not contain allegations demonstrating that Dr. McLaughlin's role was solely to serve as a gatekeeper; instead, Dr. McLaughlin's role was that of a treating physician. *See, e.g.*, [#38 at ¶¶ 52, 69, 156]; *cf. Rabidue v. Blatnick*, No. 14-cv-02403-MSK-MJW, 2017 WL 3535439, at \*7 (D. Colo. Aug. 17, 2017) ("Though Nurses Blatnick and Dang sometimes were in a position to refer patients to medical personnel capable of providing treatment, neither nurse was a 'gatekeeper' in the legal sense because neither performed only that role."). Nor does the Amended Complaint allege that Dr. McLaughlin had a duty to contact

Denver Health or another outside physician to discuss Plaintiff's condition.  *See* [#38]; *see also Oakley*, 2015 WL 5728734, at *8 (finding that allegations were insufficient to determine the defendant was a gatekeeper where there were no allegations that the defendant had a duty to request assistance from other medical personnel, but was instead an examining nurse practitioner).  And Plaintiff has cited no authority demonstrating that, because Mr. Taylor requested that his Denver Health doctors be contacted, Dr. McLaughlin's failure to do so, standing alone, amounts to a constitutional violation. Rather, "denial of a request to go to an outside hospital is a disagreement over specific treatment and does not amount to a constitutional violation."  *Ayuso v. Bentivegna*, No. 18 CIV. 3419 (NSR), 2021 WL 2535535, at *5 (S.D.N.Y. June 21, 2021).

For these reasons, the court finds that Mr. Taylor's allegations are insufficient to demonstrate that Dr. McLaughlin was subjectively deliberately indifferent to Plaintiff's serious medical needs.  As a result, I respectfully **RECOMMEND** that Plaintiff's Claim One be **DISMISSED without prejudice** with respect to Dr. McLaughlin.

***Nurse Practitioner Wenzel***.  Nurse Practitioner Wenzel first saw Mr. Taylor in September of 2017[14] to examine his left forearm; she noted at the time the "importance of follow up with [a] specialist" and indicated that, if Mr. Taylor was not bonded out of jail, she "would like to try to have the patient seen while incarcerated for [a] follow up" with his outside specialist.  [#38 at ¶ 57].  Nurse Practitioner Wenzel saw Mr. Taylor again in March, April, and August 2018, [*id.* at ¶¶ 67, 73, 170], and in August 2018, Mr. Taylor

---

[14] The Amended Complaint alleges that, after Mr. Taylor's first arrest on August 8, 2017, he was released from custody of the LCJ such that he was able to be seen at Denver Health on August 15, 2017.  *See* [#38 at ¶¶ 43, 54-55].  The Amended Complaint then states that Mr. Taylor was "in an out of the LCJ on a few occasions" and asserts that Mr. Taylor was seen by Nurse Practitioner Wenzel on September 25, 2017.  [*Id.* at ¶ 57].

requested to see his medical team at Denver Health or to "obtain any kind of medical treatment for his arm."  [*Id.* at ¶ 176].  Nurse Practitioner Wenzel "provided no treatment for Mr. Taylor and did not contact his medical team at Denver Health nor any outside medical specialist."  [*Id.* at ¶ 177].  In addition, in September 2018, Nurse Practitioner Wenzel ordered Mr. Taylor to stop receiving dressing changes on his wound and instructed Mr. Taylor to cover his wound with a Band-Aid.  [*Id.* at ¶ 197].

These allegations are insufficient to demonstrate that Nurse Practitioner Wenzel was deliberately indifferent to Plaintiff's medical needs.  Plaintiff's allegations demonstrate that Nurse Practitioner Wenzel was involved in the course of treating Plaintiff, but the court is not convinced that there are sufficient facts pleaded to allow a factfinder to conclude that Nurse Practitioner Wenzel exhibited an "extraordinary degree of neglect" in her course of treatment so as to call into question her medical judgment.  *Cf. Valdez v. City and Cty. of Denver*, No. 19-cv-03520-KLM, 2021 WL 1056511, at *8 (D. Colo. Mar. 19, 2021) (negligent actions "did not rise to the high level of deliberate indifference"); *see also Cross v. Turn Key Health Clinics LLC*, No. 6:18-cv-00081 DAK-DBP, 2020 WL 1026540, at *3 (E.D. Okla. Feb. 6, 2020), *report and recommendation adopted*, 2020 WL 1000553 (E.D. Okla. Mar. 2, 2020), *cert. denied*, 2020 WL 1694346 (E.D. Okla. Apr. 7, 2020), *and appeal dismissed*, No. 20-7012, 2020 WL 5525231 (10th Cir. Apr. 29, 2020) (an Eighth Amendment violation occurs "when the medical treatment provided is so grossly incompetent, inadequate, or excessive that it "shocks the conscience or [is] intolerable to fundamental fairness.") (alteration marks in original).  Indeed, Plaintiff's own allegations suggest that Nurse Practitioner Wenzel was appropriately concerned about his medical condition to note that she would like to have Mr. Taylor seen for a follow-up

[#38 at ¶ 57], and there are no allegations as to why Nurse Practitioner Wenzel did not contact Denver Health or put in a request for Mr. Taylor to see a medical specialist. [*Id.* at ¶ 171]. The decision to contact outside medical help or have a patient seen by an outside medical authority remains a matter of medical judgment which cannot serve as the basis of Plaintiff's instant constitutional claim, *Ayuso*, 2021 WL 2535535, at *5, and the Amended Complaint contains no allegations demonstrating that Nurse Practitioner Wenzel was a gatekeeper for Plaintiff's care. *See* [#38]. Insofar as Plaintiff challenges Nurse Practitioner Wenzel's decision to order that Plaintiff not be given dressing changes and the instruction that Mr. Taylor use a Band-Aid instead, an inmate does not have a constitutional right to a particular course of treatment, *Medina*, 2020 WL 7398772, at *6, and deliberate indifference does not exist simply because a medical provider misdiagnosed a patient or provided sub-par care. *Oakley*, 2015 WL 5728734, at *7. As a result, I respectfully **RECOMMEND** that Plaintiff's Claim One be **DISMISSED without prejudice** with respect to Nurse Practitioner Wenzel.

***Medical Assistant Wilson***. According to Mr. Taylor, in October 2018, after he declared a medical emergency, he was seen by Medical Assistant Wilson. [#38 at ¶¶ 212-13]. Mr. Taylor reported that he had been vomiting, was unable to eat, and was experiencing fever, chills, and diarrhea; Mr. Taylor requested that he be given access to outside medical care for his symptoms. [*Id.* at ¶ 212]. Medical Assistant Wilson noted in Mr. Taylor's records that he had visible shakes, chills, and was pale, and put Mr. Taylor on bedrest, prescribed him Gatorade, and excused him from his kitchen job for one day; Medical Assistant Wilson did not seek outside care for Plaintiff, contact Denver Health, or otherwise provide treatment to Mr. Taylor. [*Id.* at ¶¶ 212-13].

Insofar as Mr. Taylor implies that Medical Assistant Wilson could have done more to treat Plaintiff's infection, "an inmate does not have a constitutional right to a particular course of treatment." *Medina*, 2020 WL 7398772, at *6. Here, Medical Assistant Wilson noted Plaintiff's system in his medical records, prescribed him Gatorade, and excused him from work. While her treatment does, on its face, appear minimal, a court "cannot substitute its judgment for that of a medical professional." *Webb v. Aranas*, No. 3:17-cv-00427-RCJ-CBC, 2018 WL 5849839, at *2 (D. Nev. Nov. 6, 2018); *see also Valdez*, 2021 WL 1056511, at *7 (finding that, where defendant saw the plaintiff twice in two days, deemed the plaintiff's symptoms normal following a tooth extraction, and provided ice to numb plaintiff's pain, the defendant's actions "[might] have been negligent, [but did] not rise to the high level of deliberate indifference given [the defendant's] alleged actions in attempting to treat Plaintiff's medical needs."). Nor can Medical Assistant Wilson's failure to contact Denver Health or any other medical professional demonstrate the subjective state of mind, under either a course-of-treatment or gatekeeper theory. *Ayuso*, 2021 WL 2535535, at *5; *Rabidue*, 2017 WL 3535439, at *7; *Oakley*, 2015 WL 5728734, at *8. For these reasons, I respectfully **RECOMMEND** that Plaintiff's Claim One be **DISMISSED without prejudice** as to Medical Assistant Wilson.

*Nurse Harmon*. According to Mr. Taylor, Nurse Harmon delivered medication to Mr. Taylor in March, July, August, September, and October 2018. [#38 at ¶¶ 68, 144, 184, 205, 217]. On these occasions, Mr. Taylor complained about the worsening condition of his arm and stated that he needed to go to Denver Health or "see some medical professional who could address the problems he was experiencing. [*Id.* at ¶¶ 147, 188, 207, 220]. In August 2018, Mr. Taylor saw Nurse Harmon for his arm pain,

at which point Mr. Taylor informed Nurse Harmon that he was experiencing nausea, fever, chills, weight loss, and sleeplessness.   [*Id.* at ¶ 154].   Nurse Harmon called Dr. McLaughlin and spoke with him about Mr. Taylor's wound and purulent drainage, but did not contact anyone at Denver Health concerning Plaintiff's condition.  [*Id.* at ¶¶ 155, 158].

The court cannot conclude that Nurse Harmon's actions constitute an "extraordinary degree of neglect" so as to establish a subjective state of mind.  Instead, Nurse Harmon delivered medication to Plaintiff and, after seeing Mr. Taylor for his arm pain, spoke with Dr. McLaughlin about Plaintiff's condition.  Insofar as Plaintiff alleges Nurse Harmon's treatment was not "adequate[]," *see* [*id.* at ¶ 226], mere negligence in treatment is insufficient to state a constitutional violation.  *Valdez*, 2021 1056511, at *7. Moreover, Nurse Harmon's alleged failure to contact Denver Health is insufficient to state a claim. First, this amounts to merely a disagreement in treatment and cannot serve as the basis of a constitutional claim.  *Ayuso*, 2021 WL 2535535, at *5.  Moreover, the Amended Complaint does not contain allegations demonstrating Nurse Harmon's gatekeeper status; instead, Nurse Harmon was a treating provider.  *Oakley*, 2015 WL 5728734, at *8.  As a result, I respectfully **RECOMMEND** that Plaintiff's Claim One be **DISMISSED without prejudice** against Nurse Harmon.

***Nurses Cook, Oakley, and Peisert***.  Because the allegations with respect to Nurses Cook, Oakley, and Peisert are substantially similar, the court addresses these Defendants together.  Plaintiff alleges that these nurses delivered medications to Plaintiff, that Plaintiff complained of his condition and asked to be seen at Denver Health, and that Nurses Cook, Oakley, and Peisert failed to contact Denver Health at Plaintiff's request. *See, e.g.*, [#38 at ¶¶ 118, 121, 126, 133, 146, 185, 188-89, 201-02, 219-20].  Mr. Taylor

also alleges that, at certain medical visits with Nurse Cook, Plaintiff again complained of his condition, at which point Nurse Cook noted that Mr. Taylor's wound was "twice as large as it had been the previous day" and noted that Plaintiff's symptoms suggested an infection, *see* [*id.* at ¶¶ 167-68, 192-93], but that Nurse Cook failed to contact anyone at Denver Health about Plaintiff's condition.  [*Id.* at ¶ 194].

The court cannot conclude that these nurses' actions constitute an "extraordinary degree of neglect" so as to establish a subjective state of mind, as the allegations themselves demonstrate that these Defendants were providing treatment to Plaintiff, even if the treatment proved inadequate.  Insofar as Mr. Taylor asserts that Nurses Cook, Oakley, or Peisert could have done more to treat Plaintiff's infection, a medical provider is not deliberately indifferent when she exercises her medical judgment in deciding whether to consult a specialist or perform more testing, *Self*, 439 F.3d at 1232, and any failure to do so is, at most, negligent.  *Medina*, 2020 WL 7398772, at *7.   Finally, the allegations are insufficient to state a claim because they demonstrate that Nurses Cook, Oakley and Peisert were Plaintiff's treating providers, rather than gatekeepers, and as a result Plaintiff cannot succeed on a gatekeeper theory of liability against these Defendants.  *Oakley*, 2015 WL 5728734, at *8.

However, in addition, Plaintiff also alleges that Nurses Cook, Oakley, and Peisert made false statements in medical records or notes.  Specifically, Mr. Taylor alleges that, after an August 2018 appointment, Nurse Cook "falsely wrote that Mr. Taylor thought a Band-Aid was sufficient for his seeping wound and did not want a dressing change" when, in reality, "Mr. Taylor was gravely concerned about his wound."  [#38 at ¶ 163].  In addition, Nurse Oakley "falsely documented" in August 2018 that there was no drainage coming

from Mr. Taylor's arm and "falsely reported" that Mr. Taylor had refused wound care. [*Id.* at ¶¶ 159-60]. Similarly, Mr. Taylor alleges that Nurse Peisert "falsely reported in Mr. Taylor's medical records that . . . there were no signs of infection . . . present on Mr. Taylor's left forearm," despite signs of infection. [*Id.* at ¶ 86].

Mr. Taylor has cited to no authority demonstrating that these facts are sufficient to state a deliberate indifference claim. *See* [#56 at 11-12]. The court cannot conclude that the alleged inclusion of false statements in Plaintiff's medical file, alone, is sufficient to state a claim of unconstitutional deliberate indifference against Nurses Cook, Oakley, or Peisert absent any supporting factual allegations demonstrating that these nurses intentionally made misrepresentations in the medical file out of a deliberate indifference to Plaintiff's medical needs. *See Williams v. Bentivegna*, No. 14-CV-6105-CJS, 2015 WL 162994, at *7 (W.D.N.Y. Jan. 13, 2015) (allegation that doctors wrote false information in plaintiff's medical record "might amount to malpractice, but not a constitutional violation"); *cf. Johnson v. Lew Sterrett Crim. Just. Ctr.*, No. 3:02-CV-647M, 2003 WL 23473095, at *4 (N.D. Tex. Feb. 28, 2003) (allegation that medical director gave false statements about plaintiff's medical record did not allege a constitutional violation); *Moore v. Casselberry*, 584 F. Supp. 2d 580, 582 (W.D.N.Y. 2008) (in summary judgment context, finding that allegations that medical report was false "[did] not state a federal constitutional violation" where there was "no indication in the record that [the defendant] falsified her report out of deliberate indifference to plaintiff's serious medical needs, or out of any improper motive"). Accordingly, I respectfully **RECOMMEND** that Plaintiff's Claim One be **DISMISSED without prejudice** with respect to Nurses Cook, Oakley, and Peisert.

***Nurses Hoisington, Jarman, Mahloch, Morse, Schultz, and Palmer***.  Mr. Taylor alleges that each of these Defendants delivered medication to him from May 2018 through October 2018.[15]  On each of these occasions, Mr. Taylor complained that his wound was painful, hot, swelling, and producing discharge, and asked to see Denver Health or another outside medical professional.  [#38 at ¶¶ 82, 136, 147, 188, 207, 220].  However, none of these nurses contacted any outside help.  [*Id.* at ¶¶ 126, 137, 148, 189, 208, 221].  Plaintiff also alleges that he was seen for medical visits by some of these Defendants and that, at those appointments, he asked that he be permitted to be seen at Denver Health, but that Denver Health was not contacted.  *See, e.g.*, [*id.* at ¶¶ 74-76 (Nurse Schultz); ¶¶ 80-83 (Nurse Mahloch); ¶¶ 90-91 (Nurse Morse); ¶ 191 (Nurse Hoisington).  Plaintiff alleges that these Defendants "did nothing to adequately treat [his] infection."  [*Id.* at ¶¶ 224, 227-30, 233].

Insofar as Plaintiff implies that these Defendants' course of treatment was insufficient to treat his wound, again, a disagreement in the course of treatment does not give rise to a constitutional claim.  *Medina*, 2020 WL 7398772, at *6.  Nor does the negligent provision of medical care.  *Perkins*, 165 F.3d at 811.  And to the extent that Plaintiff alleges that he should have been taken to Denver Health, or Denver Health should have been contacted, the decision to not take these actions was in the medical

---

[15] Specifically, Plaintiff alleges that Nurse Hoisington delivered medications to Plaintiff in June, July, August, September, and October 2018, *see* [#38 at ¶¶ 134, 142, 180, 203, 216]; that Nurse Jarman delivered medication in August 2018, [*id.* at ¶ 181]; that Nurse Mahloch provided medication to Mr. Taylor in May, June, July, August, and September 2018, [*id.* at ¶¶ 119, 130, 140, 183, 206]; that Nurse Morse provided medication to Plaintiff in May, June, July, and September 2018, [*id.* at ¶¶ 116, 131, 141, 200]; that Nurse Schultz delivered medications to Mr. Taylor in May, June, August, and September 2018, [*id.* at ¶¶ 120, 143, 186, 204]; and that Nurse Palmer provided medications in May, June, July, and August 2018.  [*Id.* at ¶¶ 117, 135, 145, 182].

judgment of these Defendants.  *Ayuso*, 2021 WL 2535535, at *5.  Moreover, because the Amended Complaint demonstrates that each of these nurses was actively treating Plaintiff, and because Plaintiff does not allege that any of these nurses had a duty to contact Denver Health, Plaintiff cannot establish liability of these nurses under a gatekeeper theory.  *Oakley*, 2015 WL 5728734, at *8.  Accordingly, I respectfully **RECOMMEND** that Plaintiff's Claim one against Nurses Hoisington, Jarman, Mahloch, Morse, Schultz, and Palmer be **DISMISSED without prejudice**.

Because this court has determined that Plaintiff's Claim One against each individual Armor Defendant should be dismissed, the court respectfully **RECOMMENDS** that Claim One be **DISMISSED without prejudice** in its entirety.

### B.      The Larimer County Defendants – Claim Two

In Claim Two of his Amended Complaint, Mr. Taylor also asserts a § 1983 deliberate indifference claim, alleging violations of Mr. Taylor's Eighth and Fourteenth Amendment rights by Sheriff Smith and Captain Palmer in their individual capacities.  *See* [#38 at ¶ 474].  There is no allegation that either Sheriff Smith or Captain Palmer had contact with Mr. Taylor while he was at LCJ, or in particular, had any role in his medical treatment there.  [#38; #57 at 11-12].  Rather, Claim Two is premised on allegations of supervisory liability.

To establish supervisory liability against either Sheriff Smith or Captain Palmer in their respective individual capacities, Plaintiff must sufficiently plead facts that allows a factfinder to conclude that (1) the individual supervisor maintained a policy or custom that (2) led to the underlying constitutional violation and (3) that the individual supervisor acted with deliberate indifference.  *See Burke v. Regalado*, 935 F.3d 960, 999 (10th Cir. 2019).

Mr. Taylor alleges that both Sheriff Smith and Captain Palmer are tasked with overseeing and supervising the LCJ, including its provision of medical care.  [#38 at ¶¶ 441-43, 454-55].  Mr. Taylor alleges that these Defendants create and enforce the regulations, policies, practices, and customs at LCJ, [*id.* at ¶ 456], and that they have knowingly maintained a constitutionally deficient healthcare system at LCJ.  Specifically, Mr. Taylor alleges that Sheriff Smith and Captain Palmer failed to adequately train Armor employees, [*id.* at ¶ 463], and were "aware of the substantial risk of harm to the prisoners at the LCJ by [Larimer County's] contracting with Armor, which had exhibited deliberate indifference to the serious medical needs of hundreds of individuals across the country, including at the LCJ." [*Id.* at ¶ 476].  Mr. Taylor suggests that, despite these risks, neither of these Defendants took any actions to address the inadequacies of LCJ's medical system.  [*Id.* at ¶ 480].

The Larimer County Defendants seek to dismiss Plaintiff's Claim Two against Sheriff Smith and Captain Palmer because Mr. Taylor has failed to establish an underlying constitutional violation.  *See* [#46 at 7-8].  The Larimer County Defendants argue that, because Plaintiff's claim alleges not that either Sheriff Smith or Captain Palmer themselves provided constitutionally inadequate medical care—but that the individual Armor Defendants provided such unconstitutional care and Sheriff Smith and Captain Palmer are liable, as individuals, for such actions under a supervisor liability theory, *see* [#38 at ¶¶ 476-77, 479, 482]; [#57 at 9-10]—absent an underlying constitutional violation by the individual Armor Defendants, Mr. Taylor cannot state a deliberate indifference claim against either Sheriff Smith or Captain Palmer based on supervisory liability.  [#46 at 7-8, 10].

As Mr. Taylor implicitly concedes, a claim of supervisory liability requires the existence of an underlying constitutional violation. *See* [#57 at 9-10 (asserting elements of a supervisory liability claim)]; *see also Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010) ("A plaintiff may . . . succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) *caused the complained of constitutional harm*, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.") (emphasis added).   However, the court has already determined that Mr. Taylor has failed to allege that any of the individual Armor Defendants provided constitutionally inadequate medical care.   *See supra* Section I.A.   The court need not rehash its previous analysis concerning the existence of an underlying constitutional violation in light of the Parties' arguments as to Claim Two.   *See* [#46 at 10-14 (Larimer County Defendants arguing Plaintiff has failed to state a deliberate indifference claim because he alleged only a disagreement in treatment); #57 at 2-5 (Mr. Taylor arguing that he sufficiently alleged an underlying constitutional violation)].[16] Because Plaintiff has failed to state an underlying constitutional claim, I respectfully **RECOMMEND** that Mr. Taylor's Claim Two be **DISMISSED without prejudice** against Sheriff Smith and Captain Palmer in their individual capacities.   *Cf. Martinez v. Mafchir,* 35 F.3d 1486, 1491 (10th Cir. 1994) (citations omitted) (holding that no supervisory liability attaches without an underlying constitutional claim), *abrogated on other grounds by Kalbaugh v. Jones*, 807 F. App'x 826, 832 (10th Cir. 2020) (unpublished), *cert. denied*,

---

[16] Mr. Taylor does not allege in his Amended Complaint that either Sheriff Smith or Captain Palmer were gatekeepers who prevented him from receiving access to necessary outside medical care.   *See* [#38 at ¶¶ 473-85].

141 S. Ct. 2464 (2021); *Gray v. Univ. of Colo. Hosp. Auth.,* 672 F.3d 909, 918 n.7 (10th Cir. 2012) (recognizing that without an underlying constitutional violation, a § 1983 claim for failure to supervise "necessarily fails").  Nevertheless, because the court proceeds by Recommendation, it will briefly discuss whether, had Plaintiff sufficiently stated a constitutional claim against any individual Armor Defendant, if Plaintiff has also stated a supervisory liability claim against Sheriff Smith or Captain Palmer.  The court concludes that he has not.

Because it is dispositive, the court considers whether Mr. Taylor has sufficiently alleged the third element of a supervisory liability claim—that either Captain Palmer or Sheriff Smith "acted with the state of mind required to establish the alleged constitutional deprivation," i.e., that they acted "knowingly or with 'deliberate indifference' that a constitutional violation would occur."  *Dodds*, 614 F.3d at 1196, 1199.  In his Response, Mr. Taylor asserts that he has sufficiently stated this element because an audit by the National Commission on Correctional Healthcare ("NCCHC") revealed in 2019 that LCJ failed to provide adequate health care to its inmates.  *See* [#57 at 10-11 (Mr. Taylor arguing that "[t]he NCCHC audit here demonstrates Defendants' liability . . . because the NCCHC found that the LCJ had failed to comply with an "Essential Standard" regarding Infirmary-Level Care, which Mr. Taylor required for his wound and worsening infection.")]; [#38 at ¶¶ 415-18].  Mr. Taylor argues that this case is similar to *Burke v. Regalado*, 935 F.3d 960 (10th Cir. 2019), in which the United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") found that evidence presented at trial supported a jury's verdict that the sheriff defendant maintained a policy or custom of insufficient medical resources and training and that "he did so knowing of an urgent need for reform" where, prior to the

plaintiff's incarceration at the jail, the sheriff had been provided a NCCHC report demonstrating the striking inadequacies in the jail's medical care.  935 F.3d at 999.  But here, in contrast, the NCCHC audit was provided to Captain Palmer in 2019—*after* the events in this case allegedly occurred.  *See* [#38 at ¶¶ 415].  Accordingly, Mr. Taylor cannot rely on the existence of the audit in demonstrating that either Defendant acted with a culpable state of mind.

Moreover, Mr. Taylor's assertion that "Defendants Smith and Palmer were also aware of other issues with the medical system [at LCJ], including problems resulting in significant injury and death," and that this renders them deliberately indifferent to alleged constitutional violations of Armor, *see* [#57 at 11], is supported only by conclusory allegations in the Amended Complaint without any supporting factual averments.  *See, e.g.*, [#38 at ¶ 444 ("Defendant Smith is aware of the serious injuries that people incarcerated at the LCJ have suffered . . ., including while Armor has been providing medical services."); *id.* at ¶ 457 ("Defendant Timothy Palmer is aware of at least some of the serious injuries that individuals at the LCJ have suffered since Armor began providing medical care there.")].  Even taking these assertions as true, allegations that Captain Palmer and Sheriff Smith were aware of "serious injuries" suffered by inmates "while" or "since" Armor began providing medical care to LCJ inmates does not establish that either Defendant knew of or were deliberately indifferent to actual constitutional violations committed by Armor employees.  These allegations are thus insufficient to state a plausible supervisory liability claim.  S*ee Smith v. Allbaugh*, 987 F.3d 905, 912 (10th Cir. 2021) (finding that allegations that Defendants "were aware that the policies and procedures they created, promulgated, implemented, and/or enforce[d] . . . resulting in

grossly deficient medical care to inmates" was too conclusory to support deliberate indifference claim).  As a result, the court finds that Mr. Taylor has failed to state a claim of supervisory liability against either Sheriff Smith or Captain Palmer in their individual capacities, which provides an additional basis for dismissal of Claim Two without prejudice.

## II.   *Monell* Claims

In addition to raising claims against individual Defendants, Plaintiff also asserts claims against Armor, Sheriff Smith in his official capacity, and the BOCC pursuant to *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978) (the "*Monell*" claims).  [#38 at 85-88].  Under *Monell*, when a governmental policy or custom inflicts an injury, the governmental entity may be liable under § 1983.  436 U.S at 694.  In addition, the Tenth Circuit has held that, in addition to governmental entities, *Monell* liability may extend to private entities acting under color of state law – i.e., Armor.[17]  But "[a] *Monell* claim is not a separate, stand-alone claim."  *McClain v. Denver Health and Hospital Auth.*, No. 17-cv-02238-PAB-NRN, 2018 WL 4698595, at *6 (D. Colo. Sept. 30, 2018) (quoting *Romero v. Bd. of Cty. Comm'rs for the Cty. of Curry*, 202 F. Supp. 3d 1223, 1267 (D.N.M. 2016)).  "Rather, it *extends* liability to a municipal organization [or private entity acting under color of state law] where that organization's failure to train, or the policies or customs it has sanctioned, led to an independent constitutional violation."  *Id.* (quotation omitted) (emphasis in original).  To state a claim under *Monell*, a plaintiff must allege facts demonstrating (1) an official policy or custom, (2) that the policy or custom caused a

---

[17] Accordingly, statements of law in this section related to municipalities apply equally to Armor.

constitutional injury, and (3) deliberate indifference to "an almost inevitable constitutional injury." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013).

*Individual Liability*.   Both the Armor Defendants and the Larimer County Defendants argue that, because Mr. Taylor has failed to state an underlying constitutional violation against any of the individual Defendants, his *Monell* claims must necessarily fail. *See* [#46 at 7; #47 at 17].  However, as Mr. Taylor asserts in his Responses, *see* [#56 at 20-21; #57 at 4], the Tenth Circuit has held that a finding of individual liability is not necessarily a prerequisite to successfully stating a *Monell* claim.  *See Garcia*, 768 F.2d at 310 ("*Monell* does not require that a jury find an individual defendant liable before it can find a local governmental body liable."); *Quintana v. Santa Fe Cty. Bd. of Comm'rs*, 973 F.3d 1022, 1033-34 (10th Cir. 2020) ("[W]e concluded in *Garcia* that even where 'the acts or omissions of no one employee may violate an individual's constitutional rights, the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights.'") (quoting *Garcia*, 768 F.3d at 310)).  Neither group of Defendants responds to this argument in their respective Replies. *See* [#63; #66].

Tenth Circuit caselaw on this issue has been somewhat unclear.  In *Crowson v. Washington County Utah*, 983 F.3d 1166 (10th Cir. 2020), the Tenth Circuit discussed a "tension in [Tenth Circuit] caselaw with respect to [the] conclusion in *Garcia*."  983 F.3d at 1186.  Specifically, the court noted that, despite the holding in *Garcia*, the Tenth Circuit has made "multiple" statements "suggest[ing] a claim against a municipality may never lie where none of the municipality's individual officers are liable under § 1983."  *Id.*; *see,*

*e.g.*, *Jennings v. City of Stillwater*, 383 F.3d 1199 (10th Cir. 2004); *Livsey v. Salt Lake Cty.*, 275 F.3d 952 (10th Cir. 2001); *Trigalet v. City of Tulsa*, 239 F.3d 1150 (10th Cir. 2001). However, in *Crowson*, the Tenth Circuit determined that "most of" this precedent can be harmonized with *Garcia*, indicating that, where a claim is based upon an alleged failure to train, individual liability (of the person who was allegedly not trained properly) is a requisite for *Monell* liability, but where the claim alleges an unconstitutional policy or practice, individual liability is not required. *See Crowson,* 983 F.3d at 1187. Nevertheless, the Tenth Circuit indicated that, "[i]n most cases, . . . the question of whether a municipality is liable [is] dependent on whether a specific [individual] violated [the plaintiff's] constitutional rights," labeling *Garcia* a "limited exception" to this standard inquiry. *Id.* at 1191.

Ultimately, the Tenth Circuit in *Crowson* remanded the case to the district court, finding that, although an official-policy-or-practice claim could survive without individual liability, it lacked jurisdiction to consider whether the plaintiff had sufficiently alleged all requisite elements of a *Monell* claim. *See id.* at 1192 n.11. Thus, even if individual liability is, according to the Tenth Circuit, not required to demonstrate *Monell* liability arising out of an unconstitutional policy, a claimant must still plead all of the requisite elements of a *Monell* claim to survive a motion to dismiss. Indeed, the United States Supreme Court has instructed that "proper analysis requires [a court] to separate two different issues when a § 1983 claim is asserted against a municipality: (1) whether plaintiff's harm was caused by a constitutional violation, and (2), if so, whether the city is responsible for that violation." *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992). "With respect to the first question, a claim under § 1983 against either an individual actor or a municipality

cannot survive a determination that there has been no constitutional violation." *Crowson*, 983 F.3d at 1186. "[T]here must be a constitutional violation, not just an unconstitutional policy, for a municipality to be held liable." *Id.* at 1191. Thus, Mr. Taylor must thus sufficiently allege that he suffered a constitutional injury, which was caused by an official policy, to state a *Monell* claim against Armor or the Larimer County Defendants. *Schneider*, 717 F.3d at 769.

   ***The Existence of a Constitutional Violation***.  Although a plaintiff may, in limited circumstances, state a *Monell* claim absent individual liability, the court finds that Mr. Taylor has not done so here. Indeed, in his Response, although Mr. Taylor asserts that, "[r]egardless of whether this Court agrees that Mr. Taylor has [pled] a constitutional violation against one individual defendant, his Amended Complaint is sufficient to meet the *Monell* test because the isolated instances of each individual Defendants' denial of medical care also constitute deliberate indifference when considered together," *see* [#56 at 21], Mr. Taylor does not offer any argument explaining *why* the sum of the individual Armor Defendants' actions constitutes a constitutional injury. *See generally* [*id.*]; *see also* [#57]. Instead, he simply argues that Armor and Larimer County had an official policy or custom of delaying or denying medical care for financial gain, *see* [#56 at 21-24]; [#57 at 5-8], or, in the alternative, that Armor and/or Larimer County failed to adequately train Armor staff. *See* [#56 at 24-25]; [#57 at 8-9]. But the existence of an alleged unconstitutional policy, alone, is insufficient to state a *Monell* claim. *Schneider*, 717 F.3d at 769; *Crowson*, 983 F.3d at 1191.

   The standard analysis for an individual deliberate indifference claim is instructive for purposes of determining whether the sum of the individual Armor Defendants' actions

could create a constitutional violation.  Here, Plaintiff's *Monell* claims are based solely on allegations asserting that Defendants' policies or practices prevented him from receiving his preferred course of treatment.  *See, e.g.*, [#38 at ¶¶ 493, 507 (alleging that Larimer County's and Armor's "policies, practices, and customs" were the "moving forces behind Mr. Taylor's inability to obtain adequate treatment")].  But as set forth repeatedly above, negligent medical care does not give rise to a constitutional violation, *Sealock*, 218 F.3d at 1211, nor does the failure to provide an inmate with the inmate's preferred course of treatment, *Medina*, WL 7398772, at *6, and the court has concluded that the individual Defendants, at most, were negligent in their treatment of Plaintiff.  *See supra* Section 1. So, even assuming, without deciding, that Armor or Larimer County has in place an unconstitutional policy, and even assuming, without deciding, that the individual Defendants acted in accordance with those policies, the individual Defendants' negligent actions, however numerous, are still insufficient to give rise to an actual constitutional violation.

The court cannot find that Plaintiff's attempt to state a *Monell* claim based on an alleged collective constitutional injury negates the longstanding principle that inmates do not possess a constitutional right to a particular course of treatment, *Medina*, 2020 WL 7398772, at *6, and Mr. Taylor has provided no argument or authority indicating otherwise.  *See* [#56; #57].  The court declines to sidestep this well-settled constitutional principle and find that, because Mr. Taylor has alleged a high number of incidents that, by themselves, do not give rise to a constitutional violation, the collective sum necessarily gives rise to a constitutional injury.  *See Callahan v. Poppell*, 471 F.3d 1155, 1160 (10th Cir. 2006) (rejecting a contention that an inmate had a right to a particular course of

treatment as an "expansive view of the rights protected by the Eighth Amendment"); *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996) ("Medical decisions that may be characterized as 'classic examples of matters for medical judgment,' such as whether one course of treatment is preferable to another, are beyond the [Eighth] Amendment's purview.").

In sum, the court finds that Plaintiff's allegations are insufficient to demonstrate that he suffered a constitutional injury resulting from an official Larimer County or Armor policy. This is fatal to Plaintiff's Claims Three and Four. *See Griffith v. Franklin Cty.*, 975 F.3d 554, 581-82 (6th Cir. 2020) (discussing *Garcia* and its theory of *Monell* liability absent individual liability and stating that, "even under that theory, the plaintiff still must establish that he suffered a constitutional violation" and because the plaintiff had failed to do so, the court "need not decide whether such a theory of municipal liability may be viable"). I therefore respectfully **RECOMMEND** that Plaintiff's Claim Three against Sheriff Smith and BOCC and his Claim Four against Armor be **DISMISSED without prejudice**. However, because this court proceeds by recommendation, the court will briefly discuss whether Plaintiff can otherwise state a *Monell* claim against these Defendants. In his Amended Complaint, Mr. Taylor appears to frame his *Monell* claims against the Larimer County Defendants and Armor both as a failure-to-train claim[18] or as an official-policy-or-practice claim. *See* [#38 at ¶¶ 493, 497, 507-08].

**Failure to Train or Supervise**. "To state a *Monell* claim based on the failure to train or supervise, 'a plaintiff must sufficiently allege that the failure 'amounts to a

---

[18] Mr. Taylor asserts a failure-to-supervise theory against the Larimer County Defendants, but not Armor. [#38 at ¶ 500]. The court discusses this theory alongside the failure-to-train theory.

deliberate indifference to the rights of persons with whom the [entity] come[s] into contact.'"  *Erickson v. City of Lakewood*, 489 F. Supp. 3d 1192, 1207 (D. Colo. 2020).  To succeed on a claim under this theory, the plaintiff must demonstrate that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need."  *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996) (quotation omitted).  A *Monell* claim is "at its most tenuous where a claim turns on a failure to train."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

With respect to Armor, Mr. Taylor alleges that it "failed to adequately train its medical staff to recognize obvious signs of infection warranting immediate and emergency treatment."  [#38 at ¶ 429].  According to Mr. Taylor, "[t]he fact that no Armor medical staff provided Mr. Taylor the proper care to treat his infection," and the fact that "Armor medical staff attempted to address Mr. Taylor's infection by merely providing him Band-Aids, changing his dressing, and providing him basic oral biotics, . . . evidence[s] that the medical staff were incompetent and not properly trained."  [*Id.* at ¶¶ 431-32].  In addition, Mr. Taylor contends that "Larimer County also failed to adequately train Armor's medical staff regarding how to properly care for individuals in need of immediate and emergency care" and that Larimer County's failure to train "caused Mr. Taylor's injuries and suffering."  [*Id.* at ¶¶ 437, 440].

The court finds these allegations insufficient to state a *Monell* claim based on a failure-to-train theory because they contain no supporting factual averments demonstrating the plausibility of Plaintiff's claim.  Indeed, the Amended Complaint contains no allegations explaining the training, or lack of training, provided or explaining

why such training was insufficient.  *See Erickson*, 489 F. Supp. 3d at 1209 (finding that

the plaintiff had failed to state a municipal liability claim where he failed to "set forth any

facts concerning how the individual defendants were trained, who they were trained by,

or why their training was deficient"); *Bark v. Chacon*, No. 10-cv-01570-WYD-MJW, 2011

WL 1884691, at *3 (D. Colo. May 18, 2011) (dismissing *Monell* claim where the plaintiff

had "generally allege[d]" a lack of training but had not "allege[d] specific deficiencies in

training and supervision, or explain how [the injury] could have been avoided with different

or better training and supervision"); *Rehberg*, 2012 WL 1326575, at *5 (dismissing *Monell*

claim where the plaintiff had "identifie[d] neither a decision nor a municipal policymaker

to whom [the] alleged failure to train . . . [could] be attributed").  While a claimant need not

prove his or her claim at the motion-to-dismiss stage, *see Janes v. LeaderOne Fin. Corp.*,

No. 11-2458-EFM, 2011 WL 6000838, at *1 (D. Kan. Nov. 30, 2011), it "must give just

enough factual detail to provide fair notice of what the . . . claim is and the grounds upon

which it rests."  *Warnick v. Cooley*, 895 F.3d 746, 751 (10th Cir. 2018) (quotation omitted).

"Mere conclusory allegations that [employees] are unsatisfactorily trained will not 'suffice

to fasten liability on'" Armor or the Larimer County Defendants.  *Bark*, 2011 WL 1884691,

at *3 (quoting *City of Canton v. Harris*, 489 U.S. 378, 390-91 (1989)).  Accordingly, I find

that Plaintiff has failed to assert adequate allegations supporting a failure-to-train *Monell*

claim.

   ***Official Policy or Practice***.   An official policy, practice, or custom may take one

of the following forms:

> (1) a formal regulation or policy statement; (2) an informal custom
> amounting to a widespread practice that, although not authorized by written
> law or express municipal policy, is so permanent and well settled as to
> constitute a custom or usage with the force of law; (3) the decisions of

> employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (quotation and alteration marks omitted).  Mr. Taylor asserts that both Larimer County and Armor held official policies or informal practices or customs related to delaying or denying medical care to cut healthcare costs.  The court addresses these allegations in turn.

In the Amended Complaint, Mr. Taylor asserts that Larimer County has a policy of "maintaining an inadequate medical-care system to save costs," as "the contract between Larimer County and Armor financially incentivizes delaying or denying medical care to minimize costs and maximize profit."  [#38 at ¶¶ 368, 489].   Mr. Taylor asserts that Larimer County "has an official policy of ratifying[19] the delay and denial of care for financial purposes, as set forth in its contact" with Armor, and that Larimer County "contracted with Armor because of its widespread practice of cutting costs."  [#57 at 6 (footnote added)].  And with respect to the Armor Defendants, the Amended Complaint contains numerous paragraphs concerning the costs associated with prison healthcare generally, *see* [#38 at ¶¶ 258-68], dozens of paragraphs setting forth alleged nationwide instances of

---

[19] As an initial matter, the court notes that the Amended Complaint contains no allegations that the Larimer County Defendants ratified any conduct so as to demonstrate a policy or practice based on ratification by official policymakers.  *See* [#38].  Thus, insofar as Plaintiff attempts to assert a *Monell* claim based on a ratification theory by stating that Larimer County Defendants have "an official policy of ratifying the delay and denial of care," this argument is insufficient to demonstrate that Plaintiff has sufficiently alleged an official policy or practice.  *See Cty. of Santa Fe, N.M. v. Pub. Serv. Co. of N.M.*, 311 F.3d 1031, 1035 (10th Cir. 2002) ("In deciding a Rule 12(b)(6) motion, a federal court may only consider facts alleged within the complaint.").

constitutionally inadequate or negligent medical care by Armor, such as failing to recognize a clear medical need, *see* [*id.* at ¶¶ 273-335], allegations asserting that Armor and/or Larimer County have reduced the amount of money or number of resources spent on prison healthcare, such that their contract "financially incentivizes delaying or denying medical care to minimize costs and maximize profit," *see* [*id.* at ¶¶ 336-401]. According to Mr. Taylor, Armor has "an official policy of delaying and denying care for financial purposes" and has a "longstanding history of delaying and denying care for financial purposes." [#56 at 21-22].

However, simply stating that the Larimer County Defendants or Armor have a financial incentive to keep costs low, and then reaching the conclusion that the alleged delay or denial of medical care to Mr. Taylor was the result of an official policy or practice to keep costs low, lacks sufficient factual allegations to create the necessary link between the alleged financial incentive and the treatment Mr. Taylor received. *Sherman v. Klenke*, 653 F. App'x 580, 592 (10th Cir. 2016) (unpublished) ("The naked assertion that Defendants considered cost in treating [an inmate's] hernia does not suffice to state a claim for deliberate indifference."). Indeed, the Amended Complaint contains exhaustive allegations concerning costs of prison medical care generally, and assumes that Larimer County and/or Armor make healthcare decisions with financial considerations in mind, but does not contain supporting factual allegations demonstrating the plausibility of that assumption. *Cummings v. Dean*, 913 F.3d 1227, 1238 (10th Cir. 2019) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). *Compare* [#38 at ¶ 371 (alleging that Armor and Larimer County have a policy of understaffing the

LCJ and hiring medical staff who are not competent, but providing no specific factual allegations in support)] *with McDonald v. Wexford Health Sources*, No. 09 C 4196, 2010 WL 3034529, at *3 (N.D. Ill. July 30, 2010) (plaintiff sufficiently stated a *Monell* claim where he alleged that, due to cost-cutting measures, there was "a decreased number of medical technicians in the [jail] cell houses . . . which resulted in [the plaintiff] having to wait weeks, and sometimes months to receive medical care; and leaving [the plaintiff] without access to a medication to lower his cholesterol"); *see also Steele v. Wexford Health Sources, Inc.*, No. 17 C 6630, 2018 WL 2388429, at *8 (N.D. Ill. May 25, 2018) (finding that the plaintiff sufficiently alleged a policy or practice of sacrificing medical care for cost savings where the plaintiff's allegations "directly connect[ed] the dots between [the alleged] policy or practice and [the plaintiff's] injury: he allege[d] significant delays in his referral to an outside specialist as a direct result of [the healthcare entity's] cost-cutting practice related to internal staffing and outside referrals" and where "the link between the alleged cost-cutting policy or practice and [the plaintiff's] injury [was] plausible" because the treatments the plaintiff needed were "expensive").

Indeed, to the extent that Mr. Taylor bases his *Monell* claim on his allegation that Armor and/or Larimer County put profits and cost savings before the health and safety of the people in their care, [#38 at ¶¶ 4-5], this court finds Mr. Taylor's general allegations regarding the cost of jail healthcare, other failures by Armor to provide adequate health care to detained and/or incarcerated people at other locations, and the implied financial incentives of minimizing health care costs on the part of both Armor and Larimer County, are insufficient to establish *Monell* liability in this instant action. [*Id.* at ¶¶ 258-401]. Unlike *Swan v. Physician Health Partners*, where Judge Martínez found a cognizable *Monell*

claim in the absence of an underlying constitutional claim based on allegations of an "arbitrary non-medical denial" specifically tied to the individual defendant's treatment of the plaintiff in that case, there are no allegations that the individual Defendants believed that a different course of medical treatment was appropriate, but nonetheless denied it due to costs. *Cf. Swan*, 212 F. Supp. 3d at 1008 (distinguishing between an insufficiently pled claim that defendant's policy "was to be profitable and to provide medical services as cheaply as possible" versus a sufficiently pled claim that defendant's policy was "to deny all (or nearly all) initial requests for MRIs, and then deny subsequent requests until other steps were taken.").

Moreover, the Amended Complaint contains no allegations indicating that any alleged policy or practice was the driving force behind the individual Defendants' actions. *See Aguilar v. Colo. State Penitentiary*, 656 F. App'x 400, 403 (10th Cir. 2016) (unpublished) ("[T]o hold the entity liable, the plaintiff must identify an official policy or a custom that is the 'direct cause' or 'moving force' behind the constitutional violations."); *see also Est. of Grubbs v. Weld Cty. Sheriff's Off.*, No. 16-cv-00714-PAB-STV, 2017 WL 951149, at *4 (D. Colo. Mar. 8, 2017) (finding that the plaintiffs had failed to allege the existence of an official policy or custom where "[n]owhere in the amended complaint do plaintiffs argue that the budget was the moving force behind defendants' decision not to send Mr. Grubbs to the hospital."). Similarly here, Mr. Taylor does not link the individual Defendants' actions with the alleged directive by Larimer County and/or Armor to keep costs low. *See, e.g.*, [#38 at ¶¶ 223-35].

The court finds that Mr. Taylor has not sufficiently alleged the existence of an official policy or practice on the part of the Larimer County Defendants or Armor so as to

state a *Monell* claim.  *See Wallace v. Hounshel*, No. 1:06-CV-1560-WTL-TAB, 2009 WL 734714, at *8 (S.D. Ind. Mar. 19, 2009) ("[T]here is nothing inherently suspect—and certainly nothing inherently unconstitutional—about a governmental entity wishing to save money.  The relevant question is whether the county adopted cost-saving measures that were deliberately indifferent to its inmates' constitutional right to adequate medical care and whether those measures deprived [the plaintiff] of that right."); *Reynolds v. Wagner*, 128 F.3d 166, 175 (3d Cir. 1997) ("The deliberate indifference standard . . . does not guarantee prisoners the right to be entirely free from the cost considerations that figure in the medical-care decisions made by most non-prisoners in our society.").  The court finds that Mr. Taylor has not sufficiently alleged the existence of a policy or practice on the part of Larimer County or Armor, which provides an alternative basis for recommending dismissal of Plaintiff's Claims Three and Four.

## III.    State Law Claim

Finally, Plaintiff raises a claim against Sheriff Smith and Captain Palmer in their individual capacities pursuant to Colo. Rev. Stat. § 13-21-131 and Article 2, Sections 20 and 25 of the Colorado Constitution (the rights to be free from cruel and unusual punishment and the right to due process).  [#38 at 90].  Section 13-21-131 provides that a peace officer who "subjects or causes to be subjected, including failing to intervene, any other person to the deprivation of any individual rights" may be held liable to the injured party "for legal or equitable relief or any other appropriate relief."  Colo. Rev. Stat. § 13-21-131(1).  This statute contains a two-year statute of limitations.  Colo. Rev. Stat. § 13-21-131(5).

The Larimer County Defendants argue that Plaintiff's claim should be dismissed because application of this statute to Plaintiff's claims is unconstitutionally retrospective. [#46 at 21-22].  More specifically, the Larimer County Defendants assert that, prior to the passage of this statute, a one-year statute of limitations applied to all causes of action arising out of law enforcement officials' carrying out of their official duties.  [*Id.* at 22].  According to these Defendants, permitting Plaintiff to proceed under this statute would be unconstitutionally retrospective because it would permit Plaintiff to resurrect a previously time-barred claim.  [*Id.* at 23-24].  Plaintiff responds that applying § 13-21-131 to Sheriff Smith and Captain Palmer would not be unconstitutional.  [#57 at 14].

The question of the constitutionality of retroactive application of § 13-21-131 is a matter of first impression, as no Colorado court has addressed whether permitting a claimant to proceed under this statute and its two-year statute of limitations, when the claimant's claim otherwise would have been barred under the general one-year statute of limitations, would be unconstitutionally retrospective.  The court finds that, because federal courts are courts of limited jurisdiction, it is appropriate to reserve this issue for Colorado state courts.

Indeed, absent Plaintiff's federal claims, there is no discernible basis for this court to still exercise supplemental jurisdiction over Plaintiff's state law claim.  Plaintiff's Claim Five does not raise any issues implicating federal law and, "if federal claims are dismissed before trial, leaving only issues of state law, the 'federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.'"  *Burkhart v. Florez*, No. 20-cv-00732-RM-NYW, 2021 WL 326941, at *19 (D. Colo. Jan. 30, 2021), *report and recommendation adopted*, 2021 WL 951280 (D. Colo. Mar. 12, 2021).  Courts "generally

decline to exercise pendent jurisdiction in such instances because notions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary." *Id.* (quotation omitted); *see also Iwasko v. Santa Fe Cmty. Coll.*, No. CIV 10-1000 RB/KBM, 2011 WL 13284601, at *10 (D.N.M. Sept. 2, 2011) (declining to exercise pendent jurisdiction over the plaintiff's state law claims after dismissing all claims over which it had original jurisdiction).   As a result, I respectfully **RECOMMEND** that the presiding judge decline to exercise supplemental jurisdiction over Plaintiff's state-law claim, should no federal claims remain, and that Claim Five be **DISMISSED without prejudice**.

### CONCLUSION

For the reasons stated herein, this court respectfully **RECOMMENDS** that:

(1)     The Larimer County Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) [#46] be **GRANTED**;

(2)     The Armor Defendants' Motion to Dismiss Plaintiff's Amended Complaint Pursuant to F.R.C.P. 12(b)(6) [#47] be **GRANTED**; and

(3)     Plaintiff's Claims One, Two, Three, Four, and Five be **DISMISSED without prejudice**.[20]

---

[20] Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Property Known As 2121 East 30th Street, Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings

In addition, it is **ORDERED** that:

(1)      A copy of this Recommendation shall be sent to:

Clifford Taylor
8830 Lipan Street
Thornton, CO 80260[21]

DATED: July 21, 2021                          BY THE COURT:

Nina Y. Wang
United States Magistrate Judge

---

and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (District Court's decision to review a Magistrate Judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *International Surplus Lines Insurance Co. v. Wyo. Coal Refining Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the Magistrate Judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the Magistrate Judge's ruling). *But see Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

[21] Legal mail previously sent to Plaintiff at this address was returned undeliverable. *See* [#106]. However, this address was provided to the court by Plaintiff, *see* [#90], and the court's re-sending of the legal mail has not yet been returned as undeliverable. *See* [#107; #108]. Because this is Plaintiff's only known address, sending this Recommendation to Plaintiff at this address is appropriate.